**IN THE UNITED STATES DISTRICT COURT**
**FOR THE NORTHERN DISTRICT OF TEXAS**
**DALLAS DIVISION**

| | | |
|---|---|---|
| **MONTEREY RESOURCES, LLC,** | § | |
| | § | |
| *Plaintiff*, | § | |
| **vs.** | § | |
| | § | **Civil Action No. _____** |
| **405 ARAPAHOE, LLC AND ARENA** | § | |
| **INVESTORS, LP,** | § | |
| | § | |
| *Defendants*. | § | |

**NOTICE OF REMOVAL**
**EXHIBIT A**

| DOC. NO. | NAME OF DOCUMENT | DATE |
|---|---|---|
| 1 | Docket Sheet | |
| 2 | Plaintiff's Original Petition and Request for Disclosure | 04-16-2019 |
| 3 | Letter from Court to Arena Investors re: dismissal | 04-22-2019 |
| 4 | Letter from Court to 405 Arapahoe LLC re: dismissal | 04-22-2019 |
| 5 | Letter from Court to Julie A. Pettit re: dismissal | 04-22-2019 |
| 6 | Citation to 405 Arapahoe LLC | 04-22-2019 |
| 7 | Citation to Arena Investors | 04-22-2019 |
| 8 | Affidavit of Service to Arena Investors LP | 04-29-2019 |
| 9 | Affidavit of Service to 405 Arapahoe LLC | 04-29-2019 |



EXHIBIT
**A**

## Case Information

DC-19-05466 | Monterey Resources, LLC vs. 405 Arapahoe, LLCet al

| Case Number | Court | Judicial Officer |
|---|---|---|
| DC-19-05466 | 101st District Court | WILLIAMS, STACI |
| File Date | Case Type | Case Status |
| 04/16/2019 | OTHER CONTRACT | OPEN |

## Party

PLAINTIFF
Monterey Resources, LLC

Inactive Attorneys ▼
Lead Attorney
PETTIT, JULIE A
Retained

Work Phone
214-329-0151

Fax Phone
214-329-4076

Attorney
HURST, MICHAEL
K
Retained

Work Phone
214-981-3800

Fax Phone
214-981-3839

Attorney
URTEAGO, DAVID
B
Retained

Work Phone
214-329-0151

Fax Phone
214-329-4076

DEFENDANT
405 Arapahoe, LLC

Address
By Serving Its Registered Agent, Vcorp Services,
LLC
1013 Centre Road Suite 403-B
Wilmington DE 19805

DEFENDANT
Arena Investors, LP

Address
By Serving Its Registered Agent, Vcorp Services,
LLC
1013 Centre Road Suite 403-B
Wilmington DE 19805

## Events and Hearings

04/16/2019 NEW CASE FILED (OCA) - CIVIL

04/16/2019 ORIGINAL PETITION ▾

ORIGINAL PETITION

04/17/2019 ISSUE CITATION ▾

ISSUE CITATION

ISSUE CITATION

04/22/2019 CITATION▾

Anticipated Server
ESERVE

Anticipated Method
Actual Server
OUT OF STATE

Returned
04/29/2019

04/22/2019 CITATION ▾

Anticipated Server
ESERVE

Anticipated Method
Actual Server
PRIVATE PROCESS SERVER

Returned
04/29/2019

04/29/2019 RETURN OF SERVICE ▾

Affidavit of Service - Citation - 405 Arapahoe LLC

    Comment
    Affidavit of Service - Citation - 405 Arapahoe LLC

04/29/2019 RETURN OF SERVICE ▾

EXECUTED CITATION - Arena Investors, LP

    Comment
    EXECUTED CITATION - Arena Investors, LP

06/14/2019 DISMISSAL FOR WANT OF PROSECUTION ▾

101st Dismissal Letter - 2017

101st Dismissal Letter - 2017

101st Dismissal Letter - 2017

Judicial Officer
WILLIAMS, STACI

Hearing Time
9:00 AM

# Financial

Monterey Resources, LLC
    Total Financial Assessment               $308.00
    Total Payments and Credits           $308.00

Assessment

| 4/17/2019 | CREDIT CARD - TEXFILE (DC) | Receipt # 25552-2019-DCLK | Monterey Resources, LLC | ($308.00) |

## Documents

ORIGINAL PETITION

101st Dismissal Letter - 2017

101st Dismissal Letter - 2017

101st Dismissal Letter - 2017

ISSUE CITATION

ISSUE CITATION

Affidavit of Service - Citation - 405 Arapahoe LLC

EXECUTED CITATION - Arena Investors, LP

2 CIT ESERVE

FILED
DALLAS COUNTY
4/16/2019 6:51 PM
FELICIA PITRE
DISTRICT CLERK

Case 3:19-cv-01144-K   Document 1-1   Filed 05/13/19   Page 6 of 132   PageID 13

Belinda Hernandez

CAUSE NO. DC-19-05466

| | | |
|---|---|---|
| **MONTEREY RESOURCES, LLC,** | § | **IN THE DISTRICT COURT** |
| | § | |
| *Plaintiff*, | § | |
| | § | |
| | § | |
| | § | |
| **V.** | § | **_____ JUDICIAL DISTRICT** |
| | § | |
| **405 ARAPAHOE, LLC AND ARENA** | § | |
| **INVESTORS, LP,** | § | |
| | § | |
| *Defendants*. | § | **OF DALLAS COUNTY, TEXAS** |

### PLAINTIFF'S ORIGINAL PETITION
### AND REQUEST FOR DISCLOSURE

TO THE HONORABLE JUDGE OF SAID COURT:

NOW COMES Monterey Resources, LLC, Plaintiff herein, and files this *Plaintiff's Original Petition and Request for Disclosure* against 405 Arapahoe, LLC and Arena Investors, LP, Defendants herein, and in support thereof, would respectfully show the Court the following:

### I.        Discovery Control Plan

1.        Pursuant to Rule 190.4 of the Texas Rules of Civil Procedure, Plaintiff requests a **Level 2** discovery control plan.

### II.        Parties & Service

2.        Plaintiff Monterey Resources, LLC ("Monterey") is a limited liability company formed under the laws of the state of Texas with its principal place of business in Dallas County, Texas.

3.        Defendant 405 Arapahoe LLC ("Arapahoe") is a limited liability company formed under the laws of the state of Delaware. Defendant may be served by serving its registered agent Vcorp Services, LLC at 1013 Centre Road Suite 403-B, Wilmington, DE 19805.

4.      Defendant Arena Investors, LP ("Arena") is a limited partnership formed under the laws of the state of Delaware. Defendant may be served by serving its registered agent Vcorp Services, LLC at 1013 Centre Road Suite 403-B, Wilmington, DE 19805.

### III.      Jurisdiction & Venue

5.      The Court has jurisdiction over Defendants because they have done business in Texas, have continuing contacts with Texas, and are amenable to service by a Texas Court. Further, Defendant Arapahoe agreed in Section 8.09 of the Credit Agreement to submit itself to the jurisdiction of the state district courts located in Dallas, Texas.

6.      Venue in Dallas County is mandatory in this case under Section 15.020 of the Texas Civil Practice and Remedies Code because the claims asserted herein arise from a major transaction and the written agreement between the parties specify Dallas County as the county where suit needs to be filed.

### IV.      Rule 47(c) Disclosure

7.      Plaintiff seeks monetary relief over $1,000,000.

### V.      Request for Disclosure

8.      Pursuant to Texas Rule of Civil Procedure 194, Plaintiff requests Defendants to disclose, within fifty (50) days of service of this request, the information and material described in Rule 194.2 of the Texas Rules of Civil Procedure. Plaintiff specifically requests the responding parties to produce responsive documents at the undersigned law offices within fifty (50) days of service of this request.

### VI.      Facts

9.      Monterey is an oil and gas company which owns the mineral rights to certain real property located in Louisiana.

---

Plaintiff's Original Petition and Request for Disclosure                                    Page 2

10.     On or about November 20, 2017, Monterey executed a Credit Agreement (the "Credit Agreement") in favor of Fulcrum Energy Capital II Monterey LLC ("Fulcrum"). The Credit Agreement is secured by Monterey's property.

11.     Fulcrum assigned the Credit Agreement to Arapahoe.

12.     On or about May 15, 2018, the Credit Agreement was amended (the "Amended Credit Agreement"). A true and correct copy of the Amended Credit Agreement is attached hereto as **Exhibit A**.

13.     Section 5.12 of the Amended Credit Agreement requires Monterey to place its revenues into a lockbox account. If Monterey is not in default on its obligations under the Amended Credit Agreement, then section 5.14 of the agreement requires Arapahoe to release all funds placed in the lockbox account.

14.     Arapahoe alleged that Monterey defaulted on its obligations under the Amended Credit Agreement. Thereafter, Arapahoe allegedly took possession and control of the assets pending a foreclosure sale of Monterey's Louisiana properties pursuant to an order issued by the 2nd Judicial District Court of Claiborne Parish, Louisiana on March 8, 2019 (the "Order"). The Order was issued pursuant to what is know as an "executory proceeding," which allows creditors alleging a default to obtain an ex parte appointment of a keeper to take immediate possession of mortgaged property via a confession of judgment contained within the underlying mortgage. A true and correct copy of the Order is attached hereto as **Exhibit B**.

15.     Monterey outsources its accounting to a company called The Resource Group, LLC ("TRG"). After Arapahoe alleged a default, Arapahoe and its agents, including Arena, contacted TRG in Oklahoma in an attempt to obtain all of Monterey's accounting files. Neither the Amended Credit Agreement nor the Order allowed Arapahoe to obtain these documents in Oklahoma.

16.     As a result of Defendants actions, TRG has ceased work for Monterey. To date, TRG will not even give Monterey its own accounting information, despite Monterey's requests.

## VII.     Agency & Respondeat Superior

17.     Wherever it is alleged that Defendants did anything, or failed to do anything, it is meant that such conduct was done by Defendants' employees, vice principals, agents, attorneys, affiliated entities, and/or representatives in the normal or routine scope of their authority, or ratified by Defendants, or done with such apparent authority so as to cause Plaintiff to reasonably rely that such conduct was within the scope of their authority. Plaintiff did rely to Plaintiff's detriment on Defendant's representatives being vested with authority for their conduct. Defendants are vicariously liable for the conduct of its employees, vice principals, agents, attorneys, affiliated entities, and representatives of Defendants' affiliated entities by virtue of the respondeat superior, apparent authority, and estoppel doctrines.

## VIII.     Causes of Action

### A.     Tortious Interference.

18.     Plaintiff repeats and re-alleges the facts set forth in all preceding paragraphs of this Petition as if fully set forth herein.

19.     A claim for tortious interference with an existing contract contains the following elements: (1) the plaintiff had a valid contract, (2) the defendant willfully and intentionally interfered with the contract, (3) the interference proximately caused the plaintiff's injury, and (4) the plaintiff incurred actual damage or loss.

20.     Plaintiff had valid contract with TRG. Defendants willfully and intentionally interfered with this Contract. As a direct result of Defendants' interference, the Plaintiff was damaged and continues to suffer damages.

**B.    Declaratory Judgment.**

21.    Plaintiff re-alleges and incorporates by reference all proceeding paragraphs as though fully set forth herein.

22.    Arapahoe obtained the Order pursuant to a petition it filed with the Louisiana court. The rules governing an "executory proceeding" require strict compliance. Louisiana law requires an executory proceeding to be supported by an "authentic act." *See* La CCP 2631. An "authentic act" requires a notary and two witnesses. *See* La CC 1833. Arapahoe's petition was supported by only one witness.

23.    Pursuant to Chapter 37 of the Texas Civil Practice and Remedies Code, Plaintiff requests that this Court make the following declarations:

   a.    Arapahoe failed to comply with the applicable rules regarding executory proceedings in Louisiana;

   b.    The Order is therefore void.

## IX.    Exemplary Damages

24.    Plaintiff is entitled to an award of exemplary damages because the Defendants acted with either malice or gross negligence when they caused the Plaintiff's damages.

## X.    Attorney's Fees

25.    Plaintiff has retained representation to prosecute and defend this action and has agreed to pay its attorneys reasonable fees for necessary services. An award of attorneys' fees to the Plaintiff would be equitable and just and authorized by Chapter 37 of the Texas Civil Practice and Remedies Code.

## XI.      Conditions Precedent

26.      All conditions precedent to Plaintiff's claims for relief have been performed or have occurred.

## XII.      Prayer

WHEREFORE, PREMISES CONSIDERED, Plaintiff respectfully prays that:

a.  Defendants be cited to appear and answer;

b.  The Court empanel a jury to determine any issue of fact and, upon final hearing of this cause, the Court make declarations as specified above and to award Plaintiff:

    i.  Actual damages;

    ii.  Consequential damages;

    iii.  Attorneys' fees;

    iv.  Exemplary damages; and

    v.  Court costs;

c.  The Court grant any other relief to which Plaintiff may be entitled.

Respectfully Submitted,


**THE PETTIT LAW FIRM**

By: */s/ Julie Pettit*
_____
Julie Pettit
State Bar No. 24065971
jpettit@pettitfirm.com
Craig Stoddart
State Bar No. 19260950
cstoddart@pettitfirm.com
David B. Urteago
State Bar No. 24079493
durteago@pettitfirm.com
Jane Cherry
State Bar No. 24087292
jcherry@pettitfirm.com
2101 Cedar Springs, Suite 1540
Dallas, TX 75201
Tel. (214) 329-0151
Fax. (214) 329-4076

**LYNN PINKER COX & HURST, LLP**
Michael K. Hurst
Texas Bar No. 10316310
mhurst@lynnllp.com
2100 Ross Avenue, Suite 2700
Dallas, Texas 75201
Telephone:  214-981-3800
Facsimile:  214-981-3839

**ATTORNEYS FOR PLAINTIFF**

**EXHIBIT**

**A**

exhibitsticker.com

**AMENDED AND RESTATED CREDIT AGREEMENT**

dated as of

May 15, 2018

among

**MONTEREY RESOURCES LLC,**

and

**GREEN WHEEL, LLC,**

each as a Borrower and collectively as Co-Borrowers,

**ROBERT A. IMEL,**
as Limited Obligor,


**405 ARAPAHOE LLC,**
as Agent,

and

the Lenders party hereto from time to time

1

# TABLE OF CONTENTS

**Page**

## ARTICLE I
### DEFINITIONS AND ACCOUNTING MATTERS

| | | |
|---|---|---|
| Section 1.01 | Certain Defined Terms | 1 |
| Section 1.02 | Rules of Construction | 19 |
| Section 1.03 | Accounting Terms; GAAP; Pro Forma Calculations | 20 |

## ARTICLE II
### TERM LOAN

| | | |
|---|---|---|
| Section 2.01 | Term Loan | 20 |
| Section 2.02 | Funding | 20 |
| Section 2.03 | Repayment of Loan. | 21 |
| Section 2.04 | Interest. | 21 |
| Section 2.05 | Maximum Interest Rate. | 21 |
| Section 2.06 | Prepayment. | 21 |
| Section 2.07 | Manner of Payment. | 21 |
| Section 2.08 | Pro Rata Treatment; Adjustments | 22 |
| Section 2.09 | Fees. | 22 |
| Section 2.10 | Taxes. | 23 |
| Section 2.11 | Keepwell | 24 |

## ARTICLE III
### CONDITIONS PRECEDENT

| | | |
|---|---|---|
| Section 3.01 | [Reserved] | 24 |
| Section 3.02 | [Reserved]. | 24 |
| Section 3.03 | [Reserved]. | 24 |
| Section 3.04 | Effective Date | 24 |

## ARTICLE IV
### REPRESENTATIONS AND WARRANTIES

| | | |
|---|---|---|
| Section 4.01 | Organization; Powers | 27 |
| Section 4.02 | Authorization; Enforceability | 28 |
| Section 4.03 | Approvals; No Conflicts | 28 |
| Section 4.04 | Financial Condition; No Material Adverse Change | 28 |
| Section 4.05 | Litigation | 28 |

i

| | | |
|---|---|---|
| Section 4.06 | Environmental Matters | 28 |
| Section 4.07 | Compliance with the Laws and Agreements; No Defaults | 30 |
| Section 4.08 | Investment Company Act | 30 |
| Section 4.09 | Taxes | 30 |
| Section 4.10 | Disclosure; No Material Misstatements | 30 |
| Section 4.11 | Insurance | 31 |
| Section 4.12 | Restrictions on Liens | 31 |
| Section 4.13 | Borrower | 31 |
| Section 4.14 | Foreign Operations | 31 |
| Section 4.15 | Properties; Title, Etc. | 31 |
| Section 4.16 | Maintenance of Properties | 32 |
| Section 4.17 | Gas Imbalances; Prepayments | 32 |
| Section 4.18 | Marketing of Production | 32 |
| Section 4.19 | Security Instruments | 33 |
| Section 4.20 | Swap Agreements and Eligible Contract Participant | 33 |
| Section 4.21 | Use of Loan Proceeds | 33 |
| Section 4.22 | Solvency | 33 |
| Section 4.23 | Anti-Corruption Laws and Sanctions | 34 |
| Section 4.24 | Ad Valorem and Severance Taxes | 34 |
| Section 4.25 | Anti-Terrorism Laws | 34 |
| Section 4.26 | Money Laundering | 35 |
| Section 4.27 | ERISA | 35 |

## ARTICLE V
## AFFIRMATIVE COVENANTS

| | | |
|---|---|---|
| Section 5.01 | Financial Statements; Other Information | 36 |
| Section 5.02 | Notices of Material Events | 39 |
| Section 5.03 | Existence; Conduct of Business | 39 |
| Section 5.04 | Payment of Obligations | 39 |
| Section 5.05 | Operation and Maintenance of Properties | 40 |
| Section 5.06 | Insurance | 40 |
| Section 5.07 | Books and Records; Inspection Rights | 41 |
| Section 5.08 | Compliance with Laws | 41 |
| Section 5.09 | Environmental Matters | 41 |
| Section 5.10 | Further Assurances | 42 |
| Section 5.11 | Net Profits Overriding Royalty Interest | 42 |
| Section 5.12 | Lockbox Account | 42 |

ii

Section 5.13    Additional Collateral; Other Deliveries......................................................43
Section 5.14    Deposit Accounts...................................................................................43
Section 5.15    Commodity Agreements..........................................................................43
Section 5.16    Management Equity Contribution ............................................................44

ARTICLE VI
NEGATIVE COVENANTS

Section 6.01    [Reserved] ...........................................................................................44
Section 6.02    Indebtedness.........................................................................................44
Section 6.03    Liens...................................................................................................45
Section 6.04    Restricted Payments ..............................................................................46
Section 6.05    Investments, Loans and Advances............................................................46
Section 6.06    Nature of Business; No International Operations.........................................47
Section 6.07    Proceeds of Loans and Management Equity Contribution ............................47
Section 6.08    Sale or Discount of Receivables...............................................................47
Section 6.09    Mergers, Etc. .......................................................................................47
Section 6.10    Sale of Properties...................................................................................47
Section 6.11    Sales and Leasebacks .............................................................................48
Section 6.12    Environmental Matters ...........................................................................48
Section 6.13    Transactions with Affiliates ....................................................................48
Section 6.14    Negative Pledge Agreements; Dividend Restrictions ...................................48
Section 6.15    Take-Or-Pay or Other Prepayments .........................................................48
Section 6.16    Swap Agreements...................................................................................49
Section 6.17    Amendments to Organizational Documents and Material Contracts ...............49
Section 6.18    Marketing Activities...............................................................................49
Section 6.19    Changes in Fiscal Periods; Accounting Changes .........................................49
Section 6.20    Subsidiaries ..........................................................................................49
Section 6.21    ERISA Compliance ................................................................................49
Section 6.22    Capital Expenditures ..............................................................................50
Section 6.23    Leverage Ratio......................................................................................50
Section 6.24    Expense Ratio .......................................................................................50
Section 6.25    PDP Collateral Coverage Ratio ...............................................................50
Section 6.26    Total Proved Collateral Coverage Ratio....................................................50

ARTICLE VII
EVENTS OF DEFAULT; REMEDIES

Section 7.01    Events of Default...................................................................................50

iii

Section 7.02      Remedies ........................................................................................................52

## ARTICLE VIII
## MISCELLANEOUS

Section 8.01      Notices...........................................................................................................53

Section 8.02      Waivers; Amendments ..................................................................................54

Section 8.03      Expenses, Indemnity; Damage Waiver .........................................................55

Section 8.04      Successors and Assigns ................................................................................57

Section 8.05      Survival; Revival; Reinstatement .................................................................58

Section 8.06      Counterparts; Integration; Effectiveness; Electronic Execution...................58

Section 8.07      Severability....................................................................................................59

Section 8.08      Power of Attorney .........................................................................................59

Section 8.09      GOVERNING LAW; JURISDICTION; CONSENT TO SERVICE OF
                  PROCESS......................................................................................................59

Section 8.10      Headings ........................................................................................................60

Section 8.11      Amendment and Restatement........................................................................60

Section 8.12      [Reserved] ....................................................................................................61

Section 8.13      EXCULPATION PROVISIONS....................................................................61

Section 8.14      Flood Insurance Provisions ..........................................................................61

Section 8.15      No Advisory or Fiduciary Responsibility......................................................61

Section 8.16      Waiver of Trade Practices Acts ....................................................................62

Section 8.17      [Reserved.] ...................................................................................................62

Section 8.18      Joint and Several Liability.............................................................................62

Section 8.19      Obligations Absolute ....................................................................................63

## ARTICLE IX

Section 9.01      Agent ..............................................................................................................64

[CREDIT AGREEMENT]

## EXHIBITS AND SCHEDULES

Exhibit A            [Reserved]
Exhibit B            Form of Compliance Certificate
Exhibit C            Form of Solvency Certificate
Exhibit D            Form of Collateral Agreement
Exhibit E            Form of Assignment and Assumption

Schedule 4.05        Litigation
Schedule 4.06        Environmental Matters
Schedule 4.13        Borrower
Schedule 4.17        Gas Imbalances
Schedule 4.18        Marketing of Production
Schedule 4.19(a)     UCC Filings
Schedule 4.20        Swap Agreements
Schedule 6.02        Indebtedness
Schedule 6.03        Liens
Schedule 6.05        Investments

[CREDIT AGREEMENT]

**THIS AMENDED AND RESTATED CREDIT AGREEMENT** dated as of May 15, 2018 (this "Agreement"), is among **MONTEREY RESOURCES LLC**, a Texas limited liability company ("Monterey"), **GREEN WHEEL, LLC**, a Delaware limited liability company ("Green Wheel" and Monterey are each a "Borrower", and collectively, sometimes referred to jointly as the "Borrower" or the "Borrowers"), **ROBERT A. IMEL**, an individual resident in Dallas, Texas (the "Limited Obligor"), **405 ARAPAHOE LLC**, in its capacity as administrative agent and collateral agent for the lenders (in such capacities, the "Agent"), and the lenders party hereto from time to time (the "Lenders").  This Agreement amends and restates that certain Credit Agreement dated as of November 20, 2017 (as amended by that certain First Amendment to Credit Agreement dated as of January 25, 2018, and as may have been further amended, supplemented or otherwise modified prior to the date hereof, the "Original Credit Agreement"), among the Monterey, the Limited Obligor, and Fulcrum Energy Capital II Monterey LLC, a Delaware limited liability company (the "Closing Date Lender").

# R E C I T A L S

A.	The Borrowers have requested that the Lenders enter into this Agreement and make the Loan contemplated hereby.

B.	The Lenders have agreed to provide the Loan to the Borrower upon the terms and conditions set forth in this Agreement.

NOW, THEREFORE, for good and valuable consideration, the receipt and sufficiency of which are hereby acknowledged by the parties hereto, the parties hereto hereby agree as follows:

## ARTICLE I
## DEFINITIONS AND ACCOUNTING MATTERS

Section 1.01	Certain Defined Terms.  As used in this Agreement, the following terms have the meanings specified below:

"Acquisition" means the acquisition on the Original Closing Date by Monterey of those certain oil and gas production assets in Caddo, Webster and Claiborne Parishes, Louisiana pursuant to that certain Purchase and Sale Agreement dated October 24, 2017, by and between Monterey and Wagon Wheel ArkLaTex, LLC.

"Acquisition 2" means, collectively (a) the acquisition on the Effective Date by Monterey of those certain oil and gas production assets in Caddo, Claiborne, Union and Webster Parishes, Louisiana pursuant to that certain Purchase and Sale Agreement dated April 18, 2018, by and between Borrower and Wagon Wheel ArkLaTex, LLC and (b) the acquisition on the Effective Date by Monterey of all of the issued and outstanding Equity Interests in Green Wheel pursuant to that certain Membership Interest Purchase Agreement dated January 1, 2018 by and between Wagon Wheel Exploration, LLC and Monterey.

"Acquisition 2 Fee Letter" means that certain fee letter among the Borrower and the Lenders dated as of the Effective Date.

"Additional Hedge Adjustment Event" has the meaning given to such term in Section 5.15(a).

"Affiliate" means, with respect to a specified Person, another Person that directly, or indirectly through one or more intermediaries, Controls or is Controlled by or is under common Control with the Person specified.

[CREDIT AGREEMENT]

"Agent" has the meaning set forth in the introductory paragraph of this Agreement.

"Agreement" means this Amended and Restated Credit Agreement, including the Schedules and Exhibits hereto.

"Anti-Corruption Laws" means all laws, rules, and regulations of any jurisdiction applicable to the Borrower from time to time concerning or relating to bribery or corruption.

"Anti-Terrorism Laws" has the meaning assigned to such term in Section 4.25.

"Applicable Percentage" means (a) for Fulcrum Energy Capital II Monterey LLC, nineteen and one-half percent (19.5%%), (b) for 405 Arapahoe LLC, seventy-nine and one-half percent (79.5%) and (c) for Cargill Incorporated, one percent (1.0%).

"Approved Engineer" means Netherland Sewell and Associates Inc., or another engineering firm approved by the Required Lenders in their sole discretion.

"Approved Swap Counterparty" shall mean any Lender or a counterparty to a Swap Agreement with the Borrower approved by the Agent and the Lenders.

"ASC" means the Financial Accounting Standards Board Accounting Standards Codification, as in effect.

"Assignment and Assumption" means an assignment and assumption agreement entered into by a Lender and an assignee, and accepted by the Agent, in the form of Exhibit E or any other form approved by the Agent.

"Bankruptcy Code" means Title 11 of the United States Code.

"Beneficial Owner" has the meaning assigned to such term in Rule 13d-3 and Rule 13d-5 under the Securities Exchange Act of 1934, except that in calculating the beneficial ownership of any particular "person" (as that term is used in Section 13(d)(3) of the Securities Exchange Act of 1934), such "person" will be deemed to have beneficial ownership of all securities that such "person" has the right to acquire by conversion or exercise of other securities, whether such right is currently exercisable or only after the passage of time.

"Board" means the Board of Governors of the Federal Reserve System of the United States of America or any successor Governmental Authority.

"Borrower" has the meaning set forth in the introductory paragraph of this Agreement.

"Business Day" means any day that is not a Saturday, Sunday or other day on which commercial banks in Denver, Colorado are authorized or required by law to remain closed.

"Capital Lease Obligations" of any Person means the obligations of such Person to pay rent or other amounts under any lease of (or other arrangement conveying the right to use) real or personal property, or a combination thereof, which obligations are required to be classified and accounted for as capital lease obligations on a balance sheet of such Person under GAAP, and the amount of such obligations shall be the capitalized amount thereof determined in accordance with GAAP.

"Casualty Event" means any loss, casualty or other insured damage to, or any nationalization, taking under power of eminent domain or by condemnation or similar proceeding of, any Property of the Borrower having a fair market value in excess of the Threshold Amount.

"CERCLA" has the meaning assigned to such term within the definition of "Environmental Laws."

"Change in Control" means that (a) the Permitted Holders collectively cease to be the Beneficial Owners of more than 75% of the Equity Interests of Monterey with ordinary voting power to elect or appoint the directors or managers of Monterey or collectively cease to Control Monterey or (b) Green Wheel shall cease to be a wholly owned Subsidiary of Monterey.

"Closing Date Lender" has the meaning set forth in the introductory paragraph of this Agreement.

"Code" means the Internal Revenue Code of 1986, as amended.

"Collateral" means all Property of the Borrower, now owned or hereafter acquired, upon which a Lien is purported to be created by any Security Instrument.  For the avoidance of doubt, Excluded Property (as defined in the Collateral Agreement) shall not constitute Collateral.

"Collateral Agreement" means the Amended and Restated Collateral Agreement to be dated as of the Effective Date and executed by the Borrower in favor of the Agent (as successor to the Closing Date Lender), which shall be in substantially the form of Exhibit D.

"Commodity Exchange Act" means the Commodity Exchange Act (7 U.S.C. § 1 et seq.).

"Compliance Certificate" means a certificate of a Financial Officer of the Borrower, substantially in the form attached as Exhibit B.

"Connection Income Taxes" means Other Connection Taxes that are imposed on or measured by net income (however denominated) or that are franchise Taxes or branch profits Taxes.

"Control" means the possession, directly or indirectly, of the power to direct or cause the direction of the management or policies of a Person, whether through the ability to exercise voting power, by contract or otherwise.  "Controlling" and "Controlled" have meanings correlative thereto.

"Controlled Account" means a Deposit Account of the Borrower that is subject to a Deposit Account Control Agreement.

"Default" means any event or condition which constitutes an Event of Default or which upon notice, lapse of time or both would, unless cured or waived, become an Event of Default.

"Default Rate" means the highest rate of interest allowable under Texas law.

"Deposit Accounts" means, collectively, (a) all "deposit accounts" (as such term is defined in the UCC) of the Borrower, and in any event shall include all accounts and sub-accounts relating to any of the foregoing accounts, and (b) all cash, funds, checks, notes and instruments from time to time on deposit in any of the accounts or sub-accounts described in clause (a) of this definition.

"Deposit Account Control Agreement" means an agreement in form and substance acceptable to the Required Lenders in their sole discretion establishing the Agent's Control with respect to any Deposit

3

Account. For purposes of this definition, "Control" means "control" within the meaning of Section 9-104 of the Uniform Commercial Code. Each Deposit Account Control Agreement shall provide that each Lender shall have access to the applicable Deposit Account for purposes of viewing account balances and other information relating to such Deposit Account.

"Direction Letters" shall mean, collectively, letters, in form and substance reasonably satisfactory to the Agent, from the Borrower to all purchasers of production and royalty interest payors directing such payor to remit payment to the Lockbox by mail or to the Lockbox Account by wire transfer.

"Disqualified Capital Stock" means any Equity Interest that, by its terms (or by the terms of any security into which it is convertible or for which it is exchangeable) or upon the happening of any event, (a) matures or is mandatorily redeemable for any consideration other than other Equity Interests (which would not constitute Disqualified Capital Stock), pursuant to a sinking fund obligation or otherwise, (b) is convertible or exchangeable for Indebtedness or redeemable for any consideration other than other Equity Interests (which would not constitute Disqualified Capital Stock) at the option of the holder thereof, in whole or in part, or (c) provides for the scheduled payment of dividends in cash, in each case, prior to the date that is ninety-one (91) days after the Maturity Date.

"Dollars" or "$" refers to lawful money of the United States of America.

"EBITDA" means, for any period, the net income (or loss) of the Borrower, determined in accordance with GAAP, for such period; plus without duplication and to the extent deducted in the calculation of net income for such period, the sum of (in each case for such period and determined in accordance with GAAP): (a) income or franchise Taxes paid or accrued; (b) the sum of aggregate interest expense and capitalized interest of Borrower; (c) amortization, depletion and depreciation expense; (d) any non-cash losses or charges on any Swap Agreement resulting from the requirements of Accounting Standards Codification Section 815-10; (e) losses from dispositions of assets (other than Hydrocarbons produced in the ordinary course of business) and other extraordinary or non-recurring losses (other than workover costs, even if non-recurring); and (f) other non-cash charges (excluding accruals for cash expenses made in the ordinary course of business); minus, to the extent included in the calculation of net income for such period, (h) the sum of (i) any non-cash gains on any Swap Agreements resulting from the requirements of Accounting Standards Codification Section 815-10; (ii) gains from dispositions of assets (other than Hydrocarbons produced in the ordinary course of business) and other extraordinary or non-recurring gains; and (iii) other non-cash gains; provided that, with respect to the determination of the Borrower's compliance with the Leverage Ratio covenant set forth in Section 6.23, EBITDA shall be adjusted to give effect, on a pro forma basis and consistent with GAAP, to any acquisitions or dispositions made during such period as if such acquisition or disposition, as the case may be, was made at the beginning of such period.

"ECP" means an "eligible contract participant" as defined in Section 1(a)(18) of the Commodity Exchange Act or any regulations promulgated thereunder and the applicable rules issued by the Commodity Futures Trading Commission.

"Effective Date" means the date on which each of the conditions precedent set forth in Section 3.04 are satisfied or waived by the Lenders in their sole discretion.

"Eligible Contract Participant" shall have the meaning assigned to such term in the Commodity Exchange Act and the regulations thereunder.

"Environmental Laws" means any and all Governmental Requirements pertaining in any way to health and safety (insofar as either may be affected by a Release of, or exposure to, Hazardous Materials),

the environment, the preservation or reclamation of natural resources, or the management, Release or threatened Release of any Hazardous Materials, in effect in any and all jurisdictions in which the Borrower is conducting, or at any time has conducted, business, or where any Property of the Borrower is located, including the Oil Pollution Act of 1990, the Clean Air Act, the Comprehensive Environmental, Response, Compensation, and Liability Act of 1980 ("CERCLA"), the Federal Water Pollution Control Act, the Occupational Safety and Health Act of 1970, the Resource Conservation and Recovery Act of 1976 ("RCRA"), the Safe Drinking Water Act, the Toxic Substances Control Act, the Superfund Amendments and Reauthorization Act of 1986, the Hazardous Materials Transportation Act, the Natural Gas Pipeline Safety Act of 1968, the Hazardous Liquid Pipeline Safety Act of 1979, and other environmental conservation or protection Governmental Requirements.

"Environmental Permit" means any permit, registration, license, approval, consent, exemption, variance, or other authorization required under or issued pursuant to applicable Environmental Laws.

"Equity Interests" means shares of capital stock, partnership interests, membership interests in a limited liability company, beneficial interests in a trust or other equity ownership interests in a Person, and any warrants, options or other rights entitling the holder thereof to purchase or acquire any such Equity Interest.

"ERISA" means the Employee Retirement Income Security Act of 1974.

"ERISA Affiliate" means each trade or business (whether or not incorporated) which together with the Borrower would be deemed to be a "single employer" within the meaning of Section 4001(b)(1) of ERISA or subsections (b), (c), (m) or (o) of Section 414 of the Code.

"ERISA Event" means (a) a Reportable Event with respect to any Plan subject to Title IV of ERISA, (b) the withdrawal of the Borrower or any ERISA Affiliates from a Plan subject to Title IV of ERISA during a plan year in which it was a "substantial employer" (as defined in Section 4001(a)(2) of ERISA), (c) the providing of notice of intent to terminate a Plan in a distress termination (as described in Section 4041(c) of ERISA), (d) the institution by the PBGC of proceedings to terminate a Plan or a Multiemployer Plan, (e) any event or condition (i) that provides a basis under Section 4042(a)(1), (2), or (3) of ERISA for the termination of, or the appointment of a trustee to administer, any Plan subject to Title IV of ERISA, or (ii) that may result in termination of a Multiemployer Plan pursuant to Section 4041A of ERISA, (f) the partial or complete withdrawal within the meaning of Sections 4203 and 4205 of ERISA, of any Loan Party or ERISA Affiliates from a Multiemployer Plan, or (g) the occurrence of a non-exempt Prohibited Transaction for which the Borrower could reasonably be expected to incur any liability.

"Event of Default" has the meaning assigned to such term in Section 7.01.

"Excepted Liens" means:

(a)     Liens for Taxes, assessments or other governmental charges or levies which are not delinquent or which (provided foreclosure, sale, or other similar proceedings have not been initiated) are being contested in good faith by appropriate action and for which adequate reserves have been maintained in accordance with GAAP;

(b)     Liens in connection with workers' compensation, unemployment insurance or other social security, old age pension or public liability obligations which are not delinquent or which are being contested in good faith by appropriate action and for which adequate reserves have been maintained in accordance with GAAP;

(c)      landlord's liens and operators', vendors', carriers', warehousemen's, repairmen's, mechanics', suppliers', workers', materialmen's, construction or other like Liens arising by operation of law or otherwise in the ordinary course of business or incident to the exploration, development, operation and maintenance of Oil and Gas Properties, each of which is in respect of obligations that are not delinquent or which are being contested in good faith by appropriate action and for which adequate reserves have been maintained in accordance with GAAP;

(d)      Liens arising under operating agreements, unitization and pooling agreements and orders, farmout agreements, gas balancing agreements and other agreements, in each case (i) that are customary in the oil, gas and mineral production business, and are entered into in the ordinary course of business, (ii) that are taken into account in computing the net revenue interests and working interests of the Borrower warranted in the Security Instruments or in this Agreement, (iii) that are for claims which are being contested in good faith by appropriate action and for which adequate reserves have been maintained in accordance with GAAP, and (iv) to the extent that any such Lien referred to in this clause does not materially impair the use of the Property covered by such Lien for the purposes for which such Property is held by the Borrower or materially impair the value of the Property subject to such Lien;

(e)      (i) banker's liens, rights of set-off or similar rights and remedies arising in the ordinary course of business and burdening only Deposit Accounts or other funds maintained with a creditor depository institution, provided that no such Deposit Account is a dedicated cash collateral account or is subject to restrictions against access by the depositor in excess of those set forth by regulations promulgated by the Board and no such Deposit Account is intended by the Borrower to provide collateral to the depository institution to secure any Indebtedness (other than pursuant to the Loan Documents), and (ii) Liens in favor of depository banks arising in the ordinary course of business under documentation governing Deposit Accounts which Liens burden only the applicable Deposit Accounts and secure the payment of returned items, settlement item amounts, customary bank fees for maintaining said Deposit Accounts, and similar items and fees;

(f)      zoning and land use requirements, easements, restrictions, servitudes, permits, conditions, covenants, exceptions or reservations in any Property of the Borrower for the purpose of roads, pipelines, transmission lines, transportation lines, distribution lines for the removal of gas, oil, coal or other minerals or timber, and other like purposes, or for the joint or common use of real estate, rights of way, facilities and equipment, that do not secure any monetary obligations and which in the aggregate do not materially impair the use of such Property for the purposes of which such Property is held by the Borrower or materially impair the value of such Property subject thereto;

(g)      Liens on cash or securities pledged to secure performance of (or to secure letters of credit that secure performance solely of) tenders, surety and appeal bonds, government contracts, performance and return of money bonds, bids, trade contracts, leases, statutory obligations, regulatory obligations, and other obligations of a like nature incurred in the ordinary course of the Borrower's business or in the ordinary course in the oil and gas business generally and not in connection with the borrowing of money;

(h)      minor defects or other irregularities in title or zoning and other restrictions that do not secure any Indebtedness and which in the aggregate do not materially impair the use of such Property for the purposes of which such Property is held by the Borrower or materially impair the value of such Property subject thereto;

(i)      rights reserved to or vested in a Governmental Authority having jurisdiction to control or regulate any Oil and Gas Property in any manner whatsoever and all laws of such Governmental Authority;

6

(j)     Liens arising from precautionary Uniform Commercial Code financing statement or similar filings;

(k)     Liens on cash earnest money deposited pursuant to the terms of an agreement to acquire assets used in, or Persons engaged in, the oil and gas business, as permitted by this Agreement, in order to secure only the obligations of the Borrower in connection with such agreement; and

(o)     Liens, titles and interests of licensors of software and other intangible Property licensed by such licensors to the Borrower, restrictions and prohibitions on encumbrances and transferability with respect to such Property and the Borrower's interests therein imposed by such licenses, and Liens and encumbrances encumbering such licensors' titles and interests in such Property and to which the Borrower's license interests may be subject or subordinate, in each case, whether or not evidenced by UCC financing statement filings or other documents of record, provided that such Liens do not secure Indebtedness of the Borrower and do not encumber Property of the Borrower other than the Property that is the subject of such licenses.

provided, however, that (1) the Liens described in clauses (a) through (e) shall remain "Excepted Liens" only for so long as no action to enforce such Lien has been commenced unless such action is contested in good faith by appropriate proceedings and for which adequate reserves are maintained in accordance with GAAP and (2) no intention to subordinate the first priority Lien otherwise granted in favor of the Agent (as successor to the Closing Date Lender) is to be hereby implied or expressed by the permitted existence of any Excepted Liens.

"Excluded Swap Obligation" shall mean, with respect to the Borrowers, any Swap Obligation if, and to the extent that, all or a portion of the grant by the relevant Borrower of a Lien to secure such Swap Obligation is or becomes illegal under the Commodity Exchange Act or any rule, regulation or order of the Commodity Futures Trading Commission (or the application or official interpretation of any thereof) by virtue of the relevant Borrower's failure, for any reason, to constitute an Eligible Contract Participant at the time the grant of such Lien becomes effective with respect to such Swap Obligation and, if a Swap Obligation arises under a master agreement governing more than one Swap, such exclusion shall apply only to the portion of such Swap Obligation that is attributable to Swap Agreements for which such Lien is or becomes illegal.

"Excluded Taxes" means any of the following Taxes imposed on or with respect to any Lender or required to be withheld or deducted from a payment to any Lender: (a) Taxes imposed on or measured by net income (however denominated), franchise Taxes, and branch profits Taxes, in each case, (i) imposed as a result of a Lender being organized under the laws of, having its principal office or its applicable lending office located in, the jurisdiction imposing such Tax (or any political subdivision thereof) or (ii) that are Other Connection Taxes, (b) U.S. federal withholding Taxes imposed on amounts payable to or for the account of a Lender with respect to its interest in the Loan pursuant to a law in effect on the date on which (i) such Lender acquires such interest in the Loan or (ii) such Lender changes its lending office, and (c) any U.S. federal withholding Taxes imposed under FATCA.

"Executive Order" has the meaning assigned to such term in Section 4.25.

"Expense Ratio Limit" has the meaning assigned to such term in Section 6.24.

"FATCA" means Sections 1471 through 1474 of the Code, as of the Effective Date (or any amended or successor version that is substantively comparable and not materially more onerous to comply with), any current or future regulations or official interpretations thereof and any agreement entered into pursuant to Section 1471(b)(1) of the Code.

7

[Credit Agreement]

"Fee Letter" means that certain fee letter between the Borrower and the Closing Date Lender dated as of the Original Closing Date.

"Financial Officer" means, for any Person, the chief financial officer, principal accounting officer, treasurer or controller of such Person.  Unless otherwise specified, all references herein to a Financial Officer means a Financial Officer of the Borrower.

"fiscal quarter" means each fiscal quarter ending on the last day of each March, June, September and December.

"fiscal year" means each fiscal year of the Borrower for accounting and tax purposes, ending on December 31 of each year.

"Forecasted Net Production" means the forecasted gross production attributable to the Borrower's Oil and Gas Properties less production attributable to royalties, overriding royalties, and any other interest payable out of production attributable to such interest.

"G&A Expenses" means, for any period, the reasonable general and administrative expenses (as calculated in accordance with GAAP) paid by the Borrower during such period in the ordinary course of business, but expressly excluding third party audit expenses, third party reserve response expenses, legal expenses and transaction expenses incurred in connection with Acquisition 2 and the negotiation, execution, amendment or maintenance of this Agreement and the other Loan Documents.

"GAAP" means generally accepted accounting principles in the United States of America as in effect from time to time, subject to the terms and conditions set forth in Section 1.03.

"Governmental Authority" means the government of the United States of America or any other nation or any political subdivision thereof, whether state or local, and any agency, authority, instrumentality, regulatory body, court, central bank or other entity exercising executive, legislative, judicial, taxing, regulatory or administrative powers or functions of or pertaining to government.

"Governmental Requirement" means any law, statute, code, ordinance, order, determination, rule, regulation, judgment, decree, injunction, franchise, permit, certificate, license, rules of common law, authorization or other directive or requirement, whether now or hereinafter in effect, of any Governmental Authority.

"Green Wheel" has the meaning set forth in the introductory paragraph of this Agreement.

"Guarantee" of or by any Person (the "guarantor") means any obligation, contingent or otherwise, of the guarantor guaranteeing or having the economic effect of guaranteeing any Indebtedness or other obligation of any other Person (the "primary obligor") in any manner, whether directly or indirectly, and including any obligation of the guarantor, direct or indirect, (a) to purchase or pay (or advance or supply funds for the purchase or payment of) such Indebtedness or other obligation or to purchase (or to advance or supply funds for the purchase of) any security for the payment thereof, (b) to purchase or lease property, securities or services (even if such property, securities or services are never received) for the purpose of assuring the owner of such Indebtedness or other obligation of the payment thereof, (c) to maintain working capital, equity capital or any other financial statement condition or liquidity of the primary obligor so as to enable the primary obligor to pay such Indebtedness or other obligation or (d) as an account party in respect of any letter of credit or letter of guaranty issued to support such Indebtedness or obligation; provided, however, that the term "Guarantee" shall not include endorsements for collection or deposit in the ordinary course of business.

8

"Hazardous Material" means any substance regulated or as to which liability might arise under any applicable Environmental Law including: (a) any chemical, compound, material, product, byproduct, substance or waste defined as or included in the definition or meaning of "hazardous substance," "hazardous material," "hazardous waste," "solid waste," "toxic waste," "extremely hazardous substance," "toxic substance," "contaminant," "pollutant," or words of similar meaning or import found in any applicable Environmental Law; (b) Hydrocarbons, petroleum products, petroleum substances, natural gas, oil, oil and gas waste (including drilling fluids and any produced water), crude oil, and any components, fractions or derivatives thereof; and (c) radioactive materials (including those that are naturally occurring), explosives, asbestos or asbestos containing materials, polychlorinated biphenyls, radon, infectious materials or medical wastes.

"Hedge Unwind" means any assignment, sale, early termination or unwinding of any hedge position established under any Swap Agreement or the creation of any off-setting position in respect of any hedge position established under any Swap Agreement, in each case, if the net effect of such action (when taken together with any other Swap Agreements executed substantially contemporaneously with the taking of such action) would be to cancel any positions of the Borrower under such Swap Agreements.

"Hydrocarbon Interests" means all rights, titles, interests and estates now or hereafter acquired in and to oil and gas leases, oil, gas and mineral leases, or other liquid or gaseous hydrocarbon leases, fee interests, surface interests, mineral fee interests, overriding royalty and royalty interests, net profit interests and production payment interests, including any reserved or residual interests of whatever nature, all Wells, and all rents, issues, profits, proceeds, products, revenues and other incomes from or attributable to any of the foregoing interests. Unless otherwise expressly provided herein, all references in this Agreement to "Hydrocarbon Interests" refer to Hydrocarbon Interests owned at the time in question by the Borrower.

"Hydrocarbons" means all oil, gas, casinghead gas, drip gasoline, natural gasoline, condensate, distillate, liquid hydrocarbons, gaseous hydrocarbons and all constituents, elements or compounds thereof and all products refined or separated therefrom and all other minerals which may be produced and saved from or attributable to the Oil and Gas Properties of any Person, including all oil in tanks.

"Indebtedness" means, for any Person, the sum of the following (without duplication):

(a)     all obligations of such Person for borrowed money or evidenced by bonds (other than surety and other bonds described in clause (b) below), bankers' acceptances, debentures, notes or other similar instruments;

(b)     all obligations of such Person (whether contingent or otherwise) in respect of letters of credit, surety bonds (or other similar bonds) and similar instruments;

(c)     all accounts payable and all accrued expenses, liabilities or other obligations of such Person to pay the deferred purchase price of Property or services;

(d)     all Capital Lease Obligations;

(e)     all obligations under Synthetic Leases;

(f)     all Indebtedness (as defined in the other clauses of this definition) of others secured by (or for which the holder of such Indebtedness has an existing right, contingent or otherwise, to be secured by) a Lien on any Property of such Person, whether or not such Indebtedness is assumed by such Person (but to the extent such Indebtedness is limited in recourse with respect to such Person, the amount of such

Indebtedness shall be limited to the greater of (i) the fair market value of such Property subject to such Lien and (ii) the principal amount of the obligations or liability with respect to which recourse exists to such Person);

(g)     all Guarantees of such Person with respect to any Indebtedness (as defined in the other clauses of this definition) to the extent of the lesser of the amount of such Indebtedness and the maximum stated amount of such Guarantee;

(h)     obligations to deliver commodities, goods or services, including Hydrocarbons, in consideration of one or more advance payments, made more than one month in advance of the month in which the commodities, goods or services are to be delivered, other than gas balancing arrangements in the ordinary course of business;

(i)     obligations to pay for goods or services even if such goods or services are not actually received or utilized by such Person;

(j)     any Indebtedness of a partnership for which such Person is liable either by agreement, by operation of law or by a Governmental Requirement, but only to the extent of such liability;

(k)     Disqualified Capital Stock;

(l)     net obligations of such Person payable with respect to any Swap Agreements, except for ordinary course of business settlement payments; and

(l)     the undischarged balance of any production payment created by such Person or for the creation of which such Person directly or indirectly received payment;

provided, however, that "Indebtedness" does not include accounts payable and accrued expenses, liabilities or other obligations to pay the deferred purchase price of Property or services, from time to time incurred in the ordinary course of business which are not greater than ninety (90) days past the date of invoice or which are being contested in good faith by appropriate action and for which adequate reserves have been maintained in accordance with GAAP.

The Indebtedness of any Person shall include all obligations of such Person of the character described above to the extent such Person remains legally liable in respect thereof notwithstanding that any such obligation is not included as a liability of such Person under GAAP. Indebtedness shall not include (i) liabilities resulting from endorsements of instruments for collection in the ordinary course of business or (ii) obligations in respect of Swap Agreements.

"Indemnified Taxes" means (a) Taxes, other than Excluded Taxes, imposed on or with respect to any payment made by or on account of any obligation of the Borrower under any Loan Document and (b) to the extent not otherwise described in clause (a) above, Other Taxes.

"Investment" means, for any Person: (a) the acquisition (whether for cash, Property, services or securities or otherwise) of Equity Interests of any other Person (including any "short sale" or any sale of any securities at a time when such securities are not owned by the Person entering into such short sale); (b) the making of any advance, loan or capital contribution to, assumption of Indebtedness of, purchase or other acquisition of any other Indebtedness of or equity participation or interest in, or other extension of credit to, any other Person (including the purchase of Property from another Person subject to an understanding or agreement, contingent or otherwise, to resell such Property to such Person, but excluding any such advance, loan or extension of credit having a term not exceeding ninety (90) days

representing the purchase price of goods or services sold by such Person in the ordinary course of business); (c) the purchase or acquisition (in one or a series of transactions) of Property of any other Person that constitute a business of the seller; or (d) the entering into of any Guarantee by such Person of Indebtedness of any other Person and (without duplication) any amount committed to be advanced, lent or extended to such other Person.

"IRS" means the United States Internal Revenue Service.

"Legacy Accounts" means the following deposit accounts: (a) account number 209935125 maintained by Green Wheel with Bank of Oklahoma, (b) account number 217029289 maintained by Monterey with Prosperity Bank and (c) any other deposit account maintained by a Borrower, other than the Lockbox Account and the Washington Federal Controlled Account.

"Lenders" has the meaning set forth in the introductory paragraph of this Agreement.

"Leverage Ratio" means, as of any date of determination, the ratio of Total Debt as of such date to EBITDA (measured for the trailing twelve-month period ending on such date).

"Lien" means any interest in Property securing an obligation owed to, or a claim by, a Person other than the owner of the Property, whether such interest is based on the common law, statute or contract, and whether such obligation or claim is fixed or contingent, and including but not limited to (a) the lien or security interest arising from a mortgage, deed of trust, encumbrance, pledge, security agreement, conditional sale or trust receipt or a lease, consignment or bailment for security purposes or (b) production payments and the like payable out of Oil and Gas Properties, other than the Net Profits Overriding Royalty Interest. The term "Lien" shall include easements, restrictions, servitudes, permits, conditions, covenants, exceptions or reservations that burden Property to the extent they secure an obligation owed to a Person other than the owner of the Property. For the purposes of this Agreement, the Borrower shall be deemed to be the owner of any Property which they have acquired or hold subject to a conditional sale agreement, or leases under a financing lease or other arrangement pursuant to which title to the Property has been retained by or vested in some other Person in a transaction intended to create a financing.

"Limited Obligations" means the obligations of the Limited Obligor pursuant to Section 5.16.

"Limited Obligor" has the meaning set forth in the introductory paragraph of this Agreement.

"Live Oak Limited Guarantee" means that certain Amended and Restated Limited Guarantee dated as of the Effective Date, as amended, supplemented or otherwise modified from time to time, pursuant to which Live Oak Energy, Inc. has guaranteed the Limited Obligations, subject to the limitations set forth therein.

"Live Oak Mortgage" means that certain amended and restated mortgage or similar security instrument dated the date hereof, as amended, supplemented or otherwise modified from time to time, pursuant to which Live Oak Energy, Inc. has granted a security interest in all of its right, title and interest in and to the collateral described therein to Agent (as successor to the Closing Date Lender) to secure the Limited Obligations, subject to the limitations set forth therein.

"Loan" has the meaning assigned to such term in Section 2.01.

"Loan Documents" means this Agreement, the Fee Letter, the Acquisition 2 Fee Letter, the Security Instruments, the Live Oak Limited Guarantee, the Live Oak Mortgage, including any

11

amendments, waivers or supplements to any of the foregoing, and each other document, instrument, certificate and agreement designated as a Loan Document by the Borrower, the Agent and the Lenders from time to time.

"Lockbox" shall mean the Post Office Box maintained with or through Citibank, pursuant to the Lockbox Services Agreement between the Agent and Citibank bearing the following address:    405 Arapahoe LLC, Mail Code 5229, P.O. Box 660367, Dallas, Texas 75266-0367.

"Lockbox Account" shall mean the deposit account maintained by the Agent at Citibank and associated with the Lockbox, bearing account number 6783795432.

"Management Equity Contribution" means cash contributions by Permitted Holders in a minimum aggregate amount of $500,000 in return for common equity interests in Monterey.

"Material Adverse Effect" means a material adverse effect on, or a material adverse change in, (a) the operations, business, assets, liabilities or financial condition of the Borrower, taken as a whole, (b) the ability of the Borrower to perform its obligations under any Loan Document to which it is a party, (c) the validity or enforceability of any Loan Document, or (d) the rights and remedies of the Agent or the Lenders under any Loan Document.

"Material Contract" means (a) any contract or agreement, written or oral, of the Borrower involving monetary liability of or to any such Person in any year in excess of the Threshold Amount or (b) any other contract or agreement of the Borrower, the breach, non-performance, cancellation or failure to renew of which could reasonably be expected to have a Material Adverse Effect.

"Material Indebtedness" means Indebtedness (other than the Loan), or obligations in respect of one or more Swap Agreements, of the Borrower in an aggregate principal amount (including undrawn committed or available amounts) exceeding the Threshold Amount.  For purposes of determining Material Indebtedness, the "principal amount" of the obligations of the Borrower in respect of any Swap Agreement at any time shall be the Swap Termination Value in respect of such Swap Agreement at such time.

"Maturity Date" means the date that is three (3) years after the Original Closing Date.

"Minimum Required Swap Agreements" shall mean Swap Agreements between  the Borrower and one or more Approved Swap Counterparties covering not less than seventy-five percent (75%) of the Borrower's thirty-six (36) month forward projected oil production based on Proved Developed Producing Reserves set forth in the most recent Reserve Report.

"Money Laundering Laws" means any law governing conduct or acts designed in whole or in part to conceal or disguise the nature, location, source, ownership or control of money (including currency or equivalents, e.g., checks, electronic transfers, etc.) to avoid a transaction reporting requirement under state or federal law or to disguise the fact that the money was acquired by illegal means.

"Monterey" has the meaning set forth in the introductory paragraph of this Agreement.

"Moody's" means Moody's Investors Service, Inc. and any successor thereto that is a nationally recognized rating agency.

"Mortgage" means each of the mortgages, deeds of trust or other real property security documents encumbering any Oil and Gas Properties or other real property executed by a Borrower for the

[CREDIT AGREEMENT]

benefit of the Agent (as successor to the Closing Date Lender) as security for the Obligations, together with any assumptions or assignments of the obligations thereunder by the Borrower, and "Mortgages" shall mean all of such Mortgages executed by the Borrowers collectively.

"Mortgaged Property" means any Oil and Gas Property or other Property owned by the Borrower which is subject to a Lien under any Mortgage.

"Multiemployer Plan" means a multiemployer plan, as defined in Section 3(37) or 4001(a)(3) of ERISA, that is subject to Title IV of ERISA and (i) to which the Borrower or an ERISA Affiliate is making or accruing an obligation to make contributions or was obligated to make contributions within the last six (6) years, or (ii) with respect to which the Borrower or an ERISA Affiliate otherwise has any outstanding liability.

"Net Profits Overriding Royalty Interest" means the net profits overriding royalty interest assigned to the Lenders by the NPORI Conveyance.

"New Lenders" means 405 Arapahoe LLC and Cargill Incorporated.

"NPORI Conveyance" means that certain Amended and Restated Net Profits Overriding Royalty Interest Conveyance from Borrower to the Lenders (as successors to the Closing Date Lender), dated effective as of 7:00 a.m. Denver, Colorado time, May 15, 2018.

"Obligations" means all unpaid principal of and accrued and unpaid interest on the Loan, all accrued and unpaid fees and all expenses, reimbursements, indemnities and other obligations and indebtedness (including interest and fees accruing during the pendency of any bankruptcy, insolvency, receivership or other similar proceeding, regardless of whether allowed or allowable in such proceeding), obligations and liabilities of the Borrower to the Agent or any Lender or any indemnified party, individually or collectively (whether existing on the Original Closing Date or arising thereafter, direct or indirect, joint or several, absolute or contingent, matured or unmatured, liquidated or unliquidated, secured or unsecured, arising by contract, operation of law or otherwise) arising or incurred under this Agreement or any of the other Loan Documents or otherwise in respect of the Loan, amounts owing or to be owing by the Borrower to any Lender under any Swap Agreements between the Borrower and such Lender (which it is agreed shall rank *pari passu* with all other items listed in this definition), except Excluded Swap Obligations, and to the extent that any of the foregoing includes or refers to the payment of amounts deemed or constituting interest, only so much thereof as shall have accrued, been earned and which remains unpaid at each relevant time of determination.

"Oil and Gas Properties" means (a) Hydrocarbon Interests; (b) the properties now or hereafter pooled or unitized with Hydrocarbon Interests; (c) all presently existing or future unitization, communitization, pooling agreements and declarations of pooled units and the units created thereby (including all units created under orders, regulations and rules of any Governmental Authority) which may affect all or any portion of the Hydrocarbon Interests; (d) all operating agreements, production sales or other contracts, farmout agreements, farm-in agreements, area of mutual interest agreements, equipment leases and other agreements which relate to any of the Hydrocarbon Interests or any interests therein or to the production, transportation, sale, purchase, exchange, processing, handling, storage, transporting or marketing of the Hydrocarbons from or attributable to such Hydrocarbon Interests; (e) all Hydrocarbons; (f) all tenements, hereditaments, appurtenances and properties in any manner appertaining, belonging, affixed or incidental to the Hydrocarbon Interests, including all compressor sites, settling ponds and equipment or pipe yards; and (g) all properties, rights, titles, interests and estates described or referred to above whether now owned or hereinafter acquired, including any and all property, real or personal, immoveable or moveable, situated upon, used or held for use in connection with the operating,

working or development of any of such Hydrocarbon Interests or property (excluding drilling rigs, automotive equipment, rental equipment or other personal property which may be on such premises for the purpose of drilling a well or for other similar temporary uses) and including any and all oil wells, gas wells, injection wells or other wells, structures, fuel separators, liquid extraction plants, plant compressors, pumps, pumping units, pipelines, sales and flow lines, gathering systems, field gathering systems, salt water disposal facilities, tanks and tank batteries, fixtures, valves, fittings, machinery and parts, engines, boilers, steam generation facilities, meters, apparatus, equipment, appliances, tools, implements, cables, wires, towers, casing, tubing and rods, surface leases, rights-of-way, easements, servitudes, licenses and other surface and subsurface rights, together with all additions, substitutions, replacements, accessions and attachments to any and all of the foregoing. Unless otherwise expressly provided herein, all references in this Agreement to "Oil and Gas Properties" refer to Oil and Gas Properties owned at the time in question by the Borrower, and for the avoidance of doubt, the Borrower shall be deemed to own the properties it acquires pursuant to Acquisition 2 as of the Effective Date.

"Oil and Gas Revenues" means, for any period, all of the Borrower's revenues collected during such period in respect of its Oil and Gas Properties (including, for the avoidance of doubt, any COPAS overhead charged through the Joint Operating Agreement (as defined in the NPORI Conveyance) and received by the Borrower.

"Organizational Documents" means (a) with respect to any corporation, the certificate or articles of incorporation and bylaws (or equivalent or comparable constitutive documents with respect to such corporation's jurisdiction) of such corporation; (b) with respect to any limited liability company, the certificate or articles of formation or organization and operating agreement or limited liability company agreement of such limited liability company; and (c) with respect to any partnership, joint venture, trust or other form of business entity, the partnership, joint venture or other applicable agreement of formation or organization of such entity and any agreement, instrument, filing or notice with respect thereto filed in connection with its formation or organization with the applicable Governmental Authority in the jurisdiction of its formation or organization and, if applicable, any certificate or articles of formation or organization of such entity.

"Original Closing Date" means November 20, 2017.

"Original Credit Agreement" has the meaning given to such term in the introductory paragraph of this Agreement.

"Original Lender" means Fulcrum Energy Capital II Monterey LLC, in its capacity as the sole lender under the Original Credit Agreement prior to the Effective Date.

"Other Connection Taxes" means with respect to any Lender, Taxes imposed as a result of a present or former connection between such Lender and the jurisdiction imposing such Tax (other than connections arising from such Lender having executed, delivered, become a party to, performed its obligations under, received payments under, received or perfected a security interest under, engaged in any other transaction pursuant to, or enforced, any Loan Document, or sold or assigned an interest in the Loan or any Loan Document).

"Other Taxes" means all present or future stamp, court or documentary, intangible, recording, filing or similar Taxes that arise from any payment made under, from the execution, delivery, performance, enforcement or registration of, from the receipt or perfection of a security interest under, or otherwise with respect to, any Loan Document, except any such Taxes that are Other Connection Taxes imposed with respect to an assignment.

"<u>Patriot Act</u>" means the Uniting and Strengthening America by Providing Appropriate Tools Required to Intercept and Obstruct Terrorism Act of 2001.

"<u>Payment in Full</u>" means the principal of and interest on the Loan and all fees payable hereunder and all other amounts payable under the Loan Documents (other than contingent indemnification obligations for which no claim has been received by the Borrower) shall have been paid in full.

"<u>PBGC</u>" means the Pension Benefit Guaranty Corporation as defined in Title IV of ERISA, or any successor thereto.

"<u>Permitted Holders</u>" means Robert A. Imel and Richard Boyce.

"<u>Permitted Investments</u>" means:

(a)     direct obligations of, or obligations the principal of and interest on which are unconditionally guaranteed by, the United States of America (or by any agency thereof to the extent such obligations are backed by the full faith and credit of the United States of America), in each case maturing within one year from the date of acquisition thereof;

(b)     investments in commercial paper maturing within 270 days from the date of acquisition thereof and having, at such date of acquisition, the highest credit rating obtainable from S&P or from Moody's;

(c)     investments in certificates of deposit, banker's acceptances and time deposits maturing within 180 days from the date of acquisition thereof issued or guaranteed by or placed with, and demand deposits with, and money market deposit accounts issued or offered by, any domestic office of any commercial bank organized under the laws of the United States of America or any State thereof which has a combined capital and surplus and undivided profits of not less than $500,000,000;

(d)     fully collateralized repurchase agreements with a term of not more than thirty (30) days for securities described in clause (a) above and entered into with a financial institution satisfying the criteria described in clause (c) above; and

(e)     money market funds that (i) comply with the criteria set forth in SEC Rule 2a-7 under the Investment Company Act of 1940, (ii) are rated AAA by S&P and Aaa by Moody's and (iii) have portfolio assets of at least $5,000,000,000.

"<u>Permitted Mortgaged Property Liens</u>" means Excepted Liens identified in clauses (a) to (d), (f) and (i) of the definition thereof, but subject to the proviso at the end of such definition.

"<u>Permitted Tax Distributions</u>" so long as any Borrower has elected to be taxed as a partnership or in accordance with Subchapter S of the Code and any comparable state tax laws applicable to its respective shareholders or as a partnership for federal income tax purposes may make distributions in an amount necessary for the payment of the federal and state income tax obligations on account of the attribution of each such Borrower's income to its shareholders or members, as the case may be, by reason of such Borrower being a Subchapter S corporation or a partnership for federal income tax purposes, in each case determined by reference to the shareholder or member, as the case may be, who has the highest combined marginal rate for income tax purposes.

"<u>Person</u>" means any natural person, corporation, limited liability company, trust, joint venture, association, company, partnership, Governmental Authority or other entity.

"Plan" means any employee pension benefit plan (other than a Multiemployer Plan) subject to the provisions of Title IV of ERISA or Section 412 of the Code or Section 302 of ERISA, and in respect of which the Borrower or any ERISA Affiliate (i) is (or, if such plan were terminated, would under Section 4069 of ERISA be deemed to be) an "employer" as defined in Section 3(5) of ERISA, or (ii) otherwise has any outstanding liability.

"Prior Loans" shall mean the aggregate outstanding principal amount of the loans made to Monterey under the Original Credit Agreement, in particular, (a) a loan made on the Original Closing Date to Monterey in an amount equal to Three Million Seven Hundred Sixty Six Thousand Five Hundred Ninety Nine Dollars ($3,766,599.00), and (b) a loan made to Monterey on December 1, 2017 in an amount equal to Two Hundred Thirty Three Thousand Four Hundred and One Dollars ($233,401.00), for a total amount of $4,000,000 as of the Effective Date.

"Production Forecast" means, for any period, a forecast prepared in reasonable detail by the Borrower, satisfactory in form and substance to the Required Lenders in their reasonable discretion, of the Forecasted Net Production for each month in such period.

"Prohibited Transaction" has the meaning assigned to such term in Section 406 of ERISA and Section 4975(c) of the Code.

"Property" means any interest in any kind of property or asset, whether real, personal or mixed, or tangible or intangible, including cash, securities, accounts and contract rights, including any Oil and Gas Property. Unless otherwise expressly provided herein, all references in this Agreement to "Property" refer to Property owned at the time in question by the Borrower, and for the avoidance of doubt, the Borrower shall be deemed to own the properties it acquires pursuant to Acquisition 2 as of the Effective Date.

"Proved Reserves" means "Proved Reserves" as defined in the Petroleum Resources Management System as in effect at the time in question (the "PRMS") prepared by the Oil and Gas Reserves Committee of the Society of Petroleum Engineers and reviewed and jointly sponsored by the World Petroleum Council, the American Association of Petroleum Geologists and the Society of Petroleum Evaluation Engineers (or any generally recognized successor organizations).

"Proved Developed Producing Reserves" means Proved Reserves that are categorized as "Developed Producing Reserves" in the PRMS.

"Qualified ECP Credit Party" shall mean, in respect of any Swap Obligation, the Borrower and other obligor that has total assets exceeding $10,000,000 at the time the relevant grant of any Lien becomes effective with respect to such Swap Obligation or such other Person as constitutes an Eligible Contract Participant and can cause another Person to qualify as an Eligible Contract Participant at such time by entering into a keepwell under Section 1a(18)(A)(v)(II) of the Commodity Exchange Act.

"RCRA" has the meaning assigned to such term within the definition of "Environmental Laws."

"Redemption" means with respect to any Indebtedness, the repurchase, redemption, prepayment, repayment, defeasance or any other acquisition or retirement for value (or the segregation of funds with respect to any of the foregoing) of such Indebtedness. "Redeem" has the correlative meaning thereto.

"Related Parties" means, with respect to any specified Person, such Person's Affiliates and the respective directors, officers, employees, agents, advisors (including attorneys, accountants and experts) and representatives of such Person and such Person's Affiliates.

16

"Release" means any depositing, spilling, leaking, pumping, pouring, placing, emitting, discarding, abandoning, emptying, discharging, migrating, injecting, escaping, leaching, dumping or disposing.

"Remedial Work" has the meaning assigned to such term in Section 5.09(a).

"Reportable Event" means any of the events described in Section 4043(c) of ERISA or the regulations thereunder other than such an event as to which the provision of thirty (30) days' notice to the PBGC is waived under applicable regulations.

"Responsible Officer" means, as to any Person, the chief executive officer, the president, any Financial Officer or any vice president of such Person. Unless otherwise specified, all references to a Responsible Officer herein shall mean a Responsible Officer of the Borrower.

"Required Lenders" means the Lenders or Lender holding at least 50.1% of the outstanding principal amount of the Loan hereunder.

"Restricted Payment" means any dividend or other distribution (whether in cash, securities or other Property) with respect to any Equity Interests in the Borrower, or any payment (whether in cash, securities or other Property), including any sinking fund or similar deposit, on account of the purchase, redemption, retirement, acquisition, cancellation or termination of any such Equity Interests. Notwithstanding anything set forth herein to the contrary, the following shall not constitute a Restricted Payment: (a) the payment, for general and administrative services rendered to the Borrowers, of G&A Expenses to the direct or indirect holders of the Equity Interests of Monterey or (b) any payments made by Green Wheel to Monterey.

"Reserve Report" shall mean each report prepared by an Approved Engineer, covering the Reserves attributable to the interests of the Borrower in Oil and Gas Properties and containing such information as required by Section 5.01(p).

"Reserves" shall mean volumes of Hydrocarbons.

"S&P" means Standard & Poor's Ratings Services, a Standard & Poor's Financial Services LLC business, and any successor thereto that is a nationally recognized rating agency.

"Sanctioned Country" means, at any time, a country, region or territory which is itself the subject or target of any Sanctions (at the time of this Agreement, Crimea, Cuba, Iran, North Korea, Sudan and Syria).

"Sanctioned Person" means, at any time, (a) any Person listed in any Sanctions-related list of designated Persons maintained by the Office of Foreign Assets Control of the U.S. Department of the Treasury or the U.S. Department of State, (b) any Person operating, organized or resident in a Sanctioned Country or (c) any Person owned or controlled by any such Person or Persons described in the foregoing clauses (a) or (b).

"Sanctions" means all economic or financial sanctions or trade embargoes imposed, administered or enforced from time to time by the U.S. government, including those administered by the Office of Foreign Assets Control of the U.S. Department of the Treasury or the U.S. Department of State.

"SEC" means the United States Securities and Exchange Commission.

"Security Instruments" means, collectively, the Collateral Agreement, the Mortgages, the Deposit Account Control Agreements and all other agreements, instruments and documents executed by the Borrower in connection with this Agreement that are intended to create, perfect or evidence Liens to secure the Obligations.

"Servicer" means Cortland Capital Markets Services, or any of its affiliates.

"Solvent" means, in reference to any Person, (i) the fair value of the assets of such Person, at a fair valuation, will exceed its debts and liabilities (subordinated, contingent or otherwise); (ii) the present fair saleable value of the property of such Person will be greater than the amount that will be required to pay the probable liability of its debts and other liabilities (subordinated, contingent or otherwise), as such debts and other liabilities become absolute and matured; (iii) such Person will be able to pay its debts and liabilities (subordinated, contingent or otherwise), as such debts and liabilities become absolute and matured; and (iv) such Person will not have unreasonably small capital with which to conduct the business in which it is engaged as such business is now conducted and is proposed to be conducted after the Effective Date.

"Subsidiary" means as to any Person, a corporation, partnership, limited liability company or other entity of which shares of stock or other ownership interests having ordinary voting power (other than stock or such other ownership interests having such power only by reason of the happening of a contingency) to elect a majority of the board of directors (or equivalent governing body) or other managers of such corporation, partnership or other entity are at the time owned, or the management of which is otherwise controlled, directly or indirectly through one or more intermediaries, or both, by such Person.

"Swap Agreement" means any agreement with respect to any swap, cap, collar, forward, future or derivative transaction or option or similar agreement, whether exchange traded, "over-the-counter" or otherwise, involving, or settled by reference to, one or more rates, currencies, commodities, equity or debt instruments or securities, or economic, financial or pricing indices or measures of economic, financial or pricing risk or value or any similar transaction or any combination of these transactions (including any agreement, contract or transaction that constitutes a "swap" within the meaning of Section 1a(47) of the Commodity Exchange Act); provided, however, that no phantom stock or similar plan providing for payments only on account of services provided by current or former directors, officers, employees or consultants of the Borrower shall be a Swap Agreement.

"Swap Obligation" means, with respect to the Borrower, any obligation to pay or perform under any agreement, contract or transaction that constitutes a "swap" within the meaning of Section 1a(47) of the Commodity Exchange Act or any rules or regulations promulgated thereunder.

"Swap Termination Value" means, in respect of any one or more Swap Agreements, after taking into account the effect of any legally enforceable netting agreement relating to such Swap Agreements, (a) for any date on or after the date such Swap Agreements have been closed out and termination value(s) determined in accordance therewith, such termination value(s) and (b) for any date prior to the date referenced in clause (a), the amount(s) determined as the mark-to-market value(s) for such Swap Agreements, as determined by the counterparties to such Swap Agreements.

"Synthetic Leases" means, in respect of any Person, all leases which shall have been, or should have been, in accordance with GAAP, treated as operating leases on the financial statements of the Person liable (whether contingently or otherwise) for the payment of rent thereunder and which were properly treated as indebtedness for borrowed money for purposes of U.S. federal income taxes, if the lessee in respect thereof is obligated to either purchase for an amount in excess of, or pay upon early termination

[CREDIT AGREEMENT]

an amount in excess of, 80% of the residual value of the Property subject to such operating lease upon expiration or early termination of such lease.

"Taxes" means any and all present or future taxes, levies, imposts, duties, deductions, withholdings (including backup withholding), value added taxes, or any other goods and services, use or sales taxes, assessments, fees or other charges imposed by any Governmental Authority, including any interest, additions to tax or penalties applicable thereto.

"Threshold Amount" means $50,000.

"Total Debt" means all Indebtedness of the Borrower.

"Transactions" means, (a) the Acquisition and Acquisition 2, (b) the execution, delivery and performance by the Borrower of this Agreement and each other Loan Document to which it is a party, the borrowing of the Loans by the Borrower, the use of the proceeds thereof (including, without limitation, to fund the Acquisition), the Borrower's grant of the security interests and provision of Collateral under the Security Instruments to which it is a party, (c) the execution, delivery and performance by the Limited Obligor and Live Oak of each Loan Document to which they are a party, and Live Oak's grant of the lien contemplated by the Live Oak Mortgage, and (d) the payment of fees and expenses in respect of the foregoing.

"UCC" means the Uniform Commercial Code as in effect from time to time in the State of Texas or any other state the laws of which are required to be applied in connection with the issue of perfection of security interests.

"U.S. Person" means a "United States person" within the meaning of Section 7701(a)(30) of the Code.

"Washington Federal Controlled Account" has the meaning assigned to such term in Section 5.14.

"Wells" means any oil, gas, water, CO2, disposal or injection wells (i) described in the Security Instruments, or (ii) located on the Hydrocarbon Interests or lands pooled or unitized with the Hydrocarbon Interests, in each case, whether producing, shut-in, plugged or abandoned.

"Withholding Agent" means the Borrower.

Section 1.02    Rules of Construction. The definitions of terms herein shall apply equally to the singular and plural forms of the terms defined. Whenever the context may require, any pronoun shall include the corresponding masculine, feminine and neuter forms. The words "include", "includes" and "including" shall be deemed to be followed by the phrase "without limitation". The word "will" shall be construed to have the same meaning and effect as the word "shall". The word "law" shall be construed as referring to all statutes, rules, regulations, codes and other laws (including official rulings and interpretations thereunder having the force of law or with which affected Persons customarily comply), and all judgments, orders and decrees, of all Governmental Authorities. Unless the context requires otherwise, (a) any definition of or reference to any agreement, instrument or other document herein shall be construed as referring to such agreement, instrument or other document as from time to time amended, supplemented, restated, or otherwise modified (subject to any restrictions on such amendments, supplements, restatements or modifications set forth herein and in the other Loan Documents), (b) any reference herein to any law shall be construed as referring to such law as amended, modified, codified or reenacted, in whole or in part, and in effect from time to time, (c) any reference herein to any Person shall

[CREDIT AGREEMENT]

be construed to include such Person's successors and assigns (subject to any restrictions on assignment set forth herein and in the other Loan Documents) and, in the case of any Governmental Authority, any other Governmental Authority that shall have succeeded to any or all functions thereof, (d) the words "herein", "hereof" and "hereunder", and words of similar import, shall be construed to refer to this Agreement in its entirety and not to any particular provision hereof, (e) with respect to the determination of any time period, the word "from" means "from and including" and the word "to" and "until" means "to but excluding" and the word "through" means "to and including", (f) any reference herein to Articles, Sections, Exhibits and Schedules shall be construed to refer to Articles and Sections of, and Exhibits and Schedules to, this Agreement, and (g) the words "asset" and "property" shall be construed to have the same meaning and effect and to refer to any and all tangible and intangible assets and properties, including cash, securities, accounts and contract rights. The word "or" is not exclusive. No provision of this Agreement or any other Loan Document shall be interpreted or construed against any Person solely because such Person or its legal representative drafted such provision.

Section 1.03    Accounting Terms; GAAP; Pro Forma Calculations.    Except as otherwise expressly provided herein, all terms of an accounting or financial nature shall be construed in accordance with GAAP, as in effect from time to time; provided, however, that, if the Borrower notifies the Agent that the Borrower requests an amendment to any provision hereof to eliminate the effect of any change occurring after the date hereof in GAAP or in the application thereof on the operation of such provision (or if the Agent requests an amendment to any provision hereof for such purpose), regardless of whether any such notice is given before or after such change in GAAP or in the application thereof, then such provision shall be interpreted on the basis of GAAP as in effect and applied immediately before such change shall have become effective until such notice shall have been withdrawn or such provision amended in accordance herewith. Notwithstanding any other provision contained herein, all terms of an accounting or financial nature used herein shall be construed, and all computations of amounts and ratios referred to herein shall be made (i) without giving effect to any election under Accounting Standards Codification 825-10-25 (or any other Accounting Standards Codification or Financial Accounting Standard having a similar result or effect) to value any Indebtedness or other liabilities of the Borrower at "fair value", as defined therein and (ii) without giving effect to any treatment of Indebtedness in respect of convertible debt instruments under Accounting Standards Codification 470-20 (or any other Accounting Standards Codification or Financial Accounting Standard having a similar result or effect) to value any such Indebtedness in a reduced or bifurcated manner as described therein, and such Indebtedness shall at all times be valued at the full stated principal amount thereof.

## ARTICLE II
## TERM LOAN

Section 2.01    Term Loan.    Subject to the terms and conditions set forth herein, each Lender agrees to make a loan available to the Borrower on the Effective Date in an amount equal to such Lender's Applicable Percentage (a) of the Prior Loans and (b) Eleven Million Dollars ($11,000,000.00) with the effect that total aggregate principal balance of the loans outstanding under this Agreement will be Fifteen Million Dollars ($15,000,000) (the "Loan"). The funding of the Prior Loans shall be made by the Lenders in accordance with Section 8.11 and no monies are being made available to the Borrower pursuant to clause (a) of the preceding sentence.

Section 2.02    Funding.    The Borrower hereby irrevocably authorizes the applicable Lenders to disburse the proceeds of the Loan in immediately available funds by wire transfer to the bank account designated by the Borrower to the Lenders in writing prior to the Effective Date.

[CREDIT AGREEMENT]

Section 2.03     Repayment of Loan.

(a)     Monthly Principal Payments.     Commencing with November 30, 2018 and continuing on last Business Day of each calendar month thereafter, the Borrowers shall make a monthly principal payment on the Loan to the Agent, for the ratable benefit of the Lenders, in the amount of One Hundred Fifty Thousand Dollars ($150,000) per month.

(b)     Payment at Maturity.     If not sooner repaid or prepaid, the Loan shall be repaid in full, together with accrued interest thereon, on the Maturity Date.  Any portion of the Loan that is repaid or prepaid may not be re-borrowed.

Section 2.04     Interest.     Interest shall accrue on the outstanding principal amount of the Loan at a rate per annum equal to fifteen percent (15.0%).  Accrued interest shall be due and payable in cash, in arrears, on the last Business Day of each calendar month, beginning with the first such date to occur after the Effective Date (and for the avoidance of doubt, the interest due on such first payment date shall include all accrued interest due and payable under the Original Credit Agreement (with all such interest accrued on the Prior Loans through the Effective Date to be paid for the account of Fulcrum Energy Capital II Monterey LLC) as well as all accrued interest from and after the Effective Date to such first payment date), and on the Maturity Date (or such other date when the principal hereunder becomes due and payable, whether by acceleration pursuant to Section 7.02, prepayment pursuant to Section 2.06, or otherwise).  After the occurrence and during the continuance of an Event of Default, the outstanding principal amount of the Loan and any accrued and unpaid interest thereon shall accrue interest at the Default Rate.  All interest hereunder shall be computed on the basis of a year of 360 days, and shall be payable for the actual number of days elapsed (including the first day but excluding the last day).

Section 2.05     Maximum Interest Rate.     In no contingency or event whatsoever shall the aggregate of all amounts deemed interest under this Agreement charged or collected pursuant to the terms of this Agreement exceed the highest rate permissible under any applicable law which a court of competent jurisdiction shall, in a final determination, deem applicable hereto.  In the event that such a court determines that the Lenders have charged or received interest hereunder in excess of the highest applicable rate, the rate in effect hereunder shall automatically be reduced to the maximum rate permitted by applicable law and the Lenders shall at their option (i) promptly refund to the Borrower any interest received by the Lenders in excess of the maximum lawful rate or (ii) apply such excess to the principal balance of the Obligations.  It is the intent hereof that the Borrower not pay or contract to pay, and that the Lenders not receive or contract to receive, directly or indirectly in any manner whatsoever, interest in excess of that which may be paid by the Borrower under applicable law.

Section 2.06     Prepayment.

(a)     Voluntary Prepayments.     The Borrower may prepay all or a portion of the outstanding principal amount of the Loan, provided that any such voluntary prepayment shall be in a principal amount equal to or greater than $25,000 (or, if less, the entire amount of the Obligations outstanding under this Agreement).

(b)     Notice of Prepayment.     The Borrower shall notify the Agent of any voluntary prepayment pursuant to Section 2.06(b) not later than 1:00 p.m., Denver, Colorado time, three (3) Business Days before the date of prepayment.  Each such notice shall be irrevocable and shall specify the prepayment date and the principal amount of the Loan to be prepaid.

Section 2.07     Manner of Payment.     Each payment by the Borrower on account of the Obligations shall be made not later than 1:00 p.m., Denver, Colorado time, on the date specified for

[CREDIT AGREEMENT]

payment under this Agreement to the Agent (for the account of the Lenders) at its account specified to the Borrower in writing from time to time, in immediately available funds and without any setoff, counterclaim or deduction whatsoever. Any payment received after 1:00 p.m. on such day may in the Agent's discretion be deemed to have been made on the next succeeding Business Day. Any payment of principal by the Borrower hereunder (including any prepayment) shall be accompanied by all interest accrued and unpaid on such principal. Any principal or interest prepaid by the Borrower hereunder shall be in addition to, and not in lieu of, all payments otherwise required to be paid under the Loan Documents at the time of such prepayment.

Section 2.08    Pro Rata Treatment; Adjustments.

(a)    Except to the extent otherwise expressly provided, (i) the borrowing pursuant to this Agreement shall be made from the Lenders pro rata in accordance with their respective percentage shares, (ii) each payment by the Borrower of fees shall be made for the account of the Agent or the Lenders as agreed among them, (iii) each payment in reduction of the Loan shall be made for the account of the Lenders pro rata in accordance with their respective shares of the Loan, (iv) each payment of interest hereunder shall be made for the account of the Lenders pro rata in accordance with their respective shares of the aggregate amount of interest due and payable to the Lenders, and (v) each payment by the Borrower under Swap Agreements with a Lender shall be made only to the Person or Persons entitled thereto.

(b)    The Agent shall distribute all payments with respect to the Obligations to the Lenders promptly upon receipt in like funds as received. In the event that any payments made hereunder by the Borrower at any particular time are insufficient to satisfy in full the Obligations due and payable at such time, such payments shall be applied pro rata in accordance with the Lenders' respective shares of the Loan (i) first, to fees and expenses due pursuant to the terms of this Agreement or any other Loan Instrument, (ii) second, to accrued interest and (iii) third, to the Loan and any other Obligations pro rata on the basis of the ratio of the amount of all such Obligations then owing to the Agent or the relevant Lender or Affiliate of any Lender, as the case may be, to the total amount of the Obligations then owing.

(c)    If any Lender (for purposes of this Section, a "Benefited Lender") shall at any time receive any payment of all or part of its portion of the Obligations, or receive any Collateral in respect thereof (whether voluntarily or involuntarily, by set-off or otherwise) in an amount greater than such Lender was entitled to receive pursuant to the terms hereof, such Benefited Lender shall purchase for cash from the other Lenders such portion of the Obligations of such other Lenders, or shall provide such other Lenders with the benefits of any such Collateral or the proceeds thereof, as shall be necessary to cause such Benefited Lender to share the excess payment or benefits of such collateral or proceeds with each of the Lenders according to the terms hereof. If all or any portion of such excess payment or obtained benefits is thereafter recovered from such Benefited Lender, such purchase shall be rescinded and the purchase price and benefits returned by such Lender, to the extent of such recovery, but without interest. The Borrower agrees that each such Lender so purchasing a portion of the Obligations of another Lender may exercise all rights of payment (including rights of set-off) with respect to such portion as fully as if such Lender were the direct holder of such portion. If any Lender ever receives, by voluntary payment, exercise of rights of set-off or banker's lien, counterclaim, cross-action or otherwise, any funds of the Borrower to be applied to the Obligations, or receives any proceeds by realization on or with respect to any Collateral, all such funds and proceeds shall be forwarded immediately to the Agent for distribution in accordance with the terms of this Agreement.

Section 2.09    Fees. The Borrower shall pay to the Closing Date Lender the fees contemplated by the Fee Letter in accordance with the terms and conditions thereof and shall pay to the Lenders the fees contemplated by the Acquisition 2 Fee Letter in accordance with the terms and conditions thereof.

22

Section 2.10    Taxes.

(a)    Payments Free of Taxes. Any and all payments by or on account of any obligation of the Borrower under any Loan Document shall be made without deduction or withholding for any Taxes, except as required by applicable law.  If any applicable law (as determined in the good faith discretion of an applicable Withholding Agent) requires the deduction or withholding of any Tax from any such payment by a Withholding Agent, then the applicable Withholding Agent shall be entitled to make such deduction or withholding and shall timely pay the full amount deducted or withheld to the relevant Governmental Authority in accordance with applicable law and, if such Tax is an Indemnified Tax, then the sum payable by the Borrower shall be increased as necessary so that, after such deduction or withholding has been made (including such deductions and withholdings applicable to additional sums payable under this Section 2.10), the applicable Lender receives an amount equal to the sum it would have received had no such deduction or withholding been made.

(b)    Payment of Other Taxes by the Borrower. The Borrower shall timely pay to the relevant Governmental Authority in accordance with applicable law, or at the option of any Lender timely reimburse it for the payment of, any Other Taxes.

(c)    Evidence of Payments. As soon as practicable after any payment of Taxes by the Borrower to a Governmental Authority pursuant to this Section 2.10, the Borrower shall deliver to the Agent the original or a certified copy of a receipt issued by such Governmental Authority evidencing such payment, a copy of the return reporting such payment or other evidence of such payment reasonably satisfactory to the Required Lenders.

(d)    Indemnification by the Borrower. The Borrower shall indemnify each Lender, within ten (10) days after demand therefor, for the full amount of any Indemnified Taxes (including Indemnified Taxes imposed or asserted on or attributable to amounts payable under this Section 2.10) payable or paid by such Lender or required to be withheld or deducted from a payment to such Lender and any reasonable expenses arising therefrom or with respect thereto, whether or not such Indemnified Taxes were correctly or legally imposed or asserted by the relevant Governmental Authority.  A certificate as to the amount of such payment or liability delivered to the Borrower by such Lender shall be conclusive absent manifest error.

(e)    Treatment of Certain Refunds. If a Lender determines, in its sole discretion exercised in good faith, that it has received a refund of any Taxes as to which it has been indemnified pursuant to this Section 2.10 (including by the payment of additional amounts pursuant to this Section 2.10), it shall pay to the indemnifying party an amount equal to such refund (but only to the extent of indemnity payments made under this Section 2.10 with respect to the Taxes giving rise to such refund), net of all out-of-pocket expenses (including Taxes) and without interest (other than any interest paid by the relevant Governmental Authority with respect to such refund).  Such indemnifying party, upon the request of such Lender, shall repay to such Lender the amount paid over pursuant to this paragraph (e) (plus any penalties, interest or other charges imposed by the relevant Governmental Authority) in the event that such Lender is required to repay such refund to such Governmental Authority.  Notwithstanding anything to the contrary in this paragraph (e), in no event will such Lender be required to pay any amount to an indemnifying party pursuant to this paragraph (e) the payment of which would place such Lender in a less favorable net after-Tax position than such Lender would have been in if the Tax subject to indemnification and giving rise to such refund had not been deducted, withheld or otherwise imposed and the indemnification payments or additional amounts with respect to such Tax had never been paid.  This paragraph shall not be construed to require any Lender to make available

23

its Tax returns (or any other information relating to its Taxes that it deems confidential) to the indemnifying party or any other Person.

Section 2.11    Keepwell.    Each Qualified ECP Credit Party hereby jointly and severally, absolutely, unconditionally and irrevocably undertakes to provide such funds or other support as may be needed from time to time by each other credit party to honor all of its obligations in respect of Swap Obligations constituting a portion of the Obligations; provided, however, that each Qualified ECP Credit Party shall only be liable under this Section 2.11 for the maximum amount of such liability that can be hereby incurred without rendering its obligations under this Section 2.12, or otherwise hereunder or under any other Loan Instrument, voidable under applicable law relating to fraudulent conveyance or fraudulent transfer, and not of any greater amount.  The obligations of each Qualified ECP Credit Party under this Section 2.11 shall remain in full force and effect until the Obligations are paid and performed in full.  Each Qualified ECP Credit Party intends that this Section 2.11 constitute, and this Section 2.11 shall be deemed to constitute, a "keepwell, support or other agreement" for the benefit of the Borrower and each other obligor for all purposes of Section 1a(18)(A)(v)(II) of the Commodity Exchange Act. Notwithstanding any other provisions of this Agreement or any other Loan Instrument, the Obligations owed by Borrower, any other obligor or secured by any Lien granted by such Borrower or obligor under any Loan Instrument shall exclude all Excluded Swap Obligations with respect to such Borrower or obligor.

(b)    Survival.    Each party's obligations under this Section 2.11 shall survive any assignment of rights by any Lender, any termination of this Agreement and the repayment, satisfaction or discharge of all obligations under any Loan Document.

ARTICLE III
**CONDITIONS PRECEDENT**

Section 3.01    [Reserved].

Section 3.02    [Reserved].

Section 3.03    [Reserved].

Section 3.04    Effective Date.  The Effective Date shall occur on the date on which each of the following conditions are satisfied or waived by the Lenders in their sole discretion:

(a)    The Agent and the Lenders shall have received from each party thereto counterparts (in such number as may be requested by the Agent and the Lenders) of the Acquisition 2 Fee Letter and each other Loan Document contemplated to be executed on the Effective Date, in each case duly executed by such party.

(b)    To the extent invoiced at least one (1) Business Day prior to the Effective Date, the Agent and the Lenders shall have received reimbursement of all out of pocket expenses required to be reimbursed by the Borrower hereunder on or before the Effective Date.

(c)    Each document (including any UCC financing statement) required by the Security Instruments or under applicable law or reasonably requested by the Agent and/or the Lenders to be filed, registered or recorded in order to perfect the security interests of the Agent on behalf of the Lenders in the Collateral (including, for the avoidance of doubt, the Collateral being

24

purchased on the Effective Date pursuant to Acquisition 2), shall have been delivered to the Agent and the Lenders in proper form for filing, registration or recordation.

(d)     The Agent and the Lenders shall have received any Mortgage reasonably required by the Lenders.

(e)     The Agent and the Lenders shall have received a certificate of a Responsible Officer, the secretary or assistant secretary of the Borrower setting forth (i) resolutions of its board of directors or other appropriate governing body with respect to the authorization of the Borrower to execute and deliver the Loan Documents referred to in Section 3.04(a) to which it is a party and to enter into the transactions contemplated in those documents, (ii) the officers of the Borrower (y) who are authorized to sign such Loan Documents to which the Borrower is a party and (z) who will, until replaced by another officer or officers duly authorized for that purpose, act as its representative for the purposes of signing documents and giving notices and other communications in connection with this Agreement and the transactions contemplated hereby, (iii) specimen signatures of such authorized officers, and (iv) the articles or certificate of incorporation and by-laws or other applicable Organizational Documents of the Borrower, certified as being true and complete.  The Agent and the Lenders may conclusively rely on such certificate until the Agent receives notice in writing from the Borrower to the contrary.

(f)     The Agent and the Lenders shall have received certificates of the appropriate state agencies, as requested by the Lenders, with respect to the existence, qualification and good standing of the Borrower in each jurisdiction where the Borrower is organized, owns any Oil and Gas Properties or is qualified to do business.

(g)     The Agent and the Lenders shall have received a certificate of a Responsible Officer of the Borrower in form and substance reasonably satisfactory to the Lenders certifying that (i) all government and third party approvals necessary in connection with Acquisition 2 have been obtained on satisfactory terms, except for such approvals that are customarily obtained on a post-closing basis, and (ii) no action or proceeding against the Borrower or its properties is pending or threatened in any court or before any Governmental Authority seeking to enjoin or prevent the consummation of Acquisition 2.

(h)     [Reserved].

(i)     The Agent and the Lenders shall have received a certificate of a Responsible Officer of the Borrower substantially in the form of Exhibit C certifying that, after giving effect to Acquisition 2, the Borrower is Solvent.

(j)     The Agent and the Lenders shall have received (i) the financial statements referred to in Section 4.04(a), and (ii) financial projections for the Borrower for the first 12 months following the Effective Date in form and substance reasonably satisfactory to the Lenders.

(k)     The Agent and the Lenders shall have received (i) a favorable opinion from counsel to the Borrower, with respect to the Borrower, the Loan Documents referred to in Section 3.04(a) and such other matters as the Lenders shall request, and (ii) a favorable opinion of local counsel for each state in which Mortgaged Property acquired in Acquisition 2 is located with respect to the applicable Mortgages and such other matters as the Lenders shall request, each of which opinions shall be in form and substance satisfactory to the Lenders, shall be addressed to

the Agent and the Lenders and shall expressly permit reliance by the permitted successors and assigns of the Agent and the Lenders.

(l)     There shall not have occurred any event, development or circumstance that has had, or could reasonably be expected to have, a Material Adverse Effect since December 31, 2017.

(m)     The Agent and the Lenders shall have received all fees, expenses and other amounts due and payable on or prior to the Effective Date.

(n)     The Agent and the Lenders shall have received appropriate UCC search results reflecting no prior Liens encumbering the Properties being acquired by the Borrower pursuant to Acquisition 2 other than those being released on or prior to the Effective Date or Liens permitted by Section 6.03.

(o)     The Agent and the Lenders shall have received title information in form and substance acceptable to the Lenders with respect to title of the Oil and Gas Properties being acquired by the Borrower pursuant to Acquisition 2 and such information shall not have revealed any condition or circumstance that would reflect that the representations and warranties contained in Section 4.15(a) are inaccurate in any material respect.

(p)     The Lenders shall be satisfied with the environmental conditions of the Oil and Gas Properties being acquired by the Borrower pursuant to Acquisition 2 and shall have received copies of all existing environmental assessments and other environmental reports relating thereto.

(q)     The Lenders shall have completed such business, accounting, environmental and legal due diligence and other due diligence with respect to the business, assets, liabilities, operations and condition (financial or otherwise) of the Borrower as they deem appropriate and shall be satisfied with the results thereof.

(r)     (i) The Agent and the Lenders shall have received final, executed copies of all definitive documentation relating to Acquisition 2 (including any amendments thereto) and all related agreements, documents and instruments as in effect on the Effective Date, all of which shall be satisfactory in form and substance to the Lenders, and the Lenders shall be satisfied that, substantially concurrently with the making of the portion of the Loan to be made on the Effective Date hereunder, Acquisition 2 shall have been consummated in accordance with the terms of such documentation and in compliance with all applicable law and regulatory approvals, without any amendment or waiver of any condition or other provision thereof except as approved by the Lenders, (ii) the Agent and the Lenders shall have received a final copy of any due diligence or similar report prepared in connection with Acquisition 2 (including, without limitation, any environmental diligence materials), and (iii) the Lenders shall be satisfied that the aggregate purchase price to be paid by the Borrower in connection with Acquisition 2 will not exceed $10,500,000.00.

(s)     The Agent and the Lenders shall have received a Production Forecast covering the period beginning on the Effective Date and ending on the Maturity Date;

(t)     Reserve Report(s) prepared as May 1, 2018 confirming that Borrower will own, after Acquisition 2, at least $16,658,049 in Proven Developed Producing Reserves.

(u)      The Agent and the Lenders shall have received such other certificates, documents, instruments and agreements as the Lenders shall reasonably request in connection with the transactions contemplated by this Agreement and the other Loan Documents.

(v)      At the time of and immediately after giving effect to the Loan, no Default or Event of Default shall have occurred and be continuing.

(w)      At the time of and immediately after giving effect to the Loan, the representations and warranties of the Borrower set forth in this Agreement and in the other Loan Documents shall be true and correct in all material respects (except to the extent qualified by materiality or reference to Material Adverse Effect, in which case such applicable representation and warranty shall be true and correct in all respects) on and as of the date hereof, except to the extent any such representations and warranties are expressly limited to an earlier date, in which case, on and as of the date of such loan, such representations and warranties shall continue to be true and correct in all material respects (except to the extent qualified by materiality or reference to Material Adverse Effect, in which case such applicable representation and warranty shall be true and correct in all respects) as of such specified earlier date.

(x)      [reserved].

(y)      The Agent and the Lenders shall have received an operating and capital budget of the Borrower, satisfactory to the Lenders in their sole discretion, covering at least the remainder of the then-current fiscal year, including the projected monthly production of Hydrocarbons by the Borrower and the assumptions used in calculating such projections, the projected capital expenditures to be incurred by the Borrower, and such other information as may be reasonably requested by the Lenders.

(z)      The Agent shall have received a copy of the Lockbox Services Agreement between the Agent and Citibank.

(aa)     The Lenders shall have received an executed copy of the NPORI Conveyance.

(bb)     The Lenders and the Agent shall have received all documentation and other information required by Governmental Authorities under applicable "know your customer" and anti-money laundering rules and regulations, including, without limitation, a completed W-9 tax form for each Borrower.

## ARTICLE IV
## REPRESENTATIONS AND WARRANTIES

The Borrower represents and warrants to the Lenders that:

Section 4.01    Organization; Powers.  (a) Monterey is duly organized, validly existing and in good standing under the laws of Texas and Green Wheel is duly organized, validly existing and in good standing under the laws of Delaware, (b) Borrower has all requisite power and authority and all governmental licenses, authorizations, consents and approvals necessary to own its assets and to carry on its business as now conducted and (c) except where the failure to do so, individually or in the aggregate, could not reasonably be expected to result in a Material Adverse Effect, Borrower is qualified to do business in, and is in good standing in, every jurisdiction where such qualification is required.

[CREDIT AGREEMENT]

Section 4.02    Authorization; Enforceability.  The Transactions (other than Transactions of the type described in clause (c) of the definition thereof) are within the Borrower's organizational powers and have been duly authorized by all necessary organizational actions and, if required, actions by equity holders. Each Loan Document to which the Borrower is a party has been duly executed and delivered by the Borrower and constitutes a legal, valid and binding obligation of the Borrower, enforceable in accordance with its terms, subject to applicable bankruptcy, insolvency, reorganization, moratorium or other laws affecting creditors' rights generally and subject to general principles of equity, regardless of whether considered in a proceeding in equity or at law.

Section 4.03    Approvals; No Conflicts.  The Transactions (a) do not require any consent or approval of, registration or filing with, or any other action by, any Governmental Authority or any other third Person, nor is any such consent, approval, registration, filing or other action necessary for the validity or enforceability of any Loan Document, except such as have been obtained or made and are in full force and effect and other than (i) the recording and filing of financing statements and the Security Instruments as required by this Agreement and (ii) those third party approvals or consents which, if not made or obtained, would not cause a Default hereunder, could not reasonably be expected to have a Material Adverse Effect, and would not have an adverse effect on the enforceability of the Loan Documents, (b) will not violate (i) any order of any Governmental Authority or (ii) the Organizational Documents of the Borrower, (c) will not violate or result in a default under any indenture, agreement or other instrument binding upon the Borrower or its Properties, or give rise to a right thereunder to require any payment to be made by the Borrower, except for such violations or defaults that, individually or in the aggregate, could not reasonably be expected to have a Material Adverse Effect, and (d) will not result in the creation or imposition of any Lien on any Property of the Borrower (other than the Liens created by the Loan Documents).

Section 4.04    Financial Condition; No Material Adverse Change.

(a)    The Borrower has furnished to the Agent and the Lenders its consolidated balance sheet and statements of income, members' equity and cash flows satisfactory as of December 31, 2017, to the Required Lenders.

(b)    Since December 31, 2017, there has been no event, development or circumstance that has had, or could reasonably be expected to have, a Material Adverse Effect.

(c)    After giving effect to the Transactions, the Borrower has no Indebtedness (including Disqualified Capital Stock) other than the Obligations and other Indebtedness permitted in Section 6.02, and no contingent liabilities, off-balance sheet liabilities or partnerships, liabilities for taxes, or unusual forward or long-term commitments or unrealized or anticipated losses from any unfavorable commitments.

Section 4.05    Litigation.  Except as set forth on Schedule 4.05, there are no actions, suits, investigations or proceedings by or before any arbitrator or Governmental Authority pending against or, to the knowledge of the Borrower, threatened in writing against or affecting the Borrower (i) that, if adversely determined, could reasonably be expected, individually or in the aggregate, to result in a Material Adverse Effect or (ii) that involve any Loan Document or the Transactions.

Section 4.06    Environmental Matters.  Except for such matters as set forth on Schedule 4.06 or that, individually or in the aggregate, could not reasonably be expected to have a Material Adverse Effect:

(a)    The Borrower and each of its Properties and operations thereon are, and within all applicable statute of limitation periods have been, in compliance with all applicable

28

Environmental Laws, and to the knowledge of the Borrower, such Properties were operated in compliance with applicable Environmental Laws prior to the acquisition thereof by the Borrower;

(b)     The Borrower (i) has obtained all Environmental Permits required for its ownership interest in its Properties and, with respect to any such Properties operated by the Borrower, required for the operation of such Properties and (ii) with respect to any such Properties operated by a third party, has used commercially reasonable efforts to cause the operator thereof to obtain all Environmental Permits required for the operation of such Properties; all such Environmental Permits are currently in full force and effect, and the Borrower has not received any written notice or otherwise has knowledge that any such existing Environmental Permit will be revoked or that any application for any new Environmental Permit or renewal or any existing Environmental Permit will be denied;

(c)     there are no claims, demands, suits, orders, inquiries, or proceedings concerning any violation of, or any liability (including as a potentially responsible party) under, any applicable Environmental Laws that are pending or, to the Borrower's knowledge, threatened against the Borrower or any of its Properties or as a result of any operations at such Properties;

(d)     none of the Properties contain or, to the Borrower's knowledge, have contained any (i) underground storage tanks; (ii) asbestos-containing materials; (iii) landfills or dumps; (iv) hazardous waste management units as defined pursuant to RCRA or any comparable state law; or (v) sites on or nominated for the National Priority List promulgated pursuant to CERCLA or any state remedial priority list promulgated or published pursuant to any comparable state law;

(e)     (i) except as permitted under applicable laws, (A) there has been no Release or, to the Borrower's knowledge, threatened Release, of Hazardous Materials attributable to the operations of the Borrower at, on, under or from the Properties and (B) to the Borrower's knowledge, there has been no Release or threatened Release of Hazardous Materials attributable to any third-party operations at, on, under or from any of the Properties and (ii) there are no investigations, remediations, abatements, removals or monitoring of Hazardous Materials required under applicable Environmental Laws relating to such Releases or threatened Releases or at such Properties and, to the knowledge of the Borrower, none of such Properties are adversely affected by any Release or threatened Release of a Hazardous Material originating or emanating from any other real property;

(f)     The Borrower has not received any written notice asserting an alleged liability or obligation under any Environmental Laws with respect to the investigation, remediation, abatement, removal, or monitoring of any Hazardous Materials, including at, under, or Released or threatened to be Released from any real properties offsite the Properties, and there are no conditions or circumstances that would reasonably be expected to result in the receipt of such written notice;

(g)     there has been no exposure of any Person or Property to any Hazardous Materials as a result of or in connection with the operations and businesses of the Borrower or relating to any of the Properties or, to the Borrower's knowledge, relating to any of the Properties operated by third parties, in each case that would reasonably be expected to form the basis for a claim for damages or compensation and, to the Borrower's knowledge, there are no conditions or circumstances that would reasonably be expected to result in the receipt of notice regarding such exposure; and

(h)     The Borrower has provided to the Agent and the Lenders complete and correct copies of all environmental site assessment reports, investigations, studies, analyses, and correspondence on environmental matters (including matters relating to any alleged non-compliance with or liability under Environmental Laws) requested by the Required Lenders that are in the Borrower's possession or control and relating to the Properties or operations thereon.

Section 4.07     Compliance with the Laws and Agreements; No Defaults.

(a)     The Borrower is in compliance with all Governmental Requirements applicable to it or its Property and all agreements and other instruments binding upon it or its Property, and possesses all licenses, permits, franchises, exemptions, approvals and other governmental authorizations necessary for the ownership of the Properties and the conduct of its business, except where the failure to do so, individually or in the aggregate, could not reasonably be expected to result in a Material Adverse Effect.

(b)     The Borrower is not in default under, nor has any event or circumstance occurred which, but for the expiration of any applicable grace period or the giving of notice, or both, would constitute a default or would require the Borrower to Redeem or make any offer to Redeem all or any portion of any Indebtedness outstanding under, any indenture, note, credit agreement or other similar instrument.

(c)     No Default or Event of Default has occurred and is continuing.

Section 4.08     Investment Company Act.  The Borrower is not an "investment company" or a company "controlled" by an "investment company," within the meaning of, or subject to regulation under, the Investment Company Act of 1940.

Section 4.09     Taxes.  The Borrower has timely filed or caused to be filed all Tax returns and reports required to have been filed and has paid or caused to be paid all Taxes required to have been paid by it, except (a) Taxes that are being contested in good faith by appropriate proceedings and for which the Borrower has set aside on its books adequate reserves in accordance with GAAP or (b) to the extent that the failure to do so could not reasonably be expected to result, individually or in the aggregate, in a Material Adverse Effect.  To the knowledge of the Borrower, no material proposed tax assessment is being asserted with respect to the Borrower.

Section 4.10     Disclosure; No Material Misstatements.  The Borrower has disclosed to the Lenders all agreements, instruments and corporate or other restrictions to which the Borrower is subject, and all other existing facts and circumstances applicable to the Borrower known to the Borrower, that, individually or in the aggregate, could reasonably be expected to result in a Material Adverse Effect. None of the reports, financial statements, certificates or other information furnished by or on behalf of the Borrower to the Agent, the Lenders or any of their respective Affiliates in connection with the negotiation of this Agreement or any other Loan Document or delivered hereunder or under any other Loan Document (as modified or supplemented by other information so furnished) contains any material misstatement of fact or omits to state any material fact (other than industry-wide risks normally associated with the types of business conducted by the Borrower) necessary to make the statements therein, in the light of the circumstances under which they were made, not misleading; provided, however, that, with respect to projected financial information, pro forma financials, prospect information, geological and geophysical data and engineering projections, the Borrower represents only that such information was prepared in good faith based upon assumptions believed to be reasonable at the time, it being understood that these items as they relate to future events are not to be viewed as fact and that the actual results during the period or periods covered thereby may differ and that projections concerning volumes

30

attributable to the Oil and Gas Properties of the Borrower and production and cost estimates are necessarily based upon professional opinions, estimates and projections and that the Borrower does not warrant that such opinions, estimates and projections will ultimately prove to have been accurate. There are no statements or conclusions in any report or document delivered to the Agent or any Lender which are based upon or include misleading information or fail to take into account material information regarding the matters reported therein.

Section 4.11    Insurance.  The Borrower has insurance coverage in at least such amounts and against such risks as required by Section 5.06.

Section 4.12    Restrictions on Liens.   The Borrower is not a party to any agreement or arrangement (other than agreements or arrangements in respect of Indebtedness pursuant to Section 6.02(d) (provided that any such restriction contained therein relates only to the asset or assets financed thereby)), or subject to any order, judgment, writ or decree, which either restricts or purports to restrict its ability to grant Liens to the Agent on or in respect of its Properties to secure the Obligations.

Section 4.13    Borrower.  Schedule 4.13 hereto contains a description of each class of Equity Interests in the Borrower that are issued and outstanding, and identifies the owners thereof.  All of the Equity Interests in the Borrower are validly issued and outstanding, and are owned by the parties identified on such Schedule 4.13 free and clear of all Liens.  There are no outstanding commitments or other obligations of the Borrower to issue, and no options, warrants or other rights of any Person to acquire, any shares of any class of Equity Interests of the Borrower.  The Borrower does not have any Subsidiaries.

Section 4.14    Foreign Operations.  The Borrower does not own any Oil and Gas Properties not located within the geographical boundaries of the United States.

Section 4.15    Properties; Title, Etc.

(a)    Subject to Permitted Mortgaged Property Liens, but otherwise free and clear of all Liens, the Borrower has good and defensible title to its Oil and Gas Properties. Subject to Excepted Liens, but otherwise free and clear of all Liens, the Borrower has good title to, or valid leasehold interests in, licenses of, or rights to use, all its personal Properties.  Subject to the Net Profits Overriding Royalty Interest, Borrower's ownership of the Hydrocarbon Interests and the undivided interests therein as described in the Security Instruments will, after giving full effect to all Permitted Mortgaged Property Liens, afford Borrower not less than those net interests (expressed as a fraction, percentage or decimal) in the production from or which is allocated to each Well and specified as Net Revenue Interest in the Security Instruments and will cause Borrower to bear not more than that portion (expressed as a fraction, percentage or decimal), specified as Working Interest in the Security Instruments, of the costs of drilling, developing and operating such Well, except to the extent of any proportionate corresponding increase in the Net Revenue Interest.

(b)    Except for matters that could not reasonably be expected to have a Material Adverse Effect, (i) all leases and agreements necessary for the conduct of the business of the Borrower are valid and subsisting and in full force and effect and (ii) there exists no default or event or circumstance which with the giving of notice or the passage of time or both would give rise to a default under any such lease or leases.

(c)    The Borrower owns, or is licensed to use, all trademarks, tradenames, copyrights, patents and other intellectual Property material to its business, and the use thereof by the

Borrower does not infringe upon the rights of any other Person, except for any such infringements that, individually or in the aggregate, could not reasonably be expected to result in a Material Adverse Effect. The Borrower either owns or has valid licenses or other rights to use all databases, geological data, geophysical data, engineering data, seismic data, maps, interpretations and other technical information used in their businesses as presently conducted, subject to the limitations contained in the agreements governing the use of the same, which limitations are customary for companies engaged in the business of the exploration and production of Hydrocarbons, with such exceptions as could not reasonably be expected to have a Material Adverse Effect.

Section 4.16    Maintenance of Properties. Except for such acts or failures to act as could not reasonably be expected to have a Material Adverse Effect, with respect to the Oil and Gas Properties (and Properties unitized therewith) of the Borrower (a) operated by the Borrower, such Properties have been maintained, operated and developed in a good and workmanlike manner and in conformity with all Governmental Requirements and in conformity with the provisions of all leases, subleases or other contracts comprising a part of the Hydrocarbon Interests and other contracts and agreements forming a part of such Oil and Gas Properties and (b) operated by any third party, the Borrower has used its commercially reasonable efforts to cause such Properties to be so maintained, operated and developed. Specifically in connection with the foregoing, except for those as could not be reasonably expected to have a Material Adverse Effect, (i) none of such Oil and Gas Properties is subject to having allowable production reduced below the full and regular allowable (including the maximum permissible tolerance) because of any overproduction (whether or not the same was permissible at the time) and (ii) no well comprising a part of such Oil and Gas Properties (or Properties unitized therewith) is in violation of applicable Governmental Requirements, and such wells are producing from, and the well bores are wholly within, such Oil and Gas Properties (or in the case of wells located on Properties unitized therewith, such unitized Properties). All pipelines, wells, gas processing plants, platforms and other material improvements, fixtures and equipment that are necessary to conduct normal operations are being, or in the case of such pipelines, wells, gas processing plants, platforms and other material improvements, fixtures and equipment the maintenance of which is performed by a third-party operator, the Borrower is using commercially reasonable efforts to cause such items to be, and to the Borrower's knowledge such items are, maintained in a state adequate to conduct normal operations (other than those the failure of which to maintain in accordance with this Section 4.16, individually or in the aggregate, could not reasonably be expected to have a Material Adverse Effect).

Section 4.17    Gas Imbalances; Prepayments. Except as set forth on Schedule 4.17, on a net basis there are no gas imbalances, take-or-pay or other prepayments with respect to the Oil and Gas Properties which would require the Borrower to deliver Hydrocarbons either generally or produced from such Oil and Gas Properties at some future time without then or thereafter receiving full payment therefor.

Section 4.18    Marketing of Production. Except for contracts listed on Schedule 4.18 and in effect on the date hereof, or thereafter disclosed in writing to the Agent (with respect to all of which contracts the Borrower represents that the Borrower is receiving a price for all production sold thereunder which is computed substantially in accordance with the terms of the relevant contract and is not having deliveries curtailed substantially below the subject Property's delivery capacity), no material agreements exist which are not cancelable on sixty (60) days' notice or less without penalty or detriment for the sale of production from the Borrower's Hydrocarbons (including calls on or other rights to purchase, production, whether or not the same are currently being exercised) that (a) pertain to the sale of production at a fixed price and (b) have a maturity or expiry date of longer than six (6) months from the date of such disclosure.

[CREDIT AGREEMENT]

Section 4.19    Security Instruments.  As of the Effective Date and thereafter:

(a)    the Collateral Agreement is effective to create in favor of the Agent (as successor to the Closing Date Lender) a legal, valid, binding and enforceable security interest in the Collateral described therein.  When financing statements or amendments thereto in appropriate form are filed in the offices specified on Schedule 4.19(a) (which financing statements or amendments thereto may be filed by the Agent), the Collateral Agreement shall constitute a valid and perfected Lien on, and security interest in, all right, title and interest of the Borrower in such Collateral, as security for the Obligations, in each case prior and superior in right to any other Person (except Excepted Liens); and

(b)    each Mortgage is effective to create in favor of the Agent (as successor to the Closing Date Lender) a legal, valid, binding and enforceable Lien on the Mortgaged Properties described therein; and when the Mortgages are filed in the recording offices designated by the Borrower, each Mortgage shall constitute a fully perfected Lien on, and security interest in, all right, title and interest of the Borrower in the Mortgaged Properties described therein and the proceeds and products thereof, as security for the Obligations, in each case prior and superior in right to any other Person (except Permitted Mortgaged Property Liens or other encumbrances or rights permitted by the relevant Mortgage).

Section 4.20    Swap Agreements and Eligible Contract Participant.  Schedule 4.20, as of the date hereof, and after the date hereof, each report required to be delivered by the Borrower pursuant to Section 5.01(d), sets forth a true and complete list of all Swap Agreements of the Borrower in effect as of such dates, the material terms thereof (including the type, effective date, term or termination date and notional amounts or volumes), the estimated net mark to market value thereof, all credit support agreements relating thereto (including any margin required or supplied) and the counterparty to each such agreement.

Section 4.21    Use of Loan Proceeds.  The proceeds of the Loan shall be used (a) to fund the purchase price for the Acquisition and for Acquisition 2, (b) to pay fees and expenses incurred in connection with the Transactions, (c) for Capital Expenditures pursuant to the sources and uses delivered to Agent prior to the Effective Date and (d) subject to the G&A limit set forth in Section 6.24, to provide for the general corporate and working capital needs of the Borrowers.  The proceeds of the Management Equity Contribution shall be used (a) to fund the Borrower's proved non-producing and behind pipe capital expenditures in accordance with the budget submitted to and approved by the Agent and the Required Lenders for the then-current fiscal year pursuant to Article III or Section 5.01(l), as applicable, and (b) to repay amounts owing to the Lenders under the Loan Documents, and for no other purpose.  The Borrower is not engaged principally, or as one of its or their important activities, in the business of extending credit for the purpose, whether immediate, incidental or ultimate, of buying or carrying margin stock (within the meaning of Regulation T, U or X of the Board).  No part of the proceeds of the Loan have been used or will be used by the Borrower, whether directly or indirectly, for any purpose that entails a violation of any of the Regulations of the Board, including Regulations T, U and X.

Section 4.22    Solvency.

(a)    Immediately after the consummation of the Transactions to occur on the Effective Date and as of any such other date this representation and warranty is made or deemed made, the Borrower will be Solvent.

(b)    The Borrower does not intend to, and the Borrower does not believe that it will, incur debts beyond its ability to pay such debts as they mature, taking into account the timing of and

amounts of cash to be received by it and the timing of the amounts of cash to be payable on or in respect of its Indebtedness.

Section 4.23    Anti-Corruption Laws and Sanctions.   The Borrower has implemented and maintains in effect policies and procedures designed to ensure compliance by the Borrower and its directors, officers, employees and agents with Anti-Corruption Laws and applicable Sanctions, and the Borrower and its officers and employees and, to the knowledge of the Borrower, its directors and agents, are in compliance with Anti-Corruption Laws and applicable Sanctions in all material respects.  None of (a) the Borrower or any of its directors, officers or employees, or (b) to the knowledge of the Borrower, any of its agents that will act in any capacity in connection with or benefit from the credit facility established hereby, is a Sanctioned Person.  No use of proceeds of the Loan, Transactions or other transaction contemplated by this Agreement or the other Loan Documents will violate Anti-Corruption Laws or applicable Sanctions.

Section 4.24    Ad Valorem and Severance Taxes.  The Borrower has paid and discharged all ad valorem taxes that are payable and have been assessed against its Oil and Gas Properties or any part thereof and all production, severance and other taxes that are payable and have been assessed against, or measured by, the production or the value, or proceeds, of the production therefrom, except to the extent such taxes are being contested in accordance with the provisions of Section 5.04.

Section 4.25    Anti-Terrorism Laws.

(a)     None of the Borrower, nor, to the Borrower's knowledge, any of its Affiliates is in violation of any laws relating to terrorism or money laundering ("Anti-Terrorism Laws"), including Executive Order No. 13224 on Terrorist Financing, effective September 24, 2001 (the "Executive Order"), and the Patriot Act.

(b)     None of the Borrower, nor, to the Borrower's knowledge, any of its Affiliates or their respective brokers or other agents acting or benefiting in any capacity in connection with the Loans is any of the following:

(i)     a Person that is listed in the annex to, or is otherwise subject to the provisions of, the Executive Order;

(ii)     a Person owned or controlled by, or acting for or on behalf of, any Person that is listed in the annex to, or is otherwise subject to the provisions of, the Executive Order;

(iii)     a Person with which any Lender is prohibited from dealing or otherwise engaging in any transaction by any Anti-Terrorism Law;

(iv)     a Person that commits, threatens or conspires to commit or supports "terrorism" as defined in the Executive Order; or

(v)     a Person that is named as a "specially designated national and blocked person" on the most current list published by the U.S. Treasury Department Office of Foreign Assets Control at its official website or any replacement website or other replacement official publication or such list.

(c)     None of the Borrower, nor, to the Borrower's knowledge, any of its brokers or other agents acting in any capacity in connection with the Loans (i) conducts any business or

engages in making or receiving any contribution of funds, goods or services to or for the benefit of any Person described in clause (b) above, (ii) deals in, or otherwise engages in any transaction relating to, any property or interests in property blocked pursuant to the Executive Order, or (iii) engages in or conspires to engage in any transaction that evades or avoids, or has the purpose of evading or avoiding, or attempts to violate, any of the prohibitions set forth in any Anti-Terrorism Law.

Section 4.26    Money Laundering.    The operations of the Borrower are and have been conducted at all times in material compliance with applicable financial recordkeeping and reporting requirements of the Money Laundering Laws, and no action, suit or proceeding by or before any court or governmental agency, authority or body or any arbitrator involving the Borrower with respect to the Money Laundering Laws is pending or, to the best knowledge of the Borrower, threatened in writing.

Section 4.27    ERISA.

(a)    Except as could not reasonably be expected to result in liability to the Borrower in an aggregate amount exceeding the Threshold Amount, each Plan (if any) is, and has been, operated, administered and maintained in substantial compliance with, and the Borrower and each ERISA Affiliate has complied in all material respects with, ERISA, the terms of the applicable Plan and the Code.

(b)    Except as could not reasonably be expected to result in liability to the Borrower in an aggregate amount exceeding the Threshold Amount, no act, omission or transaction has occurred which would result in imposition on the Borrower or any ERISA Affiliate (whether directly or indirectly) of (i) either a civil penalty assessed pursuant to subsections (c), (i) or (l) of Section 502 of ERISA or a tax imposed pursuant to Chapter 43 of Subtitle D of the Code or (ii) breach of fiduciary duty liability damages under Section 409 of ERISA.

(c)    No liability to the PBGC (other than for the payment of current premiums which are not past due) has been, or could reasonably be expected to be, incurred by the Borrower or any ERISA Affiliate. No ERISA Event has occurred or could reasonably be expected to occur.

(d)    The actuarial present value of the benefit liabilities (computed on a plan termination basis in accordance with Title IV of ERISA) under each Plan does not, as of the end of the Borrower's most recently ended fiscal year, exceed the current value of the assets of such Plan allocable to such benefit liabilities by an amount that could reasonably be expected to result in Liability in excess of the Threshold Amount. The term "actuarial present value" shall have the meaning specified in Section 4001 of ERISA.

(e)    There are no Multiemployer Plans.

ARTICLE V
**AFFIRMATIVE COVENANTS**

From and after the Effective Date until Payment in Full, each of the Borrower and, in the case of Section 5.16, the Limited Obligor, covenants and agrees with the Lenders that:

Section 5.01    Financial Statements; Other Information.  The Borrower will furnish to the Agent and the Lenders:

(a)    Annual Financial Statements.  As soon as available, but in any event in accordance with then applicable law and not later than one hundred twenty (120) days after the end of each fiscal year of the Borrower (commencing with the fiscal year ending December 31, 2018, the audited balance sheet of the Borrower as of the end of such fiscal year and related audited statements of income, members' equity and cash flows of the Borrower for such fiscal year, setting forth in comparative form the figures for the previous fiscal year, all reported on by independent public accountants (without a "going concern" or like qualification or exception and without any qualification or exception as to the scope of such audit) to the effect that such consolidated financial statements present fairly in all material respects the financial condition and results of operations of the Borrower in accordance with GAAP consistently applied.

(b)    Quarterly Financial Statements.  As soon as available, but in any event in accordance with then applicable law and not later than sixty (60) days after the end of each fiscal quarter (commencing with the first such date to occur after the Effective Date), the unaudited balance sheet of the Borrower as of the end of such fiscal quarter and related unaudited statements of income, members' equity and cash flows of the Borrower for such fiscal quarter and the then elapsed portion of the fiscal year, setting forth in comparative form the figures for the corresponding period or periods of (or, in the case of the balance sheet, as of the end of the corresponding period or periods of) the previous fiscal year, all certified by a Financial Officer of the Borrower as presenting fairly in all material respects the financial condition of the Borrower as of such date and the results of operations of the Borrower for the period or periods then ended, in each case in accordance with GAAP consistently applied, subject to normal year-end audit adjustments and the absence of footnotes.  Such quarterly financial statements shall be accompanied by a reconciliation, setting forth in reasonable detail, the variance between the actual financial performance relative to the projections in the form contained in the budget delivered prior to the Effective Date or pursuant to Section 5.01(l), as applicable, including, without limitation, a reconciliation between the actual and projected cash receipts and disbursements and a written summary of the causes for any material variations for the relevant fiscal quarter and from the first day of the then current fiscal year to the end of the relevant fiscal quarter.

(c)    Certificate of Financial Officer – Compliance.  Concurrently with any delivery of financial statements under Section 5.01(a) or Section 5.01(b), a Compliance Certificate (i) certifying as to whether a Default has occurred and, if a Default has occurred, specifying the details thereof and any action taken or proposed to be taken with respect thereto and (ii) stating whether any change in GAAP or in the application thereof has occurred with respect to the Borrower since the date of the most recently delivered financial statements referred to in Section 5.01(a) and (b) and, if any such change has occurred, specifying the effect of such change on the financial statements accompanying such certificate.

(d)    Certificate of Financial Officer – Swap Agreements.  Concurrently with any delivery of financial statements under Section 5.01(a) or Section 5.01(b) hereunder, a certificate

of a Financial Officer, in form and substance reasonably satisfactory to the Required Lenders, setting forth as of the last day of the period covered by such financial statements, a true and complete list of all Swap Agreements of the Borrower, the material terms thereof (including the type, effective date, term or termination date and notional amounts or volumes), any new credit support documents relating thereto not listed on Schedule 4.20, any margin required or supplied under any credit support document, and the counterparty to each such Swap Agreement.

(e)     Certificate of Insurer – Insurance Coverage.  Concurrently with any delivery of financial statements under Section 5.01(a), and within ten (10) Business Days following each change in the insurance maintained in accordance with Section 5.06, certificates of insurance coverage with respect to the insurance required by Section 5.06, in form and substance satisfactory to the Required Lenders, and, if requested by any Lender, all copies of the applicable policies.

(f)     Notices Under Material Instruments.  Promptly after the furnishing thereof, copies of any financial statement, report or notice furnished to or by any Person pursuant to the terms of any preferred stock designation, indenture, loan or credit or other similar agreement, other than this Agreement and not otherwise required to be furnished to the Agent and/or the Lenders pursuant to any other provision of this Section 5.01.

(g)     Lists of Purchasers.  Concurrently with the delivery of any financial statements to the Agent under Section 5.01(a) or Section 5.01(b), a list of all Persons purchasing Hydrocarbons from the Borrower (or, with respect to the Oil and Gas Properties that are not operated by the Borrower, a list of the operators of such properties).

(h)     Notice of Hedge Unwinds.  At least five (5) Business Days prior thereto (or such shorter time as the Required Lenders may agree in their sole discretion), written notice of any Hedge Unwind, specifying the material terms thereof, the consideration to be received in connection therewith, the anticipated date of effectiveness thereof and any other details with respect thereto reasonably requested by the Required Lenders.

(i)     Notice of Casualty Events.  Promptly, and in any event within five (5) Business Days, after the occurrence of any Casualty Event or the commencement of any action or proceeding that could reasonably be expected to result in a Casualty Event, written notice of such Casualty Event or such action or proceeding, including a reasonably detailed description thereof.

(j)     Information Regarding Borrower.  Prompt written notice of (and in any event at least thirty (30) days prior thereto or such other time as the Required Lenders may agree) any change in (i) the Borrower's corporate, limited liability company or partnership name, (ii) the location of the Borrower's chief executive office or principal place of business, (iii) the Borrower's jurisdiction of organization or the Borrower's organizational identification number in such jurisdiction of organization, and (iv) the Borrower's federal taxpayer identification number (if applicable).

(k)     Production Forecast.  No later than ten (10) days prior to the first day of each fiscal quarter, an updated Production Forecast covering the period beginning on such day and ending on the Maturity Date.

(l)     Cash Flow and Capital Expenditures Forecast.  No later than thirty (30) days prior to the first day of each fiscal year of the Borrower, an operating and capital budget of the Borrower, satisfactory to the Required Lenders in their sole discretion, for the ensuing four (4)

fiscal quarters, including the projected monthly production of Hydrocarbons by the Borrower and the assumptions used in calculating such projections, the projected capital expenditures to be incurred by the Borrower, and such other information as may be reasonably requested by the Required Lenders.

(m)     Environmental Matters.  Promptly, but in no event later than five (5) Business Days after it becomes aware thereof, notify the Agent and the Lenders in writing of any action, investigation or inquiry by any Governmental Authority or any demand or lawsuit by any landowner or other third party brought, filed or threatened against the Borrower or any of its Properties of which the Borrower has knowledge in connection with any Environmental Laws (excluding routine testing and corrective action) if the Borrower reasonably anticipates that such action will result in liability (whether individually or in the aggregate) in excess of the Threshold Amount, not fully covered by insurance, subject to normal deductibles.

(n)     Management Reports.  Promptly upon receipt thereof, copies of all reports, if any, submitted to the Borrower by its independent public accountant in connection with its auditing function, including any management report and any management responses thereto.

(o)     Other Requested Information.  Promptly following any request therefor, such other information regarding the operations, business affairs and financial condition of the Borrower, or compliance with the terms of this Agreement or any other Loan Document, as the Required Lenders may reasonably request.

(p)     Bi-Annual Reserve Reports.  On or prior to each December 15th and each June 15th, beginning on December 15, 2018, a Reserve Report, prepared as of November 1st (with respect to the Reserve Report delivered on or before December 15th) and May 1st (with respect to the Reserve Report delivered on or before June 15th) by an Approved Engineer, in form and substance satisfactory to the Required Lenders, and certified as being true and correct in all material respects by a Responsible Officer of the Borrower, setting forth information as to quantities of production from the Borrower's Oil and Gas Properties for each calendar month during the subject fiscal year, including (i) the PDP, PUD, shut-in, behind-pipe and undeveloped reserves (separately classified as such) attributable to the Borrower's Oil and Gas Properties, (ii) the aggregate PV-10 of the future net income with respect to PDP reserves attributable to the Borrower's Oil and Gas Properties, (iii) projections of the annual rate of production, gross income and net income with respect to such PDP reserves, (iv) information with respect to the "take-or-pay", "prepayment" and gas-balancing liabilities of the Borrower with respect to such PDP reserves, (v) general economic assumptions and (vi) such other information as the Required Lenders may reasonably request with respect to the applicable year.

(q)     Monthly Production Reports.  On or prior to the 60th day following the end of each fiscal month, a report, in form and substance satisfactory to the Required Lenders, and certified as being true and correct in all material respects by a Responsible Officer of the Borrower, setting forth information as to quantities of production from the Borrower's Oil and Gas Properties for such fiscal month, including volumes of production sold, volumes of production subject to Swap Agreements, pricing, purchasers of production, gross revenues, lease operating expenses, EBITDA and such other information as the Required Lenders may reasonably request with respect to such fiscal month.

(r)     Aging of Accounts Payable.  On or prior to the 60th day following the end of each fiscal month, an aging of the accounts payable of the Borrower as of the end of such fiscal month.

[CREDIT AGREEMENT]

(s)     Direction Letters and Letters in Lieu.  Within 15 calendar days of the Effective Date, the Borrower shall provide the Agent with undated Direction Letters and letters in lieu of transfer, in form and substance reasonably satisfactory to the Agent, executed by the Borrower and addressed to each purchaser of production from or attributable to the Mortgaged Properties or transportation fees, with the addresses for payment left blank, authorizing and directing the addressee to make future payments attributable to production from the Mortgaged Properties and/or transportation fees to such account as the Agent may specify from time to time.

Section 5.02     Notices of Material Events.  The Borrower will furnish to the Agent and the Lenders prompt written notice of the following:

(a)     the occurrence of any Default or Event of Default;

(b)     the filing or commencement of, or the threat in writing of, any action, suit, proceeding, investigation or arbitration by or before any arbitrator or Governmental Authority against or affecting the Borrower not previously disclosed in writing to the Agent or any material adverse development in any action, suit, proceeding, investigation or arbitration (whether or not previously disclosed to the Lenders) that, in either case, if adversely determined, could reasonably be expected to result in a Material Adverse Effect;

(c)     any notice of any violation received by the Borrower from any Governmental Authority, including any notice of violation of Environmental Laws, which could reasonably be expected to have a Material Adverse Effect;

(d)     any other development that results in, or could reasonably be expected to result in, a Material Adverse Effect; and

(e)     (i) the occurrence of any ERISA Event that, alone or together with any other ERISA Events that have occurred, could reasonably be expected to result in liability of the Borrower in an aggregate amount exceeding the Threshold Amount, or (ii) if the Borrower or any ERISA Affiliate establishes, contributes to or agrees to establish or contribute to, or otherwise incurs any liability with respect to, any employee benefit plan subject to Section 302 or Title IV of ERISA or Section 412 of the Code (including any "multiemployer plan" (as defined in Section 4001(a)(3) of ERISA).

Each notice delivered under this Section 5.02 shall be accompanied by a statement of a Responsible Officer of the Borrower setting forth the details of the event or development requiring such notice and any action taken or proposed to be taken with respect thereto.

Section 5.03     Existence; Conduct of Business.  The Borrower will do or cause to be done all things necessary to preserve, renew and keep in full force and effect its legal existence and the rights, licenses, permits, privileges and franchises necessary to the conduct of its business and maintain, if necessary, its qualification to do business in each other jurisdiction in which its Oil and Gas Properties are located or the ownership of its Properties requires such qualification; provided, however, that the foregoing shall not prohibit any merger, consolidation, liquidation or dissolution permitted under Section 6.09 or any disposition permitted by Section 6.10.

Section 5.04     Payment of Obligations.  The Borrower will pay its obligations, including all Taxes, assessments and other governmental charges that may be levied or assessed upon it or any of its Properties, before the same shall become delinquent or in default, except where (a) the validity or amount thereof is being contested in good faith by appropriate proceedings and the Borrower has set aside on its

books adequate reserves with respect thereto in accordance with GAAP or (b) the failure to make payment pending such contest could not reasonably be expected to result in a Material Adverse Effect.

Section 5.05    Operation and Maintenance of Properties.  The Borrower will:

(a)    operate its Oil and Gas Properties and other material Properties or cause such Oil and Gas Properties and other material Properties to be operated in a careful and efficient manner in accordance with the customary practices of the industry and in compliance with all applicable contracts and agreements and in compliance with all applicable Governmental Requirements, including applicable proration requirements and Environmental Laws, and all applicable laws, rules and regulations of every other Governmental Authority from time to time constituted to regulate the development and operation of such Oil and Gas Properties and the production and sale of Hydrocarbons and other minerals therefrom, except, in each case, where the failure to comply could not reasonably be expected to have a Material Adverse Effect;

(b)    maintain and keep in good repair, working order and efficiency (ordinary wear and tear excepted) all of its material Oil and Gas Properties and other Properties material to the conduct of its business, including all equipment, machinery and facilities, unless the Borrower determines in good faith that the continued maintenance of such Property is no longer economically desirable, necessary or useful to the business of the Borrower or such Property is sold, assigned or transferred in a transaction permitted by Section 6.10;

(c)    promptly pay and discharge, or use commercially reasonable efforts to cause to be paid and discharged, all material delay rentals, royalties, expenses and indebtedness accruing under the leases or other agreements affecting or pertaining to its Oil and Gas Properties and will do all other things necessary, in accordance with industry standards, to keep unimpaired its rights with respect thereto and prevent any forfeiture thereof or default thereunder;

(d)    promptly perform or use commercially reasonable efforts to cause to be performed, in accordance with industry standards, the material obligations required by each and all of the assignments, deeds, leases, sub-leases, contracts and agreements affecting its interests in its Oil and Gas Properties and other material Properties;

(e)    operate its Oil and Gas Properties and other material Properties or use commercially reasonable efforts to cause such Oil and Gas Properties and other material Properties to be operated in accordance with the practices of the industry and in material compliance with all applicable contracts and agreements and in compliance in all material respects with all Governmental Requirements; and

(f)    to the extent that the Borrower is not the operator of any Property, use commercially reasonable efforts to cause the operator to comply with the requirements of this Section 5.05.

Section 5.06    Insurance.  The Borrower will maintain, with financially sound and reputable insurance companies, insurance covering the Borrower, in such amounts and against such risks as are customarily maintained by companies engaged in the same or similar businesses operating in the same or similar locations and as may be required by applicable Governmental Requirements. The loss payable clauses or provisions in the applicable insurance policy or policies insuring any of the Collateral shall be endorsed in favor of and made payable to the Agent, on behalf of the Lenders, as a "lender loss payee" or other formulation acceptable to the Agent and the Required Lenders and such liability policies shall name the Agent, on behalf of the Lenders, as "additional insured".  Such insurance shall provide that no

cancellation or material modification thereof shall be effective until at least thirty (30) days after receipt by the Agent of written notice thereof (or ten (10) days in the case of cancellation for non-payment of premiums). The Borrower shall deliver to the Agent, upon its request, information in reasonable detail as to the insurance then in effect, stating the names of the insurance companies, the amounts and rates of the insurance, the dates of the expiration thereof and the properties and risks covered thereby.

Section 5.07     Books and Records; Inspection Rights. The Borrower will maintain a system of accounting, and keep proper books of record and account (in which full, true and correct entries in all material respects are made of all dealings and transactions in relation to its business and activities), as may be required or as may be necessary to permit the preparation of financial statements in accordance with GAAP. The Borrower will permit any representatives designated by the Agent or any Lender, upon reasonable prior notice, to visit and inspect its Properties, to examine and make extracts from its books and records, and to discuss its affairs, finances and condition with its officers and independent accountants, all at such reasonable times and as often as reasonably requested.

Section 5.08     Compliance with Laws. The Borrower will comply with all laws, rules, regulations and orders of any Governmental Authority applicable to it or its Property, except where the failure to do so, individually or in the aggregate, could not reasonably be expected to result in a Material Adverse Effect. The Borrower will maintain in effect and enforce policies and procedures designed to ensure compliance by the Borrower and its directors, officers, employees and agents with Anti-Corruption Laws and applicable Sanctions.

Section 5.09     Environmental Matters.

(a)     The Borrower shall:  (i) comply, and shall cause its Properties and operations to comply, with all applicable Environmental Laws, except to the extent any breach thereof could not be reasonably expected to have a Material Adverse Effect; (ii) not Release or cause a threat of Release of any Hazardous Material, including any solid waste on, under, about or from any of the Borrower's Properties or any other Property to the extent caused by the Borrower's operations except in compliance with applicable Environmental Laws, except the Release or threatened Release of such Hazardous Materials as could not reasonably be expected to have a Material Adverse Effect; (iii) timely obtain or file all notices, and Environmental Permits, if any, required under applicable Environmental Laws to be obtained or filed in connection with the operation or use of the Borrower's Properties, except to the extent the failure to obtain or file such notices and Environmental Permits could not reasonably be expected to have a Material Adverse Effect; (iv) promptly commence and diligently prosecute to completion any assessment, evaluation, investigation, monitoring, containment, cleanup, removal, repair, restoration, remediation or other remedial obligations (collectively, the "Remedial Work") in the event any Remedial Work is required or reasonably necessary under applicable Environmental Laws because of or in connection with the actual or suspected past, present or future Release or threatened Release of any Hazardous Materials on, under, about or from any of the Borrower's Properties, except to the extent the failure to commence and diligently prosecute to completion any Remedial work could not reasonably be expected to have a Material Adverse Effect; (v) conduct its operations and businesses in a manner that will not expose any Property or Person to Hazardous Materials that could reasonably be expected to form the basis for a claim for damages or compensation; and (vi) establish and implement such procedures as may be necessary to continuously determine and assure that the Borrower's obligations under this Section 5.09(a) are timely and fully satisfied. To the extent that the Borrower is not the operator of any Oil and Gas Property, the Borrower shall use reasonable efforts to cause the operator to comply with the requirements of this Section 5.09(a).

(b)     If an Event of Default has occurred and is continuing, the Agent may, and at the instruction of the Required Lenders shall (but in the absence of such instruction, shall not be obligated to), at the expense of the Borrower, conduct such Remedial Work as it deems appropriate to determine the nature and extent of any noncompliance with applicable Environmental Laws, the nature and extent of the presence of any Hazardous Material and the nature and extent of any other environmental conditions that may exist at or affect any of the Mortgaged Properties, and the Borrower shall cooperate with the Agent in conducting such Remedial Work. Such Remedial Work may include a detailed visual inspection of the Mortgaged Properties, including all storage areas, storage tanks, drains and dry wells and other structures and locations, as well as the taking of soil samples, surface water samples, and ground water samples and such other investigations or analyses as the Required Lenders deem appropriate. The Agent, each of the Lenders, and their respective officers, employees, agents and contractors shall have and are hereby granted the right to enter upon the Mortgaged Properties for the foregoing purposes.

(c)     In connection with any future acquisitions of Oil and Gas Properties or other Properties for aggregate consideration in excess of the Threshold Amount, the Borrower shall provide to the Agent and the Lenders copies of any environmental assessments, audits and tests received or obtained in connection with any such acquisitions and requested by the Agent or any Lender.

Section 5.10     Further Assurances.

(a)     The Borrower will at its sole expense promptly execute and deliver to the Agent and the Lenders all such other documents, agreements and instruments reasonably requested by the Agent or any Lender to comply with, cure any defects or accomplish the conditions precedent, covenants and agreements of the Borrower, as the case may be, in the Loan Documents or to further evidence and more fully describe the collateral intended as security for the Obligations, or to correct any omissions in this Agreement or the Security Instruments, or to state more fully the obligations secured therein, or to perfect, protect or preserve any Liens created pursuant to this Agreement or any of the Security Instruments or the priority thereof, or to make any recordings, file any notices or obtain any consents, all as may be reasonably necessary or appropriate, in the sole discretion of the Required Lenders, in connection therewith.

(b)     The Borrower hereby authorizes the Agent to file one or more financing or continuation statements, and amendments thereto, relative to all or any part of the Collateral without the signature of the Borrower where permitted by law. A carbon, photographic or other reproduction of any of the Security Instruments or any financing statement covering the Collateral or any part thereof shall be sufficient as a financing statement where permitted by law. Any such financing statement may describe the Collateral as "all assets" of the Borrower or words of similar effect.

Section 5.11     Net Profits Overriding Royalty Interest.  Anything to the contrary contained in the NPORI Conveyance notwithstanding, the Borrower shall not be required to make any "Net Profits Payment" (as defined therein) until the earliest to occur of (a) Payment in Full, (b) the acceleration of the Loan or (c) failure to repay the Loan on the Maturity Date.

Section 5.12     Lockbox Account.  The Borrower shall (a) remit all payments received by it to the Lockbox Account and (b) direct all account debtors and royalty payors to remit all payments due to Borrower to the Lockbox Account.

[CREDIT AGREEMENT]

Section 5.13    Additional Collateral; Other Deliveries.

(a)    At the request of the Agent in its sole discretion, deliver to the Agent Security Instruments covering all Oil and Gas Properties and other Properties of the Borrower and establishing perfected first priority Liens in favor or for the benefit of the Agent for the benefit of the Lenders or such other deliveries as the Agent shall reasonably request, including but not limited to new, amendment or otherwise revised Direction Letters and letters in lieu of transfer.

(b)    In the event that the Borrower acquires any Property after the Effective Date (or if Borrower acquired any Property after the Original Closing Date without complying with this Section 5.13), the Borrower shall promptly (and, in any event, within fifteen (15) days after such acquisition, as such time period may be extended by the Required Lenders in their sole discretion) grant, or cause to be granted, to the Agent as security for the Obligations, a first-priority perfected Lien (subject to Excepted Liens and Permitted Mortgaged Property Liens) on such acquired Property by delivering to the Agent and the Lenders a duly executed supplement to the Collateral Agreement or such other document as the Agent and the Required Lenders shall deem appropriate for such purpose, delivering to the Agent and the Lenders such opinions, documents and certificates as may be reasonably requested by the Agent and the Required Lenders, such updated Schedules to the Loan Documents as requested by the Agent and the Required Lenders with respect to such Property, and such other documents as may be reasonably requested by the Agent and the Required Lenders, all in form, content and scope reasonably satisfactory to the Required Lenders.

Section 5.14    Deposit Accounts.  The Borrower shall have no bank accounts other than (a) the Lockbox Account, (b) its Deposit Account held at Washington Federal, National Association, which shall become a Controlled Account as soon as reasonably practicable after the Effective Date and remain a Controlled Account at all times thereafter (such deposit account, the "Washington Federal Controlled Account"), and (c) the Legacy Accounts.  All Legacy Accounts shall be closed within forty-five (45) days after the Effective Date, and no checks may be issued from a Legacy Account after the Effective Date. On the date fifteen (15) Business Days after the Effective Date, all funds in any Legacy Account shall be transferred to the Lockbox Account.  If any additional funds are received in any Legacy Account thereafter, such funds shall be wire transferred to the Lockbox Account within three (3) Business Days after such funds were deposited in the applicable Legacy Account.  From and after the time that the Washington Federal Controlled Account becomes the subject of a Deposit Account Control Agreement, the Washington Federal Controlled Account will be funded from time to time from the Lockbox Account by the Agent, in its discretion, in light of with the provisions and limitations set forth herein for G&A Expenses; provided, however, that so long as no Event of Default has occurred and is continuing, no more frequently than twice per calendar month from and after the date on which the Washington Federal Controlled Account becomes the subject of a Deposit Account Control Agreement, Borrower may request and Agent shall permit all funds held in the Lockbox Account to be swept from the Lockbox Account to the Washington Federal Controlled Account.

Section 5.15    Commodity Agreements.

(a)    Within ten (10) Business Days of the Effective Date, the Borrower shall provide the Agent with copies of all Swap Agreements, in form and substance reasonably acceptable to the Agent and with Approved Swap Counterparties, establishing the Minimum Required Swap Agreements. Within ten (10) Business Days of the Effective Date place in effect and comply, in all material respects, with the provisions of the Minimum Required Swap Agreements and, if the daily closing price for WTI is less than $50/bbl for more than nine (9) days during any rolling thirty (30) day period (such occurrence referred to as an "Additional Hedge Adjustment Event"), the Borrowers shall hedge additional future

43

production volumes, as determined by the Agent in its sole discretion, within fifteen (15) days after receipt of notice from the Agent specifying the amounts and duration of the future production volumes to be hedged as a result of such Additional Hedge Adjustment Event.

(b)     Upon the request of the Required Lenders, the Borrower shall take all actions necessary to cause all of its right, title and interest in each Swap Agreement to which it is a party to be collaterally assigned to the Agent, and shall, if requested by the Required Lenders, use its commercially reasonable efforts to cause each such agreement or contract to (i) expressly permit such assignment and (ii) upon the occurrence of any default or event of default under such agreement or contract, (A) to permit the Agent to cure such default or event of default and assume the obligations of the Borrower under such agreement or contract and (B) to prohibit the termination of such agreement or contract by the counterparty thereto if the Agent assumes the obligations of the Borrower under such agreement or contract and the Agent takes the actions required under the foregoing clause (A). Upon the request of the Required Lenders, the Borrower shall, within ten (10) days of such request, provide to the Agent and the Lenders copies of all agreements, documents and instruments evidencing the Swap Agreements not previously delivered to the Agent and the Lenders, certified as true and correct by a Responsible Officer of the Borrower, and such other information regarding such Swap Agreements as the Required Lenders may reasonably request.

Section 5.16     Management Equity Contribution.  On or before September 20, 2018, each of the Borrower and the Limited Obligor shall cause the Management Equity Contribution to be paid to Monterey in cash, and the Borrower shall provide to Agent and the Lenders evidence thereof that is reasonably satisfactory to Lenders. If the Management Equity Contribution is not made by September 20, 2018, an Event of Default will exist pursuant to Section 7.01(d)(y)).

ARTICLE VI
**NEGATIVE COVENANTS**

From and after the Effective Date until Payment in Full, the Borrower covenants and agrees with the Lenders that:

Section 6.01     [Reserved].

Section 6.02     Indebtedness.  The Borrower will not incur, create, assume or suffer to exist any Indebtedness, except:

(a)     the Obligations;

(b)     Indebtedness existing on the Effective Date and set forth on Schedule 6.02 and extensions, renewals and replacements of any such Indebtedness with Indebtedness of a similar type that does not increase the outstanding principal amount thereof; provided that any such Indebtedness shall be subordinated to the Obligations on terms satisfactory to the Required Lenders;

(c)     Indebtedness of the Borrower at any time owing by the Borrower under any of the Minimum Required Swap Agreements or other Swap Agreements with Approved Swap Counterparties and approved by the Agent;

(d)     Indebtedness of the Borrower incurred to finance the acquisition, construction or improvement of any fixed or capital assets, including Capital Lease Obligations and any Indebtedness assumed in connection with the acquisition of any such assets or secured by a Lien

on any such assets prior to the acquisition thereof, and extensions, renewals and replacements of any such Indebtedness that do not increase the outstanding principal amount thereof, provided that (i) such Indebtedness is incurred prior to or within ninety (90) days after such acquisition or the completion of such construction or improvement and (ii) immediately after giving effect to the incurrence of such Indebtedness, the aggregate principal amount of all Indebtedness incurred under this Section 6.02(d) and then outstanding shall not exceed the Threshold Amount at such time, the aggregate principal amount of Indebtedness permitted by this clause (d);

(e)     to the extent constituting Indebtedness, Indebtedness associated with worker's compensation claims, performance, bid, surety or similar bonds or surety obligations required by Governmental Requirements or by third parties in the ordinary course of business in connection with the operation of, or provision for the abandonment and remediation of, the Oil and Gas Properties, in an aggregate amount outstanding at any time not to exceed the Threshold Amount;

(f)     other Indebtedness of the Borrower, so long as, immediately after giving effect to the incurrence of any such Indebtedness, the aggregate principal amount of all Indebtedness incurred under this Section 6.02(f) and then outstanding does not exceed the Threshold Amount at such time; and

(g)     any Guarantee with respect to any Indebtedness permitted to be incurred hereunder.

Section 6.03     Liens. The Borrower will not create, incur, assume or permit to exist any Lien on any of its Properties (now owned or hereafter acquired), except:

(a)     Liens securing any Obligations;

(b)     Excepted Liens;

(c)     Liens securing Indebtedness permitted under Section 6.02(d); provided, however, that (i) such Liens shall be created substantially simultaneously with the acquisition, construction, improvement or lease, as applicable, of the related Property, (ii) such Liens do not at any time encumber any property other than the Property financed by such Indebtedness and (iii) the principal amount of Indebtedness secured by any such Lien shall at no time exceed one hundred percent (100%) of the original price for the purchase, construction, improvement or lease amount (as applicable) of such Property at the time of purchase, repair, improvement or lease (as applicable);

(d)     any Lien on any property or asset of the Borrower existing on the Effective Date and set forth on Schedule 6.03; provided, however, that (i) such Lien shall not apply to any other property or asset of the Borrower and (ii) such Lien shall secure only those obligations which it secures on the Effective Date and extensions, renewals and replacements thereof that do not increase the outstanding principal amount thereof; and

(e)     Liens on assets of the Borrower not otherwise permitted above, so long as, immediately after giving effect to the incurrence of any such Liens, the aggregate principal amount of Indebtedness and other obligations then outstanding and secured by any Liens incurred under this Section 6.03(e) does not exceed the Threshold Amount at such time.

[CREDIT AGREEMENT]

Section 6.04     Restricted Payments.  The Borrower will not declare or make, or agree to pay or make, directly or indirectly, any Restricted Payment other than, so long as no Event of Default is in existence, Permitted Tax Distributions.

Section 6.05     Investments, Loans and Advances.  The Borrower will not make or permit to remain outstanding any Investments in or to any Person, except that the foregoing restriction shall not apply to:

(a)     Permitted Investments;

(b)     Investments existing on the Effective Date and described on Schedule 6.05;

(c)     accounts receivable arising in the ordinary course of business;

(d)     [reserved];

(e)     so long as the Borrower complies with Section 5.13(b), to the extent constituting Investments, Investments in direct ownership interests in additional Oil and Gas Properties and gas gathering systems related thereto or related to farm-out, farm-in, joint operating, joint venture or area of mutual interest agreements, gathering systems, pipelines or other similar arrangements which are usual and customary in the oil and gas exploration and production business located within the geographic boundaries of the United States of America;

(f)     Investments pursuant to Swap Agreements otherwise permitted under this Agreement;

(g)     Investments in stock, obligations or securities received in settlement of debts arising from Investments permitted under this Section 6.05 owing to the Borrower as a result of a bankruptcy or other insolvency proceeding of the obligor in respect of such debts or upon the enforcement of any Lien in favor of the Borrower, provided that the Borrower shall give the Agent and the Lenders prompt written notice in the event that the aggregate amount of all Investments held at any one time under this Section 6.05(g) exceeds the Threshold Amount as in effect at the time such Investments are made;

(h)     deposits made in the ordinary course of business to secure the performance of leases or other obligations as permitted by Section 6.03;

(i)     [reserved]

(j)     Guarantees permitted pursuant to Section 6.02; and

(k)     other Investments, so long as, immediately after giving effect to the making of any such Investments, the aggregate amount of Investments made pursuant to this Section 6.05(k) and then outstanding does not exceed the Threshold Amount at such time.

For purposes of determining the amount of any Investment outstanding for purposes of this Section 6.05, such amount shall be deemed to be the amount of such Investment when made, purchased or acquired (without adjustment for subsequent increases or decreases in the value of such Investment) less any amount realized in respect of such Investment upon the sale, collection or return of capital (not to exceed the original amount invested).

Section 6.06   Nature of Business; No International Operations.   The Borrower shall not (a) engage in any business other than the exploration, development, production and sale of Hydrocarbons and activities reasonably incidental or related thereto or (b) acquire or make any other expenditure (whether such expenditure is capital, operating or otherwise) in or related to, any Oil and Gas Properties not located within the geographical boundaries of the United States.

Section 6.07   Proceeds of Loans and Management Equity Contribution.

(a)   The proceeds of the Loan shall be used (a) to fund the purchase price for the Acquisition and Acquisition 2, (b) to pay fees and expenses incurred in connection with the Transactions, and (c) to provide for the general working capital needs of the Borrower.   The proceeds of the Management Equity Contribution shall be used (a) to fund the Borrower's proved non-producing and behind pipe capital expenditures in accordance with the budget submitted to and approved by the Agent and the Required Lenders for the then-current fiscal year pursuant to Article III or Section 5.01(l), as applicable, and (b) to repay amounts owing to the Lenders under the Loan Documents, and for no other purpose; provided that the full amount of the Management Equity Contribution must be funded as cash on the Borrower's balance sheet

(b)   The Borrower will not use the proceeds of any Loan under this Agreement directly or indirectly for the purpose of buying or carrying any "margin stock" within the meaning of Regulation U (herein called "margin stock") or for the purpose of reducing or retiring any indebtedness which was originally incurred to buy or carry a margin stock or for any other purpose which would constitute this transaction a "purpose" credit within the meaning of Regulation U.   The Borrower will not take any action which would cause this Agreement or any other Loan Document to violate Regulation T, U or X.

(c)   The Borrower will not use or otherwise make available, and will ensure that its directors, officers, employees and agents will not use or otherwise make available, the proceeds of the Loan (i) in furtherance of an offer, payment, promise to pay, or authorization of the payment or giving of money, or anything else of value, to any Person in violation of any Anti-Corruption Laws, (ii) for the purpose of funding, financing or facilitating any activities, business or transaction of or with any Sanctioned Person, or in any Sanctioned Country, or (iii) in any manner that would result in the violation of any Sanctions applicable to any party hereto.

Section 6.08   Sale or Discount of Receivables.   Except for the settlement of joint interest billing accounts in the ordinary course of business or discounts granted to settle collection of accounts receivable or the sale of defaulted accounts arising in the ordinary course of business in connection with the compromise or collection thereof and not in connection with any financing transaction, the Borrower will not discount or sell (with or without recourse) any of their respective notes receivable or accounts receivable.

Section 6.09   Mergers, Etc.   The Borrower will not merge into or with or consolidate with any other Person, or permit any other Person to merge into or consolidate with it, or sell, lease or otherwise dispose of (whether in one transaction or in a series of transactions) all or substantially all of its Property to any other Person (whether now owned or hereafter acquired) (any of the foregoing transactions, a "consolidation"), or liquidate or dissolve.

Section 6.10   Sale of Properties.   The Borrower will not sell, assign, farm-out, convey or otherwise transfer any Property (subject to Section 6.09) except for:

(a)   the sale of Hydrocarbons or seismic data in the ordinary course of business;

47

(b)      the sale or transfer of equipment that is (i) obsolete, worn out, depleted or uneconomic and disposed of in the ordinary course of business, (ii) no longer necessary for the business of such Person or (iii) contemporaneously replaced by equipment of at least comparable value and use;

(c)      Casualty Events with respect to Properties that are not Oil and Gas Properties; and

(d)      dispositions of Permitted Investments.

Section 6.11      Sales and Leasebacks.  The Borrower will not enter into any arrangement, directly or indirectly, with any Person whereby it shall sell or transfer any Property, whether now owned or hereafter acquired, and thereafter rent or lease such Property which it intends to use for substantially the same purpose or purposes as the Property being sold or transferred.

Section 6.12      Environmental Matters.  The Borrower will not (a) cause or knowingly permit any of its Property to be in violation of, or (b) do anything or knowingly permit anything to be done which will subject any such Property to any Remedial Work under, any Environmental Laws that could reasonably be expected to have a Material Adverse Effect; it being understood that clause (b) above will not be deemed as limiting or otherwise restricting any obligation to disclose any relevant facts, conditions and circumstances pertaining to such Property to the appropriate Governmental Authority.

Section 6.13      Transactions with Affiliates.  The Borrower will not sell, lease or otherwise transfer any property or assets to, or purchase, lease or otherwise acquire any property or assets from, or otherwise engage in any other transactions with, any of its Affiliates or any officer, manager or director of the Borrower, except (a) in the ordinary course of business at prices and on terms and conditions not less favorable to the Borrower than could be obtained on an arm's-length basis from unrelated third parties, (b) Restricted Payments permitted by Section 6.04, (c) employment and severance arrangements (including equity incentive plans and employee benefit plans and arrangements) with their respective officers and employees in the ordinary course of business and (d) payment of customary fees and reasonable out of pocket costs to, and indemnities for the benefit of, directors, officers and employees of the Borrower in the ordinary course of business.

Section 6.14      Negative Pledge Agreements; Dividend Restrictions.  The Borrower will not, directly or indirectly, enter into, incur or permit to exist any agreement or other arrangement that prohibits or restricts the granting, conveying, creation or imposition of any Lien on any of its Property to secure the Obligations or which requires the consent of other Persons in connection therewith; provided, however, that (i) the foregoing shall not apply to restrictions and conditions imposed by law or by any Loan Document, (ii) the foregoing shall not apply to restrictions or conditions imposed by any agreement relating to secured Indebtedness permitted under Section 6.03(c) if such restrictions or conditions apply only to the property or assets securing such Indebtedness and (iii) the foregoing shall not apply to (A) customary provisions in leases and other contracts restricting the assignment thereof and (B) customary provisions in leases, joint operating agreements, pooling and unitization agreements, Hydrocarbon marketing agreements, and other contracts, agreements, easements, rights-of-way, and assignments included or affecting or pertain to the Oil and Gas Properties restricting the assignment thereof.

Section 6.15      Take-Or-Pay or Other Prepayments.   The Borrower will not allow gas imbalances, take-or-pay or other prepayments with respect to the Oil and Gas Properties of the Borrower that would require the Borrower to deliver Hydrocarbons at some future time without then or thereafter receiving full payment therefor.

48

Section 6.16 <u>Swap Agreements</u>. The Borrower will not enter into any Swap Agreements with any Person other than as permitted by Section 5.15(a), and will not enter into any Swap Agreement that contains any requirement, agreement or covenant for the Borrower to post collateral or margin to secure their obligations under such Swap Agreement or to cover market exposures. The Borrower will not grant any Lien to any Person (other than the Agent and the Lenders) in connection with a Swap Agreement, regardless of whether any such Lien may otherwise have been permitted under Section 6.03. No Swap Agreement shall be entered into for speculative purposes.

Section 6.17 <u>Amendments to Organizational Documents and Material Contracts</u>. The Borrower shall not (a) amend, supplement or otherwise modify (or permit to be amended, supplemented or modified) its Organizational Documents in any manner that could reasonably be expected to be materially adverse to the rights or interests of the Lenders, or (b) (i) amend, supplement or otherwise modify (or permit to be amended, supplemented or modified) any Material Contract to which it is a party, (ii) terminate, replace or assign any of its interests in any Material Contract or (iii) permit any Material Contract not to be in full force and effect and binding upon and enforceable against the parties thereto, in each case if such occurrence could reasonably be expected to be materially adverse to the rights or interests of the Lenders.

Section 6.18 <u>Marketing Activities</u>. The Borrower will not engage in marketing activities for any Hydrocarbons or enter into any contracts related thereto other than (i) contracts for the sale of Hydrocarbons scheduled or reasonably estimated to be produced from their Oil and Gas Properties during the period of such contract and (ii) contracts for the sale of Hydrocarbons scheduled or reasonably estimated to be produced from Oil and Gas Properties of third parties during the period of such contract associated with the Oil and Gas Properties of the Borrower that the Borrower has the right to market pursuant to joint operating agreements, unitization agreements or other similar contracts that are usual and customary in the oil and gas business.

Section 6.19 <u>Changes in Fiscal Periods; Accounting Changes</u>. The Borrower shall not have its fiscal year end on a date other than December 31 or change its method of determining fiscal quarters or make (without the consent of the Required Lenders) any material change in its accounting treatment and reporting practices except, in each case, as required by GAAP.

Section 6.20 <u>Subsidiaries</u>. The Borrower shall not create, acquire or permit to exist any Subsidiary.

Section 6.21 <u>ERISA Compliance</u>. Except as could not reasonably be expected to result in liability to the Borrower in an aggregate amount exceeding the Threshold Amount, the Borrower will not, and will not permit any ERISA Affiliate to, at any time:

(a) allow any ERISA Event to occur;

(b) contribute to or assume an obligation to contribute to, or otherwise incur any liability with respect to, any employee benefit plan subject to Section 302 or Title IV of ERISA or Section 412 of the Code (including any "multiemployer plan" (as defined in Section 4001(a)(3) of ERISA)); or

(c) acquire an interest in any Person that causes such Person to become an ERISA Affiliate if such Person sponsors, maintains or contributes to, or at any time in the six-year period preceding such acquisition has sponsored, maintained, or contributed to, any employee benefit plan subject to Section 302 or Title IV of ERISA or Section 412 of the Code (including any "multiemployer plan" (as defined in Section 4001(a)(3) of ERISA)).

[CREDIT AGREEMENT]

Section 6.22    Capital Expenditures.  The Borrower shall not make or agree to make any capital expenditures other than (a) capital expenditures set forth in the budget submitted to and approved by the Required Lenders for the then-current fiscal year pursuant to Article III or Section 5.01(l), as applicable and (b) any other capital expenditures as to which the Required Lenders have provided their prior written consent.

Section 6.23    Leverage Ratio.  Beginning on the date that is one year after the Original Closing Date, the Borrower shall not permit the Leverage Ratio to be equal to or greater than 4.00 to 1.00, measured as of the last day of each fiscal quarter.

Section 6.24    Expense Ratio.  The Borrower shall not permit its G&A Expenses for any calendar month to exceed fifteen percent (15%) (the "Expense Ratio Limit") of the Borrower's Oil and Gas Revenues for such calendar month.

Section 6.25    PDP Collateral Coverage Ratio.  Borrower shall not at any time permit the PDP Collateral Coverage Ratio to exceed (a) on and after November 30, 2018 until (but not including) May 31, 2019, 80.0%, (b) on and after May 31, 2019 until (but not including) November 30, 2019, 75.0%, (c) on and after November 30, 2019 until (but not including) May 31, 2020, 70.0%, and (d) on and after May 31, 2020, 65.0%.  "PDP Collateral Coverage Ratio" means the ratio, expressed as a percentage, determined by dividing the then-outstanding amount of the Loan by the Borrower's PDP PV-10 Reserves as reflected and as defined in the Reserve Report most recently delivered pursuant to Section 5.01(p).

Section 6.26    Total Proved Collateral Coverage Ratio.  Borrower shall not at any time permit the Total Proved Collateral Coverage Ratio to exceed 50.0%.  "Total Proved Collateral Coverage Ratio" means the ratio, expressed as a percentage, determined by dividing the then-outstanding amount of the Loan by the PV-10 of the Borrower's Proved Reserves as reflected and as defined in the Reserve Report most recently delivered pursuant to Section 5.01(p), provided that only 20.0% of the value attributable to Proved Undeveloped Reserves (as reflected and defined in such Reserve Report) may be included in such calculation.

## ARTICLE VII
## EVENTS OF DEFAULT; REMEDIES

Section 7.01    Events of Default.  The occurrence of any one or more of the following events on or after the Original Closing Date shall constitute an "Event of Default":

(a)    the Borrower shall fail to pay any principal of the Loan when and as the same shall become due and payable, whether at the due date thereof or at a date fixed for prepayment thereof, by acceleration or otherwise;

(b)    the Borrower shall fail to pay any interest on any Loan or any fee or any other amount (other than an amount referred to in Section 7.01(a)) payable under any Loan Document, when and as the same shall become due and payable, and such failure shall continue unremedied for a period of three (3) Business Days;

(c)    any representation or warranty made or deemed made by or on behalf of the Borrower in or in connection with any Loan Document, or in any report, notice, certificate, financial statement or other document furnished pursuant to or in connection with any Loan Document, shall prove to have been incorrect in any material respect when made or deemed made (or, to the extent that any such representation and warranty is qualified by materiality or

references Material Adverse Effect in the text thereof, such representation and warranty (as so qualified) shall prove to have been incorrect in any respect when made or deemed made);

(d)     (x) the Borrower shall fail to observe or perform any covenant, condition or agreement contained in (i) Section 5.01(a), Section 5.01(b), or Section 5.01(c) and such failure shall continue unremedied for a period of five (5) days after the earlier to occur of (A) notice thereof from the Agent to the Borrower or (B) a Responsible Officer of the Borrower otherwise becoming aware of such default or (ii) Section 5.02, Section 5.03 (with respect to legal existence), Section 5.06, Section 5.10, Section 5.13, Section 5.14, Section 5.15 or in Article VI, or (y) the Borrower or the Limited Obligor shall fail to observe or perform its obligations under the covenant contained in Section 5.16;

(e)     the Borrower shall fail to observe or perform any covenant, condition or agreement contained in this Agreement (other than those specified in Section 7.01(a), Section 7.01(b) or Section 7.01(d)) or any other Loan Document, and such failure shall continue unremedied for a period of thirty (30) days after the earlier of (i) notice thereof from the Agent to the Borrower or (ii) a Responsible Officer of the Borrower otherwise becoming aware of such default;

(f)     the Borrower shall fail to make any payment (whether of principal or interest and regardless of amount) in respect of any Material Indebtedness, when and as the same shall become due and payable after giving effect to any grace periods applicable thereto;

(g)     any event or condition occurs that results in any Material Indebtedness becoming due prior to its scheduled maturity or that enables or permits (with or without the giving of notice, the lapse of time or both) the holder or holders of such Material Indebtedness or any trustee or agent on its or their behalf to cause such Material Indebtedness to become due, or to require the Redemption thereof or any offer to Redeem to be made in respect thereof, prior to its scheduled maturity or require the Borrower to make an offer to Redeem in respect thereof; provided, however, that this clause (g) shall not apply to secured Indebtedness that becomes due as a result of the voluntary sale or transfer of the property or assets securing such Indebtedness;

(h)     an involuntary proceeding shall be commenced or an involuntary petition shall be filed seeking (i) liquidation, reorganization or other relief in respect of the Borrower, or its debts, or of a substantial part of its assets, under any federal, state or foreign bankruptcy, insolvency, receivership or similar law now or hereafter in effect or (ii) the appointment of a receiver, trustee, custodian, sequestrator, conservator or similar official for the Borrower or for a substantial part of its assets, and, in any such case, such proceeding or petition shall continue undismissed for sixty (60) days or an order or decree approving or ordering any of the foregoing shall be entered;

(i)     the Borrower shall (i) voluntarily commence any proceeding or file any petition seeking liquidation, reorganization or other relief under any federal, state or foreign bankruptcy, insolvency, receivership or similar law now or hereafter in effect, (ii) consent to the institution of, or fail to contest in a timely and appropriate manner, any proceeding or petition described in Section 7.01(h), (iii) apply for or consent to the appointment of a receiver, trustee, custodian, sequestrator, conservator or similar official for the Borrower or for a substantial part of its assets, (iv) file an answer admitting the material allegations of a petition filed against it in any such proceeding, (v) make a general assignment for the benefit of creditors, (vi) take any action for the purpose of effecting any of the foregoing; or (vii) become unable, admit in writing its inability or fail generally to pay its debts as they become due;

(j)    one or more judgments for the payment of money in an aggregate amount exceeding the Threshold Amount (to the extent not covered by independent third party insurance as to which the insurer does not dispute coverage and is not subject to an insolvency proceeding) shall be rendered against the Borrower and the same shall remain undischarged for a period of 30 consecutive days during which execution shall not be effectively stayed, or any action shall be legally taken by a judgment creditor to attach or levy upon any assets of the Borrower to enforce any such judgment;

(k)    a Change in Control shall occur;

(l)    any material provision of any Loan Document for any reason ceases to be valid, binding and enforceable in accordance with its terms (or the Borrower shall challenge the enforceability of any Loan Document or shall assert in writing, or engage in any action or inaction based on any such assertion, that any provision of any of the Loan Documents has ceased to be or otherwise is not valid, binding and enforceable in accordance with its terms);

(m)    any Security Instrument shall for any reason fail to create a valid and perfected first priority security interest in any material portion of the Collateral purported to be covered thereby, except as permitted by the terms of any Loan Document, or the Live Oak Mortgage shall for any reason fail to create a valid and perfected first priority security interest in any material portion of the collateral purported to be covered thereby, except as permitted by the terms of any Loan Document, in each case, except as caused by the action of the Agent or any Lender as determined by the final non-appealable judgment of a court of competent jurisdiction;

(n)    any of the equity interests in the Borrower shall become subject to a lien or security interest in favor of any Person other than the Agent and the Lenders; or

(o)    an ERISA Event shall have occurred that, in the opinion of the Required Lenders, when taken together with all other ERISA Events that have occurred, could reasonably be expected to result in liability to the Borrower in an aggregate amount exceeding the Threshold Amount.

Section 7.02    Remedies.

(a)    In the case of an Event of Default (other than one described in Section 7.01(h) or Section 7.01(i)), and at any time thereafter during the continuance of such Event of Default, the Agent may, and at the request of the Required Lenders, shall, by notice to the Borrower, declare the Loan then outstanding to be due and payable in whole (or in part, in which case any principal not so declared to be due and payable may thereafter be declared to be due and payable), and thereupon the principal of the Loan so declared to be due and payable, together with accrued interest thereon and all fees and other obligations of the Borrower accrued hereunder and under the other Loan Documents, shall become due and payable immediately, without presentment, demand (other than written notice), protest, notice of intent to accelerate, notice of acceleration or other notice of any kind, all of which are hereby waived by the Borrower; and in case of an Event of Default described in Section 7.01(h) or Section 7.01(i), the principal of the Loan then outstanding, together with accrued interest thereon and all fees and the other obligations of the Borrower accrued hereunder and under the other Loan Documents shall automatically and immediately become due and payable, without presentment, demand, protest, notice of intent to accelerate, notice of acceleration, or other notice of any kind, all of which are hereby waived by the Borrower.

(b)      In the case of the occurrence of an Event of Default, in addition to any other rights and remedies granted to the Agent or any Lender in the Loan Documents, the Agent may exercise all rights and remedies of a secured party under the UCC or any other applicable law.

(c)      Upon the occurrence of any Event of Default, the Agent shall be authorized and entitled, in its sole and uncontrolled discretion, to withdraw all cash in the Lockbox Account on a daily basis to be applied against the Obligations until such time as no Event of Default exists. under any of the subsections of Section 7.01.

(d)      All proceeds realized from the liquidation or other disposition of Collateral or otherwise received after maturity of the Loan, whether by acceleration or otherwise, shall be applied:

(i)      *first*, to payment or reimbursement of that portion of the Obligations constituting fees, expenses, indemnities and other amounts payable to the Agent in its capacity as administrative agent and collateral agent for the Lenders;

(ii)      *second*, to the payment or reimbursement of that portion of the Obligations constituting fees, expenses, indemnities and other amounts payable to the Lenders;

(iii)      *third*, to payment of accrued interest on the Loan;

(iv)      *fourth*, to payment of the unpaid principal of the Loan and any other Obligations then due and payable, pro rata in accordance with the ratio of the principal balance of the Loan or such other Obligations, as applicable, to the sum of the principal balance of the Loan and such other Obligations; and

(v)      *fifth*, any excess, after all of the Obligations shall have been indefeasibly paid in full in cash, shall be paid to the Borrower or as otherwise required by any Governmental Requirement.

Notwithstanding the foregoing, amounts received from the Borrower or any obligor that is not an Eligible Contract Participant shall not be applied to any Excluded Swap Obligations owing to a Lender, it being understood that in the event any amount is applied to the Obligations other than Excluded Swap Obligations as a result of this sentence, the Agent shall make such adjustments as it determines are appropriate pursuant to this sentence, from amounts received from Eligible Contract Participants to ensure, as nearly as possible, that the proportional aggregate recoveries with respect to the Obligations described in the preceding sentence of this subsection (f) of this Section 7.02 by Lenders that are the holders of any Excluded Swap Obligations are the same as the proportional aggregate recoveries with respect to other Obligations pursuant to the preceding sentence of this subsection (e) of this Section 7.

ARTICLE VIII
**MISCELLANEOUS**

Section 8.01      Notices.

(a)      Except in the case of notices and other communications expressly permitted to be given by telephone (and subject to Section 8.01(b)), all notices and other communications provided for herein shall be in writing and shall be delivered by hand or overnight courier service, mailed by certified or registered mail or sent by facsimile, as follows:

(i)      if to the Borrower, to Monterey Resources LLC, 6340 Brookshire Drive, Dallas, Texas, 75230, Attention: Robert A. Imel, robertimelcpa@gmail.com;

(ii)     if to the Limited Obligor, to Robert A. Imel at 6340 Brookshire Drive, Dallas, Texas, 75230, robertimelcpa@gmail.com;

(iii)    if to Fulcrum Energy Capital II Monterey LLC, to Fulcrum Energy Capital II Monterey LLC, 417 17th Street, Suite 1150, Denver, Colorado 80202, Attention: Bradley Morse, brad@morseenergycapital.com;

(iv)     if to the Agent or to 405 Arapahoe LLC as a Lender, to 405 Arapahoe LLC, c/o Arena Investors, LP, 405 Lexington Avenue, 59th Floor, New York, New York 10174, Attention:  Greg White, gwhite@arenaco.com, with an email copy to: reporting@arenaco.com, arenaagency@cortlandglobal.com, and gpaulsen@arenaco.com.; and

(v)      if to Cargill Incorporated, 9350 Excelsior Boulevard, Mailstop #150, Hopkins, Minnesota 55343, Attention:  Tyler R. Smith, tyler_smith_1@cargill.com.

Notices sent by hand or overnight courier service, or mailed by certified or registered mail, shall be deemed to have been given when received; notices sent by facsimile shall be deemed to have been given when sent (except that, if not given during normal business hours for the recipient, shall be deemed to have been given at the opening of business on the next Business Day for the recipient).  Notices delivered electronically, to the extent provided in paragraph (b) below, shall be effective as provided in said paragraph (b).

(b)      The Agent, any Lender or the Borrower may, in its discretion, agree to accept notices and other communications to it hereunder by electronic communications pursuant to procedures approved by it; provided, however, that approval of such procedures may be limited to particular notices or communications.

Unless the Agent otherwise prescribes, (i) notices and other communications sent to an e-mail address shall be deemed received upon the sender's receipt of an acknowledgement from the intended recipient (such as by the "return receipt requested" function, as available, return e-mail or other written acknowledgement), and (ii) notices or communications posted to an Internet or intranet website shall be deemed received upon the deemed receipt by the intended recipient, at its e-mail address as described in the foregoing clause (i), of notification that such notice or communication is available and identifying the website address therefor; provided, however, that, for both clauses (i) and (ii) above, if such notice, email or other communication is not sent during the normal business hours of the recipient, such notice or communication shall be deemed to have been sent at the opening of business on the next Business Day for the recipient.

(c)      Any party hereto may change its address or facsimile number for notices and other communications hereunder by notice to the other parties hereto.

Section 8.02    Waivers; Amendments.

(a)      No failure or delay by the Agent or any Lender in exercising, and no course of dealing with respect to, any right or power hereunder or under any other Loan Document shall operate as a waiver thereof, nor shall any single or partial exercise of any such right or power, or any abandonment or discontinuance of steps to enforce any such right or power, preclude any

54

other or further exercise thereof or the exercise of any other right or power. The rights and remedies of the Agent and the Lenders hereunder and under the other Loan Documents are cumulative and are not exclusive of any rights or remedies that they would otherwise have. No waiver of any provision of this Agreement or any other Loan Document or consent to any departure by the Borrower therefrom shall in any event be effective unless the same shall be permitted by Section 8.02(b), and then such waiver or consent shall be effective only in the specific instance and for the purpose for which given. Without limiting the generality of the foregoing, the making of the Loan shall not be construed as a waiver of any Default, regardless of whether the Agent or any Lender may have had notice or knowledge of such Default at the time.

(b)     Neither this Agreement nor any provision hereof nor any other Loan Document nor any provision thereof may be waived, amended or modified except pursuant to an agreement or agreements in writing entered into by the Borrower, the Agent and the Required Lenders; provided that, without the consent of each Lender, no such waiver, amendment or modification shall (i) modify the terms of any payment obligation under any Loan Document (including, without limitation, increasing or decreasing the amount of any loan or other extension of credit, modifying the terms of any mandatory prepayment, modifying any rate of interest or fees, or changing the timing or circumstances for any payment under any Loan Document), (ii) change any term or condition hereof in a manner that would alter the pro rata sharing of payments required thereby, (iii) modify any term of Section 3.04 or Section 7.02(d), (iv) release Borrower, Limited Obligor, or any guarantor from any of its material obligations under any Loan Document, (v) release any material portion of the Collateral, (vi) change any of the provisions of this Section 8.02(b), (vii) amend or otherwise modify this Agreement or any other Loan Document in a manner that results in any Swap Obligations that are secured by a Security Instrument no longer being secured thereby on an equal and ratable basis with the principal balance of the Loan without the written consent of each Approved Swap Counterparty affected thereby, or (viii) change any of the definitions of "Applicable Percentage", "Required Lenders", or any other provision hereof specifying the number or percentage of Lenders required to waive, amend or modify any rights hereunder or under any other Loan Documents or required to make any determination or grant any consent hereunder or under any other Loan Documents.

Section 8.03     Expenses, Indemnity; Damage Waiver.

(a)     The Borrower shall pay (i) all expenses incurred by the Agent, the Lenders and their respective Affiliates, including the reasonable fees, charges and disbursements of counsel for the Agent, each of the Lenders and their respective Affiliates, in connection with the preparation, negotiation, execution, delivery and administration (both before and after the execution hereof and including advice of counsel to the Lenders with respect thereto) of this Agreement and the other Loan Documents and any amendments, modifications or waivers of, or consents related to, the provisions hereof or thereof (whether or not the transactions contemplated hereby or thereby shall be consummated), (ii) all costs, expenses, Taxes, assessments and other charges incurred by the Agent and the Lenders in connection with any filing, registration, recording or perfection of any security interest contemplated by this Agreement or any Security Instrument or any other document referred to herein, (iii) all expenses incurred by the Agent and the Lenders, including the fees, charges and disbursements of any counsel for the Agent and the Lenders, in connection with the enforcement or protection of its rights in connection with this Agreement or any other Loan Document, including its rights under this Section 8.03, or in connection with the Loan made hereunder, including all such expenses incurred during any workout, restructuring or negotiations in respect of such Loan, and (iv) all third party out-of-pocket expenses reasonably expended, advanced or incurred by on or behalf of the Agent (A) in connection with certain back office and administrative services related to the Loan provided by

[CREDIT AGREEMENT]

Cortland Capital Market Services LLC or such other third party loan servicer as the Agent may select from time to time; (B) in connection with all valuation services related to the Loan; and (C) associated with rating agency services, risk mitigation providers and insurance, provided, however, the fees and expenses in connection with clauses (iv)(A) and (iv)(C) shall not exceed $25,000 per year.

(b)     THE BORROWER SHALL INDEMNIFY THE AGENT AND THE LENDERS, AND EACH RELATED PARTY OF THE AGENT AND EACH LENDER (EACH SUCH PERSON BEING CALLED AN "INDEMNITEE") AGAINST, AND HOLD EACH INDEMNITEE HARMLESS FROM, AND SHALL PAY OR REIMBURSE ANY SUCH INDEMNITEE FOR, ANY AND ALL LOSSES, CLAIMS (INCLUDING ANY ENVIRONMENTAL CLAIMS), PENALTIES, DAMAGES, LIABILITIES AND RELATED EXPENSES (INCLUDING THE FEES, CHARGES AND DISBURSEMENTS OF ANY COUNSEL FOR ANY INDEMNITEE), INCURRED BY ANY INDEMNITEE OR ASSERTED AGAINST ANY INDEMNITEE BY ANY PERSON (INCLUDING THE BORROWER), OTHER THAN SUCH INDEMNITEE AND ITS RELATED PARTIES, ARISING OUT OF, IN CONNECTION WITH, OR AS A RESULT OF (I) THE EXECUTION OR DELIVERY OF THIS AGREEMENT, ANY OTHER LOAN DOCUMENT OR ANY AGREEMENT OR INSTRUMENT CONTEMPLATED HEREBY OR THEREBY, (II) THE PERFORMANCE BY THE PARTIES HERETO OR THE PARTIES TO ANY OTHER LOAN DOCUMENT OF THEIR RESPECTIVE OBLIGATIONS HEREUNDER OR THEREUNDER OR THE CONSUMMATION OF THE TRANSACTIONS CONTEMPLATED HEREBY OR THEREBY OR BY ANY OTHER LOAN DOCUMENT, (III) THE FAILURE OF THE BORROWER TO COMPLY WITH THE TERMS OF ANY LOAN DOCUMENT, INCLUDING THIS AGREEMENT, OR WITH ANY GOVERNMENTAL REQUIREMENT, (IV) ANY INACCURACY OF ANY REPRESENTATION OR ANY BREACH OF ANY WARRANTY OR COVENANT OF THE BORROWER SET FORTH IN ANY OF THE LOAN DOCUMENTS OR ANY INSTRUMENT, DOCUMENT OR CERTIFICATE DELIVERED IN CONNECTION HEREWITH, (V) ANY OTHER ASPECT TO THE LOAN DOCUMENTS, (VI) THE LOAN OR THE USE OR PROPOSED USE OF THE PROCEEDS THEREFROM, (VII) THE PRESENCE, GENERATION, STORAGE, RELEASE, THREATENED RELEASE, USE, TRANSPORT, DISPOSAL, ARRANGEMENT OF DISPOSAL OR TREATMENT OF, OR ALLEGED PRESENCE OR RELEASE OF, HAZARDOUS MATERIALS ON OR FROM ANY PROPERTY OWNED OR OPERATED BY THE BORROWER, OR ANY ENVIRONMENTAL CLAIM RELATED IN ANY WAY TO THE BORROWER OR ITS OPERATIONS, (VIII) THE BREACH OR NON-COMPLIANCE BY THE BORROWER WITH ANY ENVIRONMENTAL LAW APPLICABLE TO THE BORROWER OR ANY OF ITS PROPERTIES, (IX) ANY OTHER ENVIRONMENTAL, HEALTH OR SAFETY CONDITION, OR (X) ANY ACTUAL OR PROSPECTIVE CLAIM, LITIGATION, INVESTIGATION OR PROCEEDING RELATING TO ANY OF THE FOREGOING, WHETHER BASED ON CONTRACT, TORT OR ANY OTHER THEORY, WHETHER BROUGHT BY A THIRD PARTY OR BY THE BORROWER, AND REGARDLESS OF WHETHER ANY INDEMNITEE IS A PARTY THERETO;   PROVIDED, HOWEVER, THAT SUCH INDEMNITY SHALL NOT, AS TO ANY INDEMNITEE, BE AVAILABLE TO THE EXTENT THAT SUCH LOSSES, CLAIMS, DAMAGES, LIABILITIES OR RELATED EXPENSES (A) ARE DETERMINED BY A COURT OF COMPETENT JURISDICTION BY FINAL AND NONAPPEALABLE JUDGMENT TO HAVE RESULTED FROM THE GROSS NEGLIGENCE OR WILLFUL MISCONDUCT OF SUCH INDEMNITEE OR (B) RESULT FROM A CLAIM BROUGHT BY THE BORROWER AGAINST AN INDEMNITEE FOR BREACH IN BAD FAITH OF SUCH INDEMNITEE'S OBLIGATIONS HEREUNDER OR UNDER ANY OTHER LOAN DOCUMENT, IF THE BORROWER HAS OBTAINED A

[CREDIT AGREEMENT]

FINAL AND NONAPPEALABLE JUDGMENT IN ITS FAVOR ON SUCH CLAIM AS DETERMINED BY A COURT OF COMPETENT JURISDICTION. THIS SECTION 8.03(b) SHALL NOT APPLY WITH RESPECT TO TAXES OTHER THAN ANY TAXES THAT REPRESENT LOSSES, CLAIMS, DAMAGES, ETC. ARISING FROM ANY NON-TAX CLAIM.

(c)     EXPRESS NEGLIGENCE.  EXCEPT AS EXPRESSLY SET FORTH IN SECTION 8.03(b) OR ANY OTHER PROVISION OF THIS AGREEMENT, THE INDEMNITY PROVIDED IN SECTION 8.03(b) SHALL EXTEND TO EACH INDEMNITEE NOTWITHSTANDING THE SOLE OR CONCURRENT NEGLIGENCE OF EVERY KIND OR CHARACTER WHATSOEVER, WHETHER ACTIVE OR PASSIVE, WHETHER AN AFFIRMATIVE ACT OR AN OMISSION, INCLUDING ALL TYPES OF NEGLIGENT CONDUCT IDENTIFIED IN THE RESTATEMENT (SECOND) OF TORTS, OF ONE OR MORE OF THE INDEMNITEES OR BY REASON OF STRICT LIABILITY IMPOSED WITHOUT FAULT ON ANY ONE OR MORE OF THE INDEMNITEES. THIS STATEMENT COMPLIES WITH THE EXPRESS NEGLIGENCE RULE AND IS CONSPICUOUS.

(d)     To the extent permitted by applicable law, the Borrower shall not assert, and hereby waives, any claim against any Indemnitee (i) for any damages arising from the use by unintended recipients of information or other materials distributed by it through telecommunications, electronic or other information transmission systems (including the Internet) in connection with this Agreement or the other Loan Documents or the Transactions, or (ii) on any theory of liability, for special, indirect, consequential or punitive damages (as opposed to direct or actual damages) arising out of, in connection with, or as a result of, this Agreement, any other Loan Document or any agreement or instrument contemplated hereby or thereby, the Transactions, the Loan or the use of the proceeds thereof.

(e)     All amounts due under this Section 8.03 shall be payable not later than fifteen (15) days after written demand therefor.

Section 8.04     Successors and Assigns.

(a)     The provisions of this Agreement shall be binding upon and inure to the benefit of the parties hereto and their respective successors and assigns permitted hereby, except that the Borrower may not assign or otherwise transfer any of its rights or obligations hereunder without the prior written consent of the Agent and each Lender (and any attempted assignment or transfer by the Borrower without such consent shall be null and void).  Nothing in this Agreement, expressed or implied, shall be construed to confer upon any Person (other than the parties hereto, their respective successors and assigns permitted hereby and, to the extent expressly contemplated hereby, the Related Parties of the Agent and each Lender) any legal or equitable right, remedy or claim under or by reason of this Agreement.

(b)     Any Lender may assign to one or more assignees all or a portion of its rights and obligations under this Agreement pursuant to an Assignment and Assumption. Any assigning Lender and its assignee shall execute and deliver to the Agent an Assignment and Assumption, and all documentation and other information with respect to the assignee that is required by Governmental Authorities under applicable "know your customer" and anti-money laundering rules and regulations, including the Patriot Act.  The assignee, if it shall not be a Lender, shall deliver to the Agent an Administrative Questionnaire (in customary form provided by the Agent) in which the assignee designates one or more credit contacts to whom all syndicate-level information (which may contain material non-public information about the Borrowers or their

[CREDIT AGREEMENT]

respective securities) will be made available and who may receive such information in accordance with the assignee's compliance procedures and applicable laws, including Federal and state securities laws.

Section 8.05    Survival; Revival; Reinstatement.

(a)    All covenants, agreements, representations and warranties made by the Borrower herein and in the certificates or other instruments delivered in connection with or pursuant to this Agreement or any other Loan Document shall be considered to have been relied upon by the other parties hereto and shall survive the execution and delivery of this Agreement and the other Loan Documents and the making of the Loan, regardless of any investigation made by any such other party or on its behalf and notwithstanding that the Agent or any Lender may have had notice or knowledge of any Default or incorrect representation or warranty at the time any credit is extended hereunder, and shall continue in full force and effect as long as the principal of or any accrued interest on the Loan or any fee or any other amount payable under this Agreement is outstanding and unpaid or other Obligations are outstanding. The provisions of Section 2.10 and Section 8.03 shall survive and remain in full force and effect regardless of the consummation of the transactions contemplated hereby, the repayment of the Loan or the termination of this Agreement, any other Loan Document or any provision hereof or thereof.

(b)    To the extent that any payments on the Obligations or proceeds of any collateral are subsequently invalidated, declared to be fraudulent or preferential, set aside or required to be repaid to a trustee, debtor in possession, receiver or other Person under any bankruptcy law, common law or equitable cause, then to such extent, the Obligations shall be revived and continue as if such payment or proceeds had not been received and the Agent's and the Lenders' Liens, security interests, rights, powers and remedies under this Agreement and each Loan Document shall continue in full force and effect. In such event, each Loan Document shall be automatically reinstated and the Borrower shall take such action as may be reasonably requested by the Lenders to effect such reinstatement.

Section 8.06    Counterparts; Integration; Effectiveness; Electronic Execution.

(a)    This Agreement may be executed in counterparts (and by different parties hereto on different counterparts), each of which shall constitute an original, but all of which when taken together shall constitute a single contract.

(b)    This Agreement, the other Loan Documents and any separate letter agreements with respect to fees payable to the Agent and/or the Lenders constitute the entire contract among the parties relating to the subject matter hereof and thereof and supersede any and all previous agreements and understandings, oral or written, relating to the subject matter hereof and thereof. THIS AGREEMENT AND THE OTHER LOAN DOCUMENTS REPRESENT THE FINAL AGREEMENT AMONG THE PARTIES HERETO AND THERETO AND MAY NOT BE CONTRADICTED BY EVIDENCE OF PRIOR, CONTEMPORANEOUS OR SUBSEQUENT ORAL AGREEMENTS OF THE PARTIES.   THERE ARE NO UNWRITTEN ORAL AGREEMENTS BETWEEN THE PARTIES.

(c)    Except as provided in Section 3.01, this Agreement shall become effective when it shall have been executed by the Agent and the Lenders and when the Agent and the Lenders shall have received counterparts hereof which, when taken together, bear the signatures of each of the other parties hereto, and thereafter shall be binding upon and inure to the benefit of the parties hereto and their respective successors and permitted assigns. Delivery of an executed counterpart

of a signature page of this Agreement by facsimile, e-mailed, .pdf or any other electronic means that reproduces an image of the actual executed signature page shall be effective as delivery of a manually executed counterpart of this Agreement. The words "execution," "signed," "signature," "delivery," and words of like import in or relating to any document to be signed in connection with this Agreement and the transactions contemplated hereby shall be deemed to include electronic signatures, deliveries or the keeping of records in electronic form, each of which shall be of the same legal effect, validity or enforceability as a manually executed signature, physical delivery thereof or the use of a paper-based recordkeeping system, as the case may be, to the extent and as provided for in any applicable law, including the federal Electronic Signatures in Global and National Commerce Act, or any other similar state laws based on the Uniform Electronic Transactions Act; provided, however, that nothing herein shall require any Lender to accept electronic signatures in any form or format without its prior written consent.

Section 8.07    Severability.  Any provision of this Agreement or any other Loan Document held to be invalid, illegal or unenforceable in any jurisdiction shall, as to such jurisdiction, be ineffective to the extent of such invalidity, illegality or unenforceability without affecting the validity, legality and enforceability of the remaining provisions hereof or thereof; and the invalidity of a particular provision in a particular jurisdiction shall not invalidate such provision in any other jurisdiction.

Section 8.08    Power of Attorney.  The Borrower hereby designates the Agent as its agent and attorney-in-fact, to act in its name, place and stead solely for the purpose of completing and delivering any and all of the Direction Letters and letters in lieu of transfer or division orders delivered by such Borrower pursuant to this Agreement, including completing any blanks contained in such letters and attaching exhibits thereto describing the relevant Collateral.  The Borrower hereby ratifies and confirms all that the Agent shall lawfully do or cause to be done by virtue of this power of attorney and the rights granted with respect to such power of attorney.  This power of attorney is coupled with the interest of the Agent and the Lenders in the Collateral, shall commence and be in full force and effect as of the date of this Agreement and shall remain in full force and effect and shall be irrevocable so long as any Obligations (other than contingent Obligations with respect to which no claim has been made) remain outstanding.  The powers conferred on the Agent by this appointment are solely to protect the interests of the Agent and the Lenders under the Loan Documents and Swap Agreements with respect to the assignment of production proceeds under certain of the Security Instruments and shall not impose any duty upon the Agent to exercise any such powers.  The power of attorney under this Section is expressly limited to the rights and powers set forth herein and no additional rights or powers are herein created or implied.  The Agent shall be accountable only for amounts that it actually receives as a result of the exercise of such powers and shall not be responsible to the Borrower or any other Person for any act or failure to act with respect to such powers, except for gross negligence or willful misconduct.

Section 8.09    GOVERNING LAW; JURISDICTION; CONSENT TO SERVICE OF PROCESS.

(a)    THIS AGREEMENT AND THE OTHER LOAN DOCUMENTS SHALL BE GOVERNED BY, AND CONSTRUED IN ACCORDANCE WITH, THE LAWS OF THE STATE OF TEXAS.

(b)    EACH PARTY HERETO HEREBY IRREVOCABLY AND UNCONDITIONALLY SUBMITS FOR ITSELF AND ITS PROPERTY IN ANY LEGAL ACTION OR PROCEEDING RELATING TO THIS AGREEMENT AND THE OTHER LOAN DOCUMENTS TO WHICH IT IS A PARTY, OR FOR RECOGNITION AND ENFORCEMENT OF ANY JUDGMENT IN RESPECT THEREOF, TO THE EXCLUSIVE JURISDICTION OF THE STATE DISTRICT COURTS AND THE UNITED STATES

DISTRICT COURT LOCATED IN DALLAS, TEXAS AND APPELLATE COURTS FROM ANY THEREOF; PROVIDED, HOWEVER, THAT NOTHING CONTAINED HEREIN OR IN ANY OTHER LOAN DOCUMENT WILL PREVENT ANY PARTY FROM BRINGING ANY ACTION TO ENFORCE ANY AWARD OR JUDGMENT OR EXERCISE ANY RIGHT UNDER THE LOAN DOCUMENTS IN ANY OTHER FORUM IN WHICH JURISDICTION CAN BE ESTABLISHED.   EACH PARTY HEREBY IRREVOCABLY WAIVES ANY OBJECTION, INCLUDING ANY OBJECTION TO THE LAYING OF VENUE OR BASED ON THE GROUNDS OF FORUM NON CONVENIENS, WHICH IT MAY NOW OR HEREAFTER HAVE TO THE BRINGING OF ANY SUCH ACTION OR PROCEEDING IN SUCH RESPECTIVE JURISDICTIONS.

(C)   EACH PARTY TO THIS AGREEMENT IRREVOCABLY CONSENTS TO THE SERVICE OF PROCESS IN THE MANNER PROVIDED FOR NOTICES IN SECTION 8.01.   NOTHING IN THIS AGREEMENT OR ANY OTHER LOAN DOCUMENT WILL AFFECT THE RIGHT OF ANY PARTY TO THIS AGREEMENT TO SERVE PROCESS IN ANY OTHER MANNER PERMITTED BY APPLICABLE LAW.

(d)   EACH PARTY HERETO HEREBY WAIVES, TO THE FULLEST EXTENT PERMITTED BY APPLICABLE LAW, ANY RIGHT IT MAY HAVE TO A TRIAL BY JURY IN ANY LEGAL PROCEEDING DIRECTLY OR INDIRECTLY ARISING OUT OF OR RELATING TO THIS AGREEMENT, ANY OTHER LOAN DOCUMENT OR THE TRANSACTIONS CONTEMPLATED HEREBY OR THEREBY (WHETHER BASED ON CONTRACT, TORT OR ANY OTHER THEORY).   EACH PARTY HERETO (A) CERTIFIES THAT NO REPRESENTATIVE, AGENT OR ATTORNEY OF ANY OTHER PARTY HAS REPRESENTED, EXPRESSLY OR OTHERWISE, THAT SUCH OTHER PARTY WOULD NOT, IN THE EVENT OF LITIGATION, SEEK TO ENFORCE THE FOREGOING WAIVER AND (B) ACKNOWLEDGES THAT IT AND THE OTHER PARTIES HERETO HAVE BEEN INDUCED TO ENTER INTO THIS AGREEMENT BY, AMONG OTHER THINGS, THE MUTUAL WAIVERS AND CERTIFICATIONS IN THIS SECTION.

Section 8.10   Headings.  Article and Section headings and the Table of Contents used herein are for convenience of reference only, are not part of this Agreement and shall not affect the construction of, or be taken into consideration in interpreting, this Agreement.

Section 8.11   Amendment and Restatement.  This Agreement amends and restates in its entirety the Original Credit Agreement; and each of the Borrower and the Limited Obligor confirms that the Original Credit Agreement, the other Loan Documents and the Collateral for the Obligations thereunder (as all such capitalized terms are defined in the Original Credit Agreement) have at all times, since the date of the execution and delivery of such documents, remained in full force and effect and continued to secure such obligations which are continued as the Obligations hereunder as amended hereby; and all such Collateral (as defined in the Original Credit Agreement) shall continue to secure the Obligations hereunder.  In addition, this Agreement serves as a joinder by Green Wheel to the Original Credit Agreement, as amended and restated hereby.  A portion of the Loan hereunder is a continuation of the Loan under (and as defined in) the Original Credit Agreement.  The Borrower, the Limited Obligor, the Agent and the Lenders acknowledge and agree that the amendment and restatement of the Original Credit Agreement by this Agreement is not intended to constitute, nor does it constitute, a novation, interruption, suspension of continuity, satisfaction, discharge or termination of the obligations, loans, liabilities, or indebtedness under the Original Credit Agreement and the other Loan Documents (as such term is defined therein) thereunder or the collateral security therefor and this Agreement and the other Loan Documents are entitled to all rights and benefits originally pertaining to the Original Credit Agreement and the other Loan Documents (as such term is defined therein), but as amended herein.  From

and after the Effective Date, all references made to the Original Credit Agreement in any Loan Document or in any other instrument or document shall, without more, be deemed to refer to this Agreement. The Prior Loans under the Original Credit Agreement have been assigned, renewed, extended, modified, and rearranged as a tranche of the Loan under and pursuant to the terms of this Agreement. The Prior Loans are hereby reallocated among the Lenders in accordance with their Applicable Percentages. The Agent, the Lenders, the Borrower and the Limited Obligor consent to such reallocation. The Lenders shall make all appropriate adjustments and payments between and among themselves to account for the pro rata shares resulting from the reduction of the Closing Date Lender's ownership of the Prior Loans under the Original Credit Agreement to only its Applicable Percentage of the Loan under this Agreement. The Borrower, the Agent and each Lender party hereto that was a "Lender" under the Original Credit Agreement hereby agree that this Section shall be deemed an approved assignment form as required under the Agreement for purposes of reallocating the Prior Loans among the Lenders in accordance with their respective Applicable Percentages.

     Section 8.12    [Reserved].

     Section 8.13    <u>EXCULPATION PROVISIONS</u>.  EACH OF THE PARTIES HERETO SPECIFICALLY AGREES THAT IT HAS A DUTY TO READ THIS AGREEMENT AND THE OTHER LOAN DOCUMENTS AND AGREES THAT IT IS CHARGED WITH NOTICE AND KNOWLEDGE OF THE TERMS OF THIS AGREEMENT AND THE OTHER LOAN DOCUMENTS; THAT IT HAS IN FACT READ THIS AGREEMENT AND IS FULLY INFORMED AND HAS FULL NOTICE AND KNOWLEDGE OF THE TERMS, CONDITIONS AND EFFECTS OF THIS AGREEMENT; THAT IT HAS BEEN REPRESENTED BY INDEPENDENT LEGAL COUNSEL OF ITS CHOICE THROUGHOUT THE NEGOTIATIONS PRECEDING ITS EXECUTION OF THIS AGREEMENT AND THE OTHER LOAN DOCUMENTS; AND HAS RECEIVED THE ADVICE OF ITS ATTORNEY IN ENTERING INTO THIS AGREEMENT AND THE OTHER LOAN DOCUMENTS; AND THAT IT RECOGNIZES THAT CERTAIN OF THE TERMS OF THIS AGREEMENT AND THE OTHER LOAN DOCUMENTS RESULT IN ONE PARTY ASSUMING THE LIABILITY INHERENT IN SOME ASPECTS OF THE TRANSACTION AND RELIEVING THE OTHER PARTY OF ITS RESPONSIBILITY FOR SUCH LIABILITY.  EACH PARTY HERETO AGREES AND COVENANTS THAT IT WILL NOT CONTEST THE VALIDITY OR ENFORCEABILITY OF ANY EXCULPATORY PROVISION OF THIS AGREEMENT AND THE OTHER LOAN DOCUMENTS ON THE BASIS THAT THE PARTY HAD NO NOTICE OR KNOWLEDGE OF SUCH PROVISION OR THAT THE PROVISION IS NOT "CONSPICUOUS."

     Section 8.14    <u>Flood Insurance Provisions</u>. Notwithstanding any provision in this Agreement or any other Loan Document to the contrary, in no event is any Building (as defined in the applicable Flood Insurance Regulation) or Manufactured (Mobile) Home (as defined in the applicable Flood Insurance Regulation) included in the definition of "Mortgaged Property" and no Building or Manufactured (Mobile) Home is hereby encumbered by this Agreement or any other Loan Document. As used herein, "Flood Insurance Regulations" means (a) the National Flood Insurance Act of 1968 as now or hereafter in effect or any successor statute thereto, (b) the Flood Disaster Protection Act of 1973 as now or hereafter in effect or any successor statue thereto, (c) the National Flood Insurance Reform Act of 1994 (amending 42 USC 4001, *et seq.*), as the same may be amended or recodified from time to time, (d) the Flood Insurance Reform Act of 2004 and (e) the Biggert-Waters Flood Reform Act of 2012, and any regulations promulgated thereunder.

     Section 8.15    <u>No Advisory or Fiduciary Responsibility</u>. In connection with all aspects of each transaction contemplated hereby (including in connection with any amendment, waiver or other modification hereof or of any other Loan Document), the Borrower acknowledges and agrees that: (a) (i) the services regarding this Agreement provided by the Agent and the Lenders are arm's-length

commercial transactions between the Borrower and its Affiliates, on the one hand, and the Agent and the Lenders and their respective Affiliates, on the other hand, (ii) the Borrower has consulted its own legal, accounting, regulatory and tax advisors to the extent they have deemed appropriate, and (iii) the Borrower is capable of evaluating, and understands and accepts, the terms, risks and conditions of the transactions contemplated hereby and by the other Loan Documents; (b) (i) each of the Agent, each Lender and their respective Affiliates is and has been acting solely as a principal and, except as expressly agreed in writing by the relevant parties, has not been, is not, and will not be acting as an advisor, agent or fiduciary for the Borrower or any of its Affiliates, or any other Person and (ii) neither the Agent, any Lender nor any of their respective Affiliates has any obligation to the Borrower or any of its Affiliates with respect to the transactions contemplated hereby except, in the case of the Agent and the Lenders, those obligations expressly set forth herein and in the other Loan Documents; and (c) each of the Agent, each Lender and their respective Affiliates may be engaged in a broad range of transactions that involve interests that differ from those of the Borrower and its Affiliates, and neither the Agent, any Lender nor any of their respective Affiliates has any obligation to disclose any of such interests to the Borrower or its Affiliates. To the fullest extent permitted by law, the Borrower hereby waives and releases any claims that it may have against each of the Agent, each Lender and their respective Affiliates with respect to any breach or alleged breach of agency or fiduciary duty in connection with any aspect of any transaction contemplated hereby.

Section 8.16     Waiver of Trade Practices Acts.

(a)     IT IS THE INTENTION OF THE PARTIES THAT THE LOAN DOCUMENTS AND ALL ACTS OR PRACTICES OF AGENT AND EACH LENDER, PAST, PRESENT OR FUTURE, IN CONNECTION WITH THE LOAN DOCUMENTS AND THE TRANSACTIONS GOVERNED THEREBY SHALL BE GOVERNED BY LEGAL PRINCIPLES OTHER THAN THE TEXAS DECEPTIVE TRADE PRACTICES-CONSUMER PROTECTION ACT, SUBCHAPTER E OF CHAPTER 17, SECTIONS 17.41 ET SEQ., OF THE TEXAS BUSINESS AND COMMERCE CODE, AS AMENDED (THE "**DTPA**"). AS SUCH BORROWER HEREBY WAIVES THE APPLICABILITY OF THE DTPA TO THE TRANSACTIONS GOVERNED BY THE LOAN DOCUMENTS AND ANY AND ALL DUTIES, RIGHTS OR REMEDIES THAT MIGHT BE IMPOSED BY THE DTPA, WHETHER SUCH DUTIES, RIGHTS AND REMEDIES ARE APPLIED DIRECTLY BY THE DTPA ITSELF OR INDIRECTLY IN CONNECTION WITH OTHER STATUTES.

(b)     BORROWER EXPRESSLY RECOGNIZES THAT THE TERMS ON WHICH AGENT AND THE LENDERS HAVE AGREED TO PERFORM THEIR OBLIGATIONS UNDER THE LOAN DOCUMENTS HAVE BEEN PREDICATED UPON THE INAPPLICABILITY OF THE DTPA AND THIS WAIVER OF THE DTPA. BORROWER FURTHER RECOGNIZES THAT AGENT AND THE LENDERS, IN DETERMINING TO PROCEED WITH THE ENTERING INTO OF THE LOAN DOCUMENTS, HAS EXPRESSLY RELIED ON THIS WAIVER AND THE INAPPLICABILITY OF THE DTPA.

Section 8.17     [Reserved.].

Section 8.18     Joint and Several Liability.  The obligations and additional liabilities of any Borrower under this Agreement are joint and several obligations of the Borrowers, and each Borrower hereby waives to the full extent permitted by law any defense it may otherwise have to the payment and performance of the Obligations that its liability hereunder is limited and not joint and several. Each Borrower acknowledges and agrees that the foregoing waivers and those set forth below serve as a material inducement to the agreement of the Agent and the Lenders to make the Loans, and that the Agent and the Lenders are relying on each specific waiver and all such waivers in entering into this Agreement.

[CREDIT AGREEMENT]

The undertakings of each Borrower hereunder secure the obligations of itself and the other Borrower. The Agent and the Lenders, or any of them, may, in their sole discretion, elect to enforce this Agreement against any Borrower without any duty or responsibility to pursue any other Borrower and such an election by the Agent and the Lenders, or any of them, shall not be a defense to any action the Agent and the Lenders, or any of them, may elect to take against any Borrower.  Each of the Lenders and Agent hereby reserve all right against each Borrower.

Section 8.19    Obligations Absolute.  The obligations of the Borrowers hereunder shall not be discharged or impaired or otherwise diminished by the failure, default, omission, or delay, willful or otherwise, by any Lender, the Agent, or any Borrower or any other obligor on any of the Obligations, or by any other act or thing or omission or delay to do any other act or thing which may or might in any manner or to any extent vary the risk of any Borrower or would otherwise operate as a discharge of any Borrower as a matter of law or equity.  Each of the Borrowers agrees that the Obligations will be paid and performed strictly in accordance with the terms of the Loan Documents.  Without limiting the generality of the foregoing, each Borrower hereby consents to, at any time and from time to time, and the joint and several obligations of each Borrower hereunder shall not be diminished, terminated, or otherwise similarly affected by any of the following:

(a)    Any lack of genuineness, legality, validity, enforceability or allowability (in a bankruptcy, insolvency, reorganization or similar proceeding, or otherwise), or any avoidance or subordination, in whole or in part, of any Loan Document or any of the Obligations and regardless of any law, regulation or order now or hereafter in effect in any jurisdiction affecting any of the Obligations, any of the terms of the Loan Documents, or any rights of the Agent or the Lenders or any other Person with respect thereto;

(b)    Any increase, decrease, or change in the amount, nature, type or purpose of any of, or any release, surrender, exchange, compromise or settlement of any of the Obligations (whether or not contemplated by the Loan Documents as presently constituted); any change in the time, manner, method, or place of payment or performance of, or in any other term of, any of the Obligations; any execution or delivery of any additional Loan Documents; or any amendment, modification or supplement to, or refinancing or refunding of, any Loan Document or any of the Obligations;

(c)    Any failure to assert any breach of or default under any Loan Document or any of the Obligations; any extensions of credit in excess of the amount committed under or contemplated by the Loan Documents, or in circumstances in which any condition to such extensions of credit has not been satisfied; any other exercise or non-exercise, or any other failure, omission, breach, default, delay, or wrongful action in connection with any exercise or non-exercise, of any right or remedy against any Borrower or any other Person under or in connection with any Loan Document or any of the Obligations; any refusal of payment or performance of any of the Obligations, whether or not with any reservation of rights against any Borrower; or any application of collections (including but not limited to collections resulting from realization upon any direct or indirect security for the Obligations) to other obligations, if any, not entitled to the benefits of this Agreement, in preference to Obligations entitled to the benefits of this Agreement, or if any collections are applied to Obligations, any application to particular Obligations;

(d)    Any taking, exchange, amendment, modification, waiver, supplement, termination, subordination, compromise, release, surrender, loss, or impairment of, or any failure to protect, perfect, or preserve the value of, or any enforcement of, realization upon, or exercise of rights, or remedies under or in connection with, or any failure, omission, breach, default, delay,

or wrongful action by the Agent or the Lenders, or any of them, or any other Person in connection with the enforcement of, realization upon, or exercise of rights or remedies under or in connection with, or, any other action or inaction by the Agent or the Lenders, or any of them, or any other Person in respect of, any direct or indirect security for any of the Obligations.  As used in this Agreement, "direct or indirect security" for the Obligations, and similar phrases, includes any collateral security, guaranty, suretyship, letter of credit, capital maintenance agreement, put option, subordination agreement, or other right or arrangement of any nature providing direct or indirect assurance of payment or performance of any of the Obligations, made by or on behalf of any Person;

(e)     Any merger, consolidation, liquidation, dissolution, winding-up, charter revocation, or forfeiture, or other change in, restructuring or termination of the corporate structure or existence of, any Borrower or any other Person; any bankruptcy, insolvency, reorganization or similar proceeding with respect to such Borrower or any other Person; or any action taken or election made by the Agent or the Lenders, or any of them (including but not limited to any election under Section 1111(b)(2) of the United States Bankruptcy Code), any Borrower, or any other Person in connection with any such proceeding;

(f)     Any defense, setoff, or counterclaim which may at any time be available to or be asserted by any Borrower or any other person with respect to any Loan Document or any of the Obligations; or any discharge by operation of law or release of any Borrower or any other Person from the performance or observance of any Loan Document or any of the Obligations; or

(g)     Any other event or circumstance, whether similar or dissimilar to the foregoing, and whether known or unknown, which might otherwise constitute a defense available to, or limit the liability of, any Borrower, a guarantor or a surety, excepting only full, strict, and indefeasible payment and performance of the Obligations.

ARTICLE IX

**ADMINISTRATIVE AGENT PROVISIONS**

Section 9.01    Agent.  Each of the Lenders hereby irrevocably appoints the Agent as its agent and authorizes the Agent to take such actions on its behalf, including execution of other Loan Documents, and to exercise such powers as are delegated to the Agent by the terms of the Loan Documents, together with such actions and powers as are reasonably incidental thereto.

If applicable, the Person serving as the Agent hereunder shall have the same rights and powers in its capacity as a Lender as any other Lender and may exercise the same as though it were not the Agent, and such Person and its Affiliates may accept deposits from, lend money to and generally engage in any kind of business with Borrower or any Subsidiary of Borrower or other Affiliate thereof as if it were not the Agent hereunder.

The Agent shall not have any duties or obligations except those expressly set forth in the Loan Documents.  Without limiting the generality of the foregoing, (a) the Agent shall not be subject to any fiduciary or other implied duties, regardless of whether a Default has occurred and is continuing, (b) the Agent shall not have any duty to take any discretionary action or exercise any discretionary powers, except discretionary rights and powers expressly contemplated by the Loan Documents that the Agent is required to exercise in writing as directed by the Required Lenders (or such other number or percentage of the Lenders as shall be necessary under the circumstances as expressly provided in this Agreement), and (c) except as expressly set forth in the Loan Documents, the Agent shall not have any duty to

disclose, and shall not be liable for the failure to disclose, any information relating to the Borrower or any of its Subsidiaries or Affiliates that is communicated to or obtained by the Person serving as Agent or any of its Affiliates in any capacity. The Agent shall not be liable for any action taken or not taken by it with the consent or at the request of the Required Lenders (or such other number or percentage of the Lenders as shall be necessary under the circumstances as expressly provided in this Agreement) or in the absence of its own gross negligence or willful misconduct. The Agent shall be deemed not to have knowledge of any Default unless and until written notice thereof is given to the Agent by the Borrower or a Lender, and the Agent shall not be responsible for or have any duty to ascertain or inquire into (i) any statement, warranty or representation made in or in connection with any Loan Document, (ii) the contents of any certificate, report or other document delivered hereunder or in connection with any Loan Document, (iii) the performance or observance of any of the covenants, agreements or other terms or conditions set forth in any Loan Document, (iv) the validity, enforceability, effectiveness or genuineness of any Loan Document or any other agreement, instrument or document, (v) the creation, perfection or priority of Liens on the Collateral or the existence of the Collateral, or (vi) the satisfaction of any condition set forth in Article III or elsewhere in any Loan Document, other than to confirm receipt of items expressly required to be delivered to the Agent. The Agent agrees to promptly provide each Lender with a copy of each notice (including any notice of Default), report, financial statement, projection, certificate, instrument or other written information that the Agent received from or on behalf of the Borrowers or any guarantor or other obligor under any Loan Document.

The Agent shall be entitled to rely upon, and shall not incur any liability for relying upon, any notice, request, certificate, consent, statement, instrument, document or other writing believed by it to be genuine and to have been signed or sent by the proper Person. The Agent also may rely upon any statement made to it orally or by telephone and believed by it to be made by the proper Person, and shall not incur any liability for relying thereon. The Agent may consult with legal counsel, independent accountants and other experts selected by it, and shall not be liable for any action taken or not taken by it in accordance with the advice of any such counsel, accountants or experts.

The Agent may perform any and all its duties and exercise its rights and powers by or through any one or more sub-agents appointed by the Agent, including without limitation the Servicer. The Agent and any such sub-agent may perform any and all its duties and exercise its rights and powers through their respective Related Parties. The exculpatory provisions of the preceding paragraphs shall apply to any such sub-agent and to the Related Parties of the Agent and any such sub-agent.

Subject to the appointment and acceptance of a successor Agent as provided in this paragraph, the Agent may resign at any time by notifying the Lenders and the Borrower. Upon any such resignation, the Lenders shall have the right, with the consent of the Borrower (which consent shall not be unreasonably withheld or delayed), to appoint a successor; provided that no consent of the Borrower shall be required if any Default has occurred and is continuing. If no successor shall have been so appointed by the Lenders and shall have accepted such appointment within 30 days after the retiring Agent gives notice of its resignation, then the retiring Agent may, on behalf of the Lenders, appoint a successor Agent. Upon the acceptance of its appointment as Agent hereunder by a successor, such successor shall succeed to and become vested with all the rights, powers, privileges and duties of the retiring Agent, and the retiring Agent shall be discharged from its duties and obligations hereunder. The fees payable by the Borrower to a successor Agent shall be the same as those payable to its predecessor unless otherwise agreed between the Borrower and such successor.

Each Lender acknowledges that it has, independently and without reliance upon the Agent or any other Lender and based on such documents and information as it has deemed appropriate, made its own credit analysis and decision to enter into this Agreement. Each Lender also acknowledges that it will, independently and without reliance upon the Agent or any other Lender and based on such documents and

65

information as it shall from time to time deem appropriate, continue to make its own decisions in taking or not taking action under or based upon this Agreement, any other Loan Document or any related agreement or any document furnished hereunder or thereunder.

Each Lender hereby irrevocably authorizes the Agent, at its option and in its sole discretion, to (A) release any Liens granted to the Agent by the Borrower or any of its Affiliates on any Collateral (i) upon the payment and satisfaction in full in cash of all Obligations (other than any contingent obligations for which no claim has been asserted), (ii) that is permitted to be disposed of pursuant to the terms of the Loan Documents, or (iii) as required to effect any disposition of such Collateral in connection with any exercise of remedies of the Agent and the Lenders in accordance with the Loan Documents, and (B) subordinate Liens on any Property granted to or held by the Agent under any Loan Document to the holder of any Lien on such Property that is permitted hereunder. Any such release shall not in any manner discharge, affect or impair the Obligations or any Liens (other than those expressly being released) upon (or obligations of the Borrower or its applicable Affiliates in respect of) all interests retained by the Borrower or its applicable Affiliates, including the proceeds of any sale, all of which shall continue to constitute part of the Collateral. Each Lender hereby authorizes the Agent to execute and deliver to the Borrower, at the Borrower's sole cost and expense, any and all releases of Liens, termination statements, assignments, subordination agreements or other documents reasonably requested by the Borrower in connection with any release or subordination permitted hereunder. Upon the request of the Agent at any time, the Lenders will confirm in writing the Agent's authority to release or subordinate, as the case may be, particular types or items of Collateral.

Without limiting any of the foregoing, the Borrower and each of the Lenders acknowledges and agrees that the Agent may delegate any of its rights, responsibilities or authority hereunder or under any other Loan Document to the Servicer pursuant to a separate agreement, and in such event the Borrower shall reimburse the Agent for all of the Agent's costs and expenses relating to the services provided by the Servicer.

[SIGNATURES BEGIN NEXT PAGE]

[CREDIT AGREEMENT]

The parties hereto have caused this Agreement to be duly executed as of the day and year first above written.

BORROWER:                                      MONTEREY RESOURCES LLC

                                               By: _____
                                                    Name: Robert A. Imel
                                                    Title:   President

BORROWER:                                      GREEN WHEEL, LLC

                                               By: _____
                                                    Name: Robert A. Imel
                                                    Title:   President

AGENT:                                         405 ARAPAHOE LLC

                                               By: _____
                                                    Name: Lawrence Cutler
                                                    Title:   Authorized Signatory

SIGNATURE PAGE
CREDIT AGREEMENT

The parties hereto have caused this Agreement to be duly executed as of the day and year first above written.

BORROWER:                              MONTEREY RESOURCES LLC

                                       By: _____
                                           Name: Robert A. Imel
                                           Title:  President

BORROWER:                              GREEN WHEEL, LLC

                                       By: _____
                                           Name:  Robert A. Imel
                                           Title:   President

AGENT:                                 405 ARAPAHOE LLC

                                       By: _____
                                           Name: Lawrence Cutler
                                           Title:   Authorized Signatory

SIGNATURE PAGE
CREDIT AGREEMENT

LENDERS:

FULCRUM ENERGY CAPITAL II MONTEREY LLC

By: Fulcrum Energy Capital Fund II, LLC, its sole member

By: Fulcrum Energy Capital II, LLC, its manager

By: _____
Name: Bradley Morse
Title: President

405 ARAPAHOE LLC

By:_____
Name:  Lawrence Cutler
Title:    Authorized Signatory

CARGILL INCORPORATED

By:_____
Name:_____
Title:_____

LENDERS:

FULCRUM ENERGY CAPITAL II MONTEREY LLC

By: Fulcrum Energy Capital Fund II, LLC, its sole member

By: Fulcrum Energy Capital II, LLC, its manager

By: _____

    Name: Bradley Morse

    Title: President

405 ARAPAHOE LLC

By: _____

Name: Lawrence Cutler

Title:   Authorized Signatory

CARGILL INCORPORATED

By: _____

Name: _____

Title: _____

LENDERS:

FULCRUM ENERGY CAPITAL II MONTEREY LLC

By: Fulcrum Energy Capital Fund II, LLC, its sole member

By: Fulcrum Energy Capital II, LLC, its manager

By: _____
       Name: Bradley Morse
       Title: President

405 ARAPAHOE LLC

By: _____
Name:  Lawrence Cutler
Title:    Authorized Signatory

CARGILL INCORPORATED

By: _____
     —3DEB5F5BE904411...
Name: Tyler Smith
Title: Authorized signer

SIGNATURE PAGE
CREDIT AGREEMENT

Solely for purposes of the covenant set forth in Section 5.16,

LIMITED OBLIGOR:                                    ROBERT A. IMEL

SIGNATURE PAGE
CREDIT AGREEMENT

Schedule 4.05
Litigation


None

Schedule 4.06
Environmental Matters

See attached compliance orders from Office of Conservation for the State of Louisiana



JOHN BEL EDWARDS
GOVERNOR

## $\mathfrak{State}$ of $\mathfrak{Louisiana}$
### DEPARTMENT OF NATURAL RESOURCES
### OFFICE OF CONSERVATION

THOMAS F. HARRIS
SECRETARY

RICHARD P. IEYOUB
COMMISSIONER OF CONSERVATION

January 30, 2018

Mr. Adam Seibel
Green Wheel, LLC
100 South Riverfront Drive
Suite 600
Jenks, OK 74037

RE:     Pipeline Safety Section
        Field Inspection Report
        December 6, 2017
        Citation No. 658

CERTIFIED MAIL
RETURN RECEIPT REQUIRED
ARTICLE NO. 7013 2630 0001 2840 9862

Dear Mr. Seibel:

On December 6, 2017, a Pipeline Safety Inspection was completed on your gas transmission system. During said inspection, your facilities were found to be in probable violation (violation(s) enclosed) of the Louisiana Administrative Code, Title 43, Part XIII of the Office of Conservation pertaining to minimum gas Pipeline Safety standards as authorized by the Natural Resources Act of 1973, Chapter 7, Title 30 of the Louisiana Revised Statues of 1950, comprised of R.S. 30:551:B, in the following respects:

### Title 43
### NATURAL RESOURCES
### Part XIII.  Office of Conservation--Pipeline Safety
### Subpart 4.  Drug and Alcohol Testing [49 CFR Part 199]

#### §6301. Anti-Drug Plan [49 CFR 199.101]

A.    Each operator shall maintain and follow a written anti-drug plan that conforms to the requirements of this Chapter and the DOT procedures. The plan must contain: [49 CFR 199.101(a)]

   1.    methods and procedures for compliance with all the requirements of this Chapter, including the employee assistance program; [49 CFR 199.101(a)(1)]

   2.    the name and address of each laboratory that analyzes the specimens collected for drug testing; and [49 CFR 199.101(a)(2)]

   3.    the name and address of the operator's medical review officer and, substance abuse professional; and [49 CFR 199.101(a)(3)]

   4.    procedures for notifying employees of the coverage and provisions of the plan. [49 CFR 199.101(a)(4)]

Green Wheel, LLC
Page 2

### §6502. Alcohol Misuse Plan [49 CFR 199.202]

A.   Each operator must maintain and follow a written alcohol misuse plan that
     conforms to the requirements of this part and DOT procedures concerning alcohol
     testing programs. The plan shall contain methods and procedures for compliance
     with all the requirements of this Chapter, including required testing,
     recordkeeping, reporting, education and training elements. [49 CFR 199.202]

Please be advised that the Enforcement section of Pipeline Safety has the authority under La. R.S. 30:544
and LAC 43:XI, Chapter 5, to assess a civil penalty in the amount of **Ten Thousand Dollars ($10,000)**
for each violation for each day the violation persists, with the maximum civil penalty not to exceed **Five
Hundred Thousand Dollars ($500,000)** for any related series of violations.

**The Enforcement section of Pipeline Safety has suggested that Green Wheel, LLC be ordered to
show cause, under the authority of La. R.S. 30:544 and LAC 43:XI, Chapter 5, why they should
not be assessed a civil penalty in connection with the above cited probable violations up to
$20,000.00 per day per violation until compliance is achieved.**

**Under the above cited safety laws and regulations this office has the authority to compromise such
matters, and, in the spirit of compromise, it is suggested that a civil penalty in the magnitude of
$1,500.00, without assessment of cost, would be appropriate. If this meets with your approval,
please submit your payment in the amount of $1,500.00 to the Office of Conservation, Pipeline
Safety Division within 14 days after receipt of this citation, otherwise, a public hearing may be held
pursuant to this citation.**

Relative to said violations, you are hereby ordered to take any and all necessary steps by **March 30, 2018**
to develop and implement a written anti-drug and alcohol misuse plan approved by CFR 40 Part 199, or
show cause why you should not be required to do so.

Pursuant to Section 507 B of this regulation, if you dispute the determination made herein, within seven
(7) days from receipt of this citation, the **Green Wheel, LLC** may request an informal conference with
the Commissioner and/or Pipeline Safety staff at no charge to the **Green Wheel, LLC**. Within twenty
(20) days of receipt of this citation, the **Green Wheel, LLC** may request a public hearing in accordance
with LS-R.S. 30:6(G) and 8. Such a hearing request must be accompanied by a check or money order in
the non-refundable amount of $755.00 as provided by the latest revision of Statewide Order No. 29-R
(LAC 43:XIX.Chapter 7) or the request for a hearing will not be considered. **If a public hearing is
requested, a request for an informal conference will be denied.**

If you have any questions or comments concerning this matter, please contact Andrew Wascom at
225/342-3467.

Yours truly,

RICHARD P. IEYOUB
COMMISSIONER OF CONSERVATION

RPI/MDP/arw

cc:   Taylor Thomas          File

STATE OF LOUISIANA
DEPARTMENT OF NATURAL RESOURCES
Office of Conservation
P. O. Box 44277
Baton Rouge, LA   70804-4277

GREEN WHEEL, LLC
100 SOUTH RIVERFRONT DRIVE,
SUITE 600

**ATTN: ADAM SEIBEL**      When remitting, please
refer to:

Invoice Number            1168471

JENKS        OK     74037          Security Code             60676

Invoice Date    01/30/2018                        PAYABLE UPON RECEIPT

| Description | Qty | Unit Cost | Line Total |
|---|---|---|---|
| PIPELINE SAFETY FINE | 1 | 1,500.00 | 1,500.00 |
| | Total Invoice Amount | $ | 1,500.00 |
| | Less Deposit/Payments | $ | .00 |
| | Total Amount Due | $ | 1,500.00 |

Please make checks payable to:

and mail to:
DEPARTMENT OF NATURAL RESOURCES

Citation #658

P. O. Box 44277
Baton Rouge, LA   70804-4277

** CREDIT CARD PAYMENTS ARE ALSO ACCEPTED **
****MAKE PAYMENTS ONLINE using VISA, MASTERCARD, AMERICAN EXPRESS or DISCOVER****
Navigate to www.SONRIS.com
and click on the Invoice Payment link

RETURN ONE COPY WITH REMITTANCE

# LDNR eCommerce Applications

# Credit Card Funds Capture Status

# DNR Invoice Payment Capture Status

- Payment for Invoice Number 1168471 in the amount of $1,500.00 successfully completed on 13-FEB-18
- Please print and retain this information for your records. Please include the invoice number on all inquiries and correspondence concerning this transaction.

- VeriSign Results: Result=0 MSG=Approved REF=AN1O0A78EA8D AUTH CODE=000165



- VeriSign has routed, processed and secured your payment information More information about VeriSign



JOHN BEL EDWARDS
GOVERNOR

## State of Louisiana
DEPARTMENT OF NATURAL RESOURCES
OFFICE OF CONSERVATION

THOMAS F. HARRIS
SECRETARY

RICHARD P. IEYOUB
COMMISSIONER OF CONSERVATION

April 9, 2018

GREEN WHEEL LLC - ANTIOCH GAS PROC PLT 124Z
ADAM SEIBEL
100 SOUTH RIVERFRONT DRIVE, STE 600
JENKS, OK 74037-

IN RE: Compliance Notice
Gasoline and/or Cycling Plant Monthly Report
Form R6 Error Listing for the period
January 2012 - December 2015
Plant Code: 124Z
Cross Ref Code(s): 8296, L181
Compliance Date: June 29, 2018

Dear Plant of Record:

This Compliance Notice is issued under the general authority of the Minerals, Oil, Gas and Environmental
Quality Law, LSA- R.S.. 30:1 et seq, and under the specific authority set forth in Sections 6G and 18 thereof.

Please refer to the enclosed error listing. Under the statutory authority cited above, you are hereby directed
to file corrected report(s) by the date shown above. If an error code is generated that indicates "VOLUME
EXCEEDS TOLERANCE LEVEL" then it will be necessary to explain the reason briefly in the remarks section.
Failure to respond shall subject you to a Civil Penalty of Two Hundred and Fifty ($250.00) dollars. If the
corrected report(s) filed do not clear all error(s) or if they create new error(s) a Civil Penalty in the amount of
One Hundred Dollars ($100.00) will be issued. If a correction has been previously filed with this office, you
may go to the DNR Web Page at *www.dnr.state.la.us* to confirm receipt and determine whether such errors
have been corrected.

Questions concerning this Notice should be directed to CLAY ARCENEAUX, MINERAL PRODUCTION
SPECIALIST at 225- 342- 5488.

Yours truly,

*Becky Henry*

BECKY HENRY
Mineral Production Manager
Production Audit Section

Enclosure



**Louisiana Department of Natural Resources (DNR)**

**SONRIS/2000**

**SRCN7004P - R6 Letter/Error Listing**

Analyst:   CLAY ARCENEAUX.

*Reporting Period*

From:   01/01/2012     To:   12/31/2015

*Report run on:   Apr 9, 2018 8:32 AM*

**Organization ID:   124Z     GREEN WHEEL LLC - ANTIOCH GAS PROC PLT**

| REPORT<br>DATE | GRP<br>CD | RPT<br>LINE | FIELD | CONTRACT | CONSUMER | CONFIRMATION<br>CODE | LA VOL<br>FED VOL<br>TOT VOL | PRODUCT<br>CODE | OPENING<br>STOCK | ACQUISITIONS | LA INTAKE<br>FED INTAKE<br>OTHER INTAKE | DISPOSITIONS | CLOSING<br>STOCK | R6 |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| | | | OPERATOR / TRANSPORTER  8296 | | | PLAINS MARKETING, L.P | | | | | | | | |
| 01/01/2012 | 157 | 2 | | | | | 767 | | | | | | | |
| | | | | | | | 767 | | | | | | | |

Error Code:   *684 - Variance: 767; 8296 reports acq of 0 line number 3000.*

OPERATOR / TRANSPORTER  8296     PLAINS MARKETING, L.P.

06/01/2015   157   3000

Error Code:   *684 - Variance: 1109; 8296 reports acq of 1109 line number 1.*

OPERATOR / TRANSPORTER  8296     PLAINS MARKETING, L.P.

07/01/2015   157   3000

Error Code:   *684 - Variance: 918; 8296 reports acq of 918 line number 1*

## Schedule 3.12
## Company Contracts

Schedule 3.12 attached to and made part of that certain Member Interest Purchase Agreement dated effective January 1, 2018
by and between Green Wheel, LLC and Monterey Resources LLC

### GAS & OIL CONTRACTS

| CONTRACT # | DATE | PRODUCER / SELLER | PURCHASER | PRODUCT |
|---|---|---|---|---|
| 2709-003 REV | 4/2/2015 | LNGP, LLC | Ican Energy Company | Condensate |
| MIN1394PRO | 10/1/2014 | LNGP, LLC | DCP Assets Holding, LP | Gas |
| WB GGPA-DUB | 1/23/2015 | LNGP, LLC | Regency Field Services, LLC | Gas/Residue |
| Antioch Process Fees | 2015 | LNGP, LLC | | NGL/Residue |
| N/A | 4/1/2005 | Tellus Operating Group, LLC | Regency Gas Marketing, LLC | Gas |
| Antioch | 6/1/2016 | Wagon Wheel ArkLaTex, LLC | Green Wheel, LLC | |

### MISCELLANEOUS CONTRACTS

| CONTRACT # | DATE | SERVICE PROVIDER | CLIENT | TYPE |
|---|---|---|---|---|
| JWP-2015-5287 | 1/21/2016 | J-W Power Company | LNPG, LLC | Compressor |
| TreeTop Midstream Services | 6/25/2014 | BlueTick, Inc. | Tellus Operating Group, LLC | RMC system |
| Cross Lake Pipeline | 8/1/2015 | BlueTick, Inc. | Tellus Operating Group, LLC | RMC system |

Schedule 4.13
Borrower Information

<u>Monterey Resources LLC</u>:

Robert Imel – 75% owner of the common class of membership units

Richard Boyce – 25% owner of the common class of membership units

<u>Green Wheel, LLC</u>:

Monterey Resources LLC – 100% owner of the common class of membership units

Schedule 4.17
Gas Imbalances


None

Schedule 4.18
Marketing of Production


None

Schedule 4.19(a)
UCC Filings


Delaware Secretary of State

Texas Secretary of State

Caddo, Claiborne, Union, and Webster Parishes, Louisiana

Schedule 4.20
Swap Agreements


None

Schedule 6.02
Indebtedness


None

Schedule 6.03
Liens


None

Schedule 6.05
Investments

Acquisition of one hundred percent (100%) of the membership interests of Green Wheel, LLC by Monterey Resources LLC

# **EXHIBIT A**

[Reserved]

**EXHIBIT B**

**FORM OF**

**COMPLIANCE CERTIFICATE**

Dated as of: _____

      The undersigned, on behalf of MONTEREY RESOURCES LLC, a Texas limited liability company, and GREEN WHEEL, LLC, a Delaware limited liability company (the "Borrower"), hereby certifies to the Agent, as defined in the Credit Agreement referred to below, in his capacity as [____] of the Borrower (and not individually) as follows:

      1.     This certificate is delivered to you pursuant to Section 5.01(c) of the Amended and Restated Credit Agreement, dated as of May 15, 2018 (as amended, restated, amended and restated, supplemented or otherwise modified from time to time, the "Credit Agreement"), by and among the Borrower, the Agent and the Lenders. Capitalized terms used herein and not defined herein shall have the meanings assigned thereto in the Credit Agreement.

      2.     I, [____], the [____] of the Borrower, have reviewed the financial statements of the Borrower, dated as of _____ and for the _____ period[s] then ended and such statements fairly present in all material respects the financial condition of the Borrower as of the dates indicated and the results of their operations and cash flows for the period[s] indicated.

      3.     I have reviewed the terms of the Credit Agreement and the related Loan Documents and have made, or caused to be made under my supervision, a review in reasonable detail of the transactions and the financial condition of the Borrower during the accounting period covered by the financial statements referred to in Paragraph 2 above. Such review has not disclosed the existence during or at the end of such accounting period of any condition or event that constitutes a Default, nor does the undersigned have any knowledge of the existence of any such condition or event as at the date of this certificate [, except [____][1]].

      4.     There [has] [has not] been any change in GAAP or in the application thereof with respect to the Borrower since the date of the financial statements most recently delivered pursuant to Section 5.01(a) or 5.01(b) of the Credit Agreement.[2]

*[Signature Page Follows]*

---

[1] If any such condition or event existed or exists, describe the nature and period of existence thereof and what action the Borrower has taken, are taking and propose to take with respect thereto.

[2] If any changes have occurred, specify the effect of such change on the financial statements accompanying this certificate.

IN WITNESS WHEREOF, the undersigned has executed this Compliance Certificate for and on behalf of the Borrower as of the day and year first written above.

**MONTEREY RESOURCES LLC**

By:_____

Name:

Title:

**GREEN WHEEL, LLC**

By:_____

Name:

Title:

B-2

## EXHIBIT C

## FORM OF SOLVENCY CERTIFICATE

Dated as of _____

THE UNDERSIGNED HEREBY CERTIFIES AS FOLLOWS:

1.  I, [____], am the [___] of Monterey Resources LLC, a Texas limited liability company, and Green Wheel, LLC, a Delaware limited liability company (the "Borrower").

2.  Reference is made to that certain Amended and Restated Credit Agreement, dated as of the date hereof (as amended, restated, replaced, supplemented or otherwise modified from time to time, the "Credit Agreement") by and among the Borrower, the Agent and the Lenders. Capitalized terms used herein and not defined herein shall have the meanings assigned thereto in the Credit Agreement.

3.  I have reviewed the terms of the Credit Agreement, together with each of the other Loan Documents, and, in my opinion, have made, or have caused to be made under my supervision, such examination or investigation as is necessary to enable me to express an informed opinion as to the matters referred to herein.

4.  Based upon my review and examination described in paragraph 3 above, I certify (in my capacity as [___] of the Borrower and not individually) that as of the date hereof, after giving effect to the borrowing of the loan described in Section 2.01(a) of the Credit Agreement, the Borrower is Solvent.

For the purposes hereof, "Solvent" means, in reference to any Person, (i) the fair value of the assets of such Person, at a fair valuation, will exceed its debts and liabilities (subordinated, contingent or otherwise); (ii) the present fair saleable value of the property of such Person will be greater than the amount that will be required to pay the probable liability of its debts and other liabilities (subordinated, contingent or otherwise), as such debts and other liabilities become absolute and matured; (iii) such Person will be able to pay its debts and liabilities (subordinated, contingent or otherwise), as such debts and liabilities become absolute and matured; and (iv) such Person will not have unreasonably small capital with which to conduct the business in which it is engaged as such business is now conducted and is proposed to be conducted after the Effective Date.

[Remainder of Page Intentionally Left Blank]

ACTIVE 217583450

The foregoing certifications are made and delivered by the undersigned, solely in his capacity as the [__] of the Borrower (and not individually), as of the date first set forth above.

_____
Name:
Title:

## EXHIBIT D

## FORM OF COLLATERAL AGREEMENT

[Attached]

## EXHIBIT E

### Form of Assignment and Assumption

This ASSIGNMENT AND ASSUMPTION AGREEMENT (as amended, supplemented, restated or otherwise modified from time to time, this "Agreement") is dated as of _____, ___, by and between _____ (the "Assignor") and _____ (the "Assignee").

### RECITALS

WHEREAS, the Assignor is a party to the Amended and Restated Credit Agreement, dated as of May 15, 2018 (as amended, supplemented, restated or otherwise modified from time to time, the "Credit Agreement") by and among Monterey Resources LLC and Green Wheel, LLC (collectively, the "Borrower"), Robert A. Imel, as Limited Guarantor, each of the lenders that is or becomes a party thereto as provided in Section 8.04(b) of the Credit Agreement (individually, together with its successors and assigns, a "Lender", and collectively, together with their successors and assigns, the "Lenders"), and 405 Arapahoe LLC, a Delaware limited liability company, as agent for the Lenders (in such capacity, together with its successors in such capacity, the "Agent"); and

WHEREAS, the Assignor proposes to sell, assign and transfer to the Assignee, and the Assignee proposes to purchase and assume from the Assignor, **[all][a portion]** of the Assignor's Percentage Share of the Loan Balance and related rights under the Credit Agreement, all on the terms and conditions of this Agreement;

NOW, THEREFORE, in consideration of the foregoing and the mutual agreements contained herein, and for other good and valuable consideration, the receipt and sufficiency of which are hereby acknowledged, the parties hereto agree as follows:

### ARTICLE I

### DEFINITIONS AND INTERPRETATION

1.1     Definitions from Credit Agreement.  All capitalized terms used but not defined herein have the respective meanings given to such terms in the Credit Agreement.

1.2     Additional Defined Terms.  As used herein, the following terms have the following respective meanings:

"Assigned Interest" shall mean all of Assignor's (in its capacity as a "Lender") rights and obligations under the Credit Agreement and the other Loan Documents in respect of **[all of] [the portion of]** the Assignor's Percentage Share of the principal balance of the Loan**[, being the Assigned Loan Balance]** $_____ and any right to receive payments on such portion of the Loan Balance.

"Assignee's Loan Balance" shall mean the principal balance of $_____.

"Assignment Date" shall mean _____, ____ (WHICH DATE SHALL BE THE DATE OF RECORDATION IN THE REGISTER BY THE AGENT).

1.3     References.  References in this Agreement to Schedule, Exhibit, Article, or Section numbers shall be to Schedules, Exhibits, Articles, or Sections of this Agreement, unless expressly stated

to the contrary.  References in this Agreement to "hereby," "herein," "hereinafter," "hereinabove," "hereinbelow," "hereof," "hereunder" and words of similar import shall be to this Agreement in its entirety and not only to the particular Schedule, Exhibit, Article, or Section in which such reference appears.  Except as otherwise indicated, references in this Agreement to statutes, sections, or regulations are to be construed as including all statutory or regulatory provisions consolidating, amending, replacing, succeeding, or supplementing the statute, section, or regulation referred to.  References in this Agreement to "writing" include printing, typing, lithography, facsimile reproduction, and other means of reproducing words in a tangible visible form.  References in this Agreement to agreements and other contractual instruments shall be deemed to include all exhibits and appendices attached thereto and all subsequent amendments and other modifications to such instruments, but only to the extent such amendments and other modifications are not prohibited by the terms of this Agreement.  References in this Agreement to Persons include their respective successors and permitted assigns.

     1.4    <u>Articles and Sections</u>.  This Agreement, for convenience only, has been divided into Articles and Sections; and it is understood that the rights and other legal relations of the parties hereto shall be determined from this instrument as an entirety and without regard to the aforesaid division into Articles and Sections and without regard to headings prefixed to such Articles or Sections.

     1.5    <u>Number and Gender</u>.  Whenever the context requires, reference herein made to the single number shall be understood to include the plural; and likewise, the plural shall be understood to include the singular.  Definitions of terms defined in the singular or plural shall be equally applicable to the plural or singular, as the case may be, unless otherwise indicated.  Words denoting sex shall be construed to include the masculine, feminine and neuter, when such construction is appropriate; and specific enumeration shall not exclude the general but shall be construed as cumulative.

     1.6    <u>Negotiated Transaction</u>.  Each party to this Agreement affirms to the other that it has had the opportunity to consult, and discuss the provisions of this Agreement with, independent counsel and fully understands the legal effect of each provision.

ARTICLE II

<u>SALE AND ASSIGNMENT</u>

     2.1    <u>Sale and Assignment</u>.  On the terms and conditions set forth herein, effective on and as of the Assignment Date, the Assignor hereby sells, assigns and transfers to the Assignee, and the Assignee hereby purchases and assumes from the Assignor, all of the right, title and interest of the Assignor in and to, and all of the obligations of the Assignor in respect of, the Assigned Interest.  Such sale, assignment and transfer is without recourse and, except as expressly provided in this Agreement, without representation or warranty.

     2.2    <u>Assumption of Obligations</u>.  The Assignee agrees with the Assignor (for the express benefit of the Assignor and the Borrower) that the Assignee will, from and after the Assignment Date, assume and perform all of the obligations of the Assignor in respect of the Assigned Interest.  From and after the Assignment Date: (a) the Assignor shall be released from the Assignor's obligations in respect of the Assigned Interest, and (b) the Assignee shall be entitled to all of the Assignor's rights, powers and privileges under the Credit Agreement and the other Loan Documents in respect of the Assigned Interest.

ARTICLE III

PAYMENTS

3.1     Payments.   As consideration for the sale, assignment and transfer contemplated by Section 2.1, the Assignee shall, on the Assignment Date, assume Assignor's obligations in respect of the Assigned Interest and pay to the Assignor an amount equal to the Assigned Loan Balance and all accrued and unpaid interest and fees with respect to the Assigned Interest as of the Assignment Date. Except as otherwise provided in this Agreement, all payments hereunder shall be made in Dollars and in immediately available funds, without setoff, deduction or counterclaim.

3.2     Allocation of Payments.   The Assignor and the Assignee agree that (a) the Assignor shall be entitled to any payments of principal with respect to the Assigned Interest made prior to the Assignment Date, together with any interest and fees with respect to the Assigned Interest accrued prior to the Assignment Date, (b) the Assignee shall be entitled to any payments of principal with respect to the Assigned Interest made from and after the Assignment Date, together with any and all interest and fees with respect to the Assigned Interest accruing from and after the Assignment Date and (c) the Agent is authorized and instructed to allocate payments received by it for the account of the Assignor and the Assignee as provided in the foregoing clauses.  Each party hereto agrees that it will hold any interest, fees or other amounts that it may receive to which the other party hereto shall be entitled pursuant to the preceding sentence for the account of such other party and pay, in like money and funds, any such amounts that it may receive to such other party promptly upon receipt.

3.3     Delivery of Notes.   Promptly following the receipt by the Assignor of the consideration required to be paid under Section 3.1, the Assignor shall (a) deliver to the Agent (or its counsel) the Note held by the Assignor and (b) notify the Agent to request that the Borrower execute and deliver new Notes to the Assignor, if Assignor continues to be a Lender, and the Assignee, dated the Assignment Date in the appropriate respective principal amounts after giving effect to the sale, assignment and transfer contemplated hereby.

3.4     Further Assurances.   The Assignor and the Assignee hereby agree to execute and deliver such other instruments, and take such other actions, as either party may reasonably request in connection with the transactions contemplated by this Agreement.

ARTICLE IV

CONDITIONS PRECEDENT

The effectiveness of the sale, assignment and transfer contemplated hereby is subject to the satisfaction of each of the following conditions precedent:

(a)     the execution and delivery of this Agreement by the Assignor and the Assignee;

(b)     the receipt by the Assignor of the payments required to be made under Section 3.1; and

(c)     the receipt by the Agent of all documentation and other information with respect to the assignee that is required by regulatory authorities under applicable "know your customer" and anti-money laundering rules and regulations, including the USA Patriot Act.

ARTICLE V

REPRESENTATIONS AND WARRANTIES

5.1     Representations and Warranties of Assignor.  The Assignor represents and warrants to the Assignee as follows:

(a)     it has all requisite power and authority, and has taken all action necessary to execute and deliver this Agreement and to fulfill its obligations under, and consummate the transactions contemplated by, this Agreement;

(b)     the execution, delivery and compliance with the terms hereof by the Assignor and the delivery of all instruments required to be delivered by it hereunder do not and will not violate any Requirement of Law applicable to it;

(c)     this Agreement has been duly executed and delivered by it and constitutes the legal, valid and binding obligation of the Assignor, enforceable against it in accordance with its terms;

(d)     all approvals and authorizations of, all filings with and all actions by any Governmental Authority necessary for the validity or enforceability of its obligations under this Agreement have been obtained;

(e)     the Assignor has good title to, and is the sole legal and beneficial owner of, the Assigned Interest, free and clear of all Liens, claims, participations or other charges of any nature whatsoever; and

(f)     the transactions contemplated by this Agreement are commercial banking transactions entered into in the ordinary course of the banking business of the Assignor.

5.2     Disclaimer.  Except as expressly provided in Section 5.1 hereof, the Assignor does not make any representation or warranty, nor shall it have any responsibility to the Assignee, with respect to the accuracy of any recitals, statements, representations or warranties contained in the Credit Agreement or in any other Loan Document or for the value, validity, effectiveness, genuineness, execution, legality, enforceability or sufficiency of the Credit Agreement, the Notes or any other Loan Document or for any failure by the Loan Parties or any other Person (other than Assignor) to perform any of its obligations thereunder or for the existence, value, perfection or priority of any collateral security or the financial or other condition of the Loan Parties or any other Person, or any other matter relating to the Credit Agreement or any other Loan Document or any extension of credit thereunder.

5.3     Representations and Warranties of Assignee.  The Assignee represents and warrants to the Assignor as follows:

(a)     it has all requisite power and authority, and has taken all action necessary to execute and deliver this Agreement and to fulfill its obligations under, and consummate the transactions contemplated by, this Agreement;

(b)     the execution, delivery and compliance with the terms hereof by the Assignee and the delivery of all instruments required to be delivered by it hereunder do not and will not violate any Requirement of Law applicable to it;

(c)     this Agreement has been duly executed and delivered by it and constitutes the legal, valid and binding obligation of the Assignee, enforceable against it in accordance with its terms;

(d)     all approvals and authorizations of, all filings with and all actions by any Governmental Authority necessary for the validity or enforceability of its obligations under this Agreement have been obtained;

(e)     the Assignee has received copies of the Credit Agreement and the other Loan Documents, as well as copies of all financial statements previously provided by the Borrower in satisfaction of obligations under the Credit Agreement.

(f)     the Assignee has fully reviewed the terms of the Loan Agreement and the other Loan Documents and has independently and without reliance upon the Assignor, and based on such information as the Assignee has deemed appropriate, made its own credit analysis and decision to enter into this Agreement; and

(g)     if the Assignee is not incorporated under the laws of the United States of America or a state thereof, the Assignee has contemporaneously herewith delivered to the Agent and the Borrower such documents as are reasonably required by the Agent with respect to tax withholding matters.

ARTICLE VI

MISCELLANEOUS

6.1     Notices.  All notices and other communications provided for herein (including any modifications of, or waivers, requests or consents under, this Agreement) shall be given or made in writing (including by telecopy) to the intended recipient at its "Address for Notices" specified below its name on the signature pages hereof or, as to either party, at such other address as shall be designated by such party in a notice to the other party.

6.2     Amendment, Modification or Waiver.  No provision of this Agreement may be amended, modified or waived except by an instrument in writing signed by the Assignor and the Assignee.

6.3     Successors and Assigns.  This Agreement shall be binding upon and inure to the benefit of the parties hereto and their respective successors and permitted assigns.  The representations and warranties made herein by the Assignee are also made for the benefit of the Agent, and the Assignee agrees that the Agent is entitled to rely upon such representations and warranties.

6.4     Assignments.  Neither party hereto may assign any of its rights or obligations hereunder except in accordance with the terms of the Loan Agreement.

6.5     Counterparts.  This Agreement may be executed in any number of counterparts, each of which shall be identical and all of which, taken together, shall constitute one and the same instrument, and each of the parties hereto may execute this Agreement by signing any such counterpart.

6.6     Governing Law.  This Agreement (including the validity and enforceability hereof) shall be governed by, and construed in accordance with, the laws of the State of Texas, other than the conflict of laws rules thereof.

      6.7    <u>Expenses</u>.  To the extent not paid by the Borrower pursuant to the terms of the Loan Agreement, each party hereto shall bear its own expenses in connection with the execution, delivery and performance of this Agreement.

      6.8    <u>Waiver of Jury Trial</u>.  Each of the parties hereto hereby irrevocably waives, to the fullest extent permitted by law, any and all right to trial by jury in any legal proceeding arising out of or relating to this Agreement or the transactions contemplated hereby.

      IN WITNESS WHEREOF, the parties hereto have caused this Assignment Agreement to be executed and delivered as of the date first above written.

**ASSIGNOR:**

_____

By:_____
Name:_____
Title:_____

Address for Notices:

_____
_____
_____

Telephone No.:_____
Attention:_____

**ASSIGNEE:**

_____

By:_____
Name:_____
Title:_____

Address for Notices:

_____
_____
_____

Telephone No.:_____
Attention:_____

**EXHIBIT**

**B**

FILED

MAR 0 8 2019

SHANNON T. SKINNER
DEPUTY CLERK
CLAIBORNE PARISH, LA

**405 ARAPAHOE, LLC**

**VERSUS**

**MONTEREY RESOURCES, LLC, ET AL.**

NO. 41744

**2ND JUDICIAL DISTRICT COURT**

**CLAIBORNE PARISH, LA**

### ORDER

CONSIDERING the foregoing Petition for Executory Process and for Ex Parte Appointment of Keeper ("**Petition**") of Plaintiff, 405 ARAPAHOE, LLC (hereinafter referred to as "**Arapahoe**" or "**Plaintiff**"), the attached exhibits and verification,

IT IS HEREBY ORDERED THAT:

I.    An order of executory process issue herein;

II.   Writs of Seizure and Sale issue herein directing (a) the Sheriffs of Webster Parish, Claiborne Parish, Caddo Parish and Union Parish to seize the Mortgaged Property of Defendant Monterey and the Movable Property of Defendant Monterey located in their respective parishes, including in the custody, control or possession of Defendants' agents, including without limitation The Resource Group at 5100 E. Kelly Dr., Suite 405, Tulsa, OK, 74135, located at the field office of Defendant Monterey at 132 Adolph Road in Lisbon, Claiborne Parish, LA, 6340 Brookshire Drive, Dallas, Texas 75230, or wherever else any of the Movable Property of either Defendant may be located, (b) the Sheriff of Claiborne Parish to seize the Mortgaged Property of Defendant Green Wheel and the Movable Property of Defendant Green Wheel and/or Defendant Monterey, including in the custody, control or possession of Defendants' agent, without limitation The Resource Group at 5100 E. Kelly Dr., Suite 405, Tulsa, OK, 74135, located at the field office of Defendant

Monterey at 132 Adolph Road in Lisbon, Claiborne Parish, LA, 6340 Brookshire Drive, Dallas, Texas  75230, or wherever else any of the Movable Property of either Defendant may be located and (c) directing the Claiborne Parish Sheriff, pursuant to La. R.S. 13:4343, to sell in two (2) separate sales, all of the Mortgaged Property and the Movable Property of each Defendant, **with benefit of appraisal**, at Sheriff's Sale in Claiborne Parish, Louisiana;

III.    The Movable Property of each Defendant includes, but is not limited to, all equipment, machinery and supplies associated with the Mortgaged Property, and all paper files, computer files and records, software licenses, computer hardware and components thereof, in any way related to the Mortgaged Property of each Defendant;

IV.    In the event that Plaintiff is the successful bidder of all or any portion of the Mortgaged Property or the Movable Property of either of the Defendants, Plaintiff is hereby authorized to assign its rights as a successful bidder to its designee, at the sole option of Arapahoe, and record title to any of the Mortgaged Property or the Movable Property of either of the Defendants purchased by Arapahoe at Sheriff's Sale shall be placed solely in the name of Arapahoe's designee;

V.    Out of the proceeds of the sales of the Mortgaged Property and the Movable Property of each Defendant, Plaintiff shall be paid $15,000,000.00 in principal, plus interest on the unpaid principal balance at the default rate of 18.0% per annum from and after March 1, 2019, until paid (a per diem of $7,500.00), plus all other amounts due under the Notes, the Credit Agreement, the Mortgages and all

other loan documents, including without limitation all amounts advanced pursuant to the Mortgages, and all costs of collection, including attorneys' fees and expenses;

VI.   Plaintiff shall be paid the amount of the aforesaid claims with preference and priority over all inferior lienholders whomsoever;

VII.   Plaintiff or its designee (a) shall be appointed as keeper of the Mortgaged Property and the Movable Property of each Defendant; (b) as keeper, shall be granted all the powers, duties and compensation provided for in La. R.S. 9:5136 – 9:5140.2, without the necessity of posting bond; and (c), as keeper, shall receive as compensation, all costs and expenses necessarily incurred by the keeper, all of which shall be included in the Indebtedness and secured by the Monterey Mortgage and the Green Wheel Mortgage and taxed as part of the costs of this executory process action;

VIII.   Any keeper shall receive, to the maximum extent provided by applicable law, the benefit of all indemnities, defense, hold harmless and insurance requirements in favor of the "Operator" under any Operating Agreements that govern any of the Mortgaged Property of either Defendant and, to the extent of any indebtedness or other obligations owed to any keeper, the keeper shall be subrogated to the rights of the keeper under this Order with respect to any such Operating Agreements

IX.   The rights of Plaintiff to proceed later in this proceeding or in a separate proceeding against any of the Defendants, any guarantors of the Indebtedness or any other responsible party, including without limitation any additional collateral to secure their obligations, to

collect all or any portion of the Indebtedness from them, either before or after the Sheriff's Sales of the Mortgaged Property and the Movable Property of each of the Defendants are hereby preserved and maintained.

_Acadia_, _Bienville_ Parish, Louisiana, this _8th_ day of March, 2019.

Jenifer Ward Clason

DISTRICT JUDGE

Order submitted by:

R. Joseph Naus
Wiener, Weiss & Madison
A Professional Corporation
330 Marshall Street, Ste. 1000 (71101)
P. O. Box 21990
Shreveport, LA 71120-1990
318-226-9100      318-424-5128, facsimile
rjnaus@wwmlaw.com

**ATTORNEYS FOR PLAINTIFF
AND SEIZING CREDITOR,
405 ARAPAHOE LLC**

State of Louisiana,

Parish of Claiborne
I hereby certify that the above and foregoing is a true, correct and complete copy of the original on file in my office

Given officially this _____ 20____
BRIAN M. FLYNN, Clerk of Court,
Claiborne Parish, Louisiana

By _____
Deputy Clerk

**PLEASE SERVE ALONG WITH NOTICE OF SEIZURE ON BOTH DEFENDANTS, THROUGH THEIR RESPECTIVE AGENTS FOR SERVICE OF PROCESS, AT THE FOLLOWING ADDRESSES OR WHEREVER ELSE THEY MAY BE LOCATED:**

      **MONTEREY RESOURCES, LLC
      c/o Anthony Marino
      Registered Agent
      1100 Poydras Street, Suite 1800
      New Orleans, LA 70163**

      **GREEN WHEEL, LLC
      c/o Slattery, Marinos & Roberts
      Registered Agent
      1100 Poydras Street, Suite 1800
      New Orleans, LA 70163**



# 101st JUDICIAL DISTRICT COURT

GEORGE L. ALLEN COURTS BUILDING
600 COMMERCE STREET
DALLAS, TEXAS 75202-4604

April 22, 2019

Arena Investors, LP
By Serving Its Registered Agent Vcorp Services LLC
1013 Centre Road Suite 403-B
Wilmington DE  19805

Cause No:   DC-19-05466

        Monterey Resources, LLC
        vs.
        405 Arapahoe, LLCet al

ALL COUNSEL OF RECORD AND PRO SE PARTIES:

The above case is set for dismissal, pursuant to Rule 165A, Texas Rules of
Civil Procedure and pursuant to the inherent power of the Court, on:

**June 14, 2019 at 9:00 AM**

If no answer has been filed, you are expected to have moved for a default
judgment on or prior to that date.  Your failure to have done so will result
in the dismissal of the case on the above date.

If you have been unable to obtain service of process and you wish to retain
the case on the docket, you must appear on the above date, unless you have
obtained a new setting from the court coordinator.

Sincerely,

District Judge,
101st Judicial District Court

CC:   Arena Investors, LP; 405 Arapahoe, LLC; JULIE A PETTIT



## 101st JUDICIAL DISTRICT COURT

GEORGE L. ALLEN COURTS BUILDING
600 COMMERCE STREET
DALLAS, TEXAS 75202-4604

April 22, 2019

405 Arapahoe, LLC
By Serving Its Registered Agent Vcorp Services LLC
1013 Centre Road Suite 403-B
Wilmington DE  19805

Cause No:   DC-19-05466

          Monterey Resources, LLC
          vs.
          405 Arapahoe, LLCet al

ALL COUNSEL OF RECORD AND PRO SE PARTIES:

The above case is set for dismissal, pursuant to Rule 165A, Texas Rules of
Civil Procedure and pursuant to the inherent power of the Court, on:

          **June 14, 2019 at 9:00 AM**

If no answer has been filed, you are expected to have moved for a default
judgment on or prior to that date.  Your failure to have done so will result
in the dismissal of the case on the above date.

If you have been unable to obtain service of process and you wish to retain
the case on the docket, you must appear on the above date, unless you have
obtained a new setting from the court coordinator.

Sincerely,

District Judge,
101st Judicial District Court

CC:   Arena Investors, LP; 405 Arapahoe, LLC; JULIE A PETTIT



## 101st JUDICIAL DISTRICT COURT

GEORGE L. ALLEN COURTS BUILDING
600 COMMERCE STREET
DALLAS, TEXAS 75202-4604

April 22, 2019

JULIE A PETTIT
THE PETTIT LAW FIRM
2101 CEDAR SPRINGS
SUITE 1540
DALLAS TX  75201

Cause No:    DC-19-05466

        Monterey Resources, LLC
        vs.
        405 Arapahoe, LLCet al

ALL COUNSEL OF RECORD AND PRO SE PARTIES:

The above case is set for dismissal, pursuant to Rule 165A, Texas Rules of
Civil Procedure and pursuant to the inherent power of the Court, on:

### June 14, 2019 at 9:00 AM

If no answer has been filed, you are expected to have moved for a default
judgment on or prior to that date.  Your failure to have done so will result
in the dismissal of the case on the above date.

If you have been unable to obtain service of process and you wish to retain
the case on the docket, you must appear on the above date, unless you have
obtained a new setting from the court coordinator.

Sincerely,

District Judge,
101st Judicial District Court

CC:    Arena Investors, LP; 405 Arapahoe, LLC; JULIE A PETTIT

# FORM NO. 353-3 - CITATION
# THE STATE OF TEXAS

To:

**405 ARAPAHOE, LLC**
**BY SERVING ITS REGISTERED AGENT VCORP SERVICES LLC**
**1013 CENTRE ROAD SUITE 403-B**
**WILMINGTON DE 19805**

GREETINGS:
You have been sued. You may employ an attorney. If you or your attorney do not file a written answer with the clerk who issued this citation by 10 o'clock a.m. of the Monday next following the expiration of twenty   days after you were served this citation and  petition, a default judgment may be taken against you. Your answer should be addressed to the clerk of the **101st District Court** at 600 Commerce Street, Ste. 101, Dallas, Texas 75202.

Said Plaintiff being **MONTEREY RESOURCES, LLC**

Filed in said Court  **16th day of April, 2019** against

**405 ARAPAHOE, LLC AND ARENA  INVESTORS, LP,**

For Suit, said suit being numbered <u>**DC-19-05466,**</u> the nature of which demand is as follows:
Suit on **OTHER CONTRACT** etc. as shown on said petition **REQUEST FOR DISCLOSURE**, a copy of which accompanies this citation. If this citation is not served, it shall be returned unexecuted.

WITNESS: FELICIA PITRE, Clerk of the District Courts of Dallas, County Texas.
Given under my hand and the Seal of said Court at office this 22nd day of April, 2019.

ATTEST: FELICIA PITRE, Clerk of the District Courts of Dallas, County, Texas

By_____, Deputy
     COURTNEY RUTLEDGE

**ESERVE**

**CITATION**

**DC-19-05466**

**MONTEREY RESOURCES, LLC**
**VS.**
**405 ARAPAHOE, LLCET AL**

ISSUED THIS
**22nd day of April, 2019**

FELICIA PITRE
Clerk District Courts,
Dallas County, Texas

By:  COURTNEY RUTLEDGE, Deputy
_____

**Attorney for Plaintiff**
JULIE A PETTIT
THE PETTIT LAW FIRM
2101 CEDAR SPRINGS
SUITE 1540
DALLAS TX  75201
214-329-0151 x101

**DALLAS COUNTY**
**SERVICE FEES**
**NOT PAID**

# OFFICER'S RETURN

Case No. :  DC-19-05466

Court No.101st District Court

Style: Monterey Resources, LLC

vs.

405 Arapahoe, LLCet al

Came to hand on the _____day of _____, 20_____, at _____ o'clock_____.M. Executed at _____,

within the County of _____ at _____ o'clock _____ .M. on the _____day of_____,

20_____, by delivering to the within named

_____

_____

each, in person, a true copy of this Citation together with the accompanying copy of this pleading, having first endorsed on same date of delivery.  The distance actually traveled by me in serving such process was _____miles and my fees are as follows:   To certify which witness my hand.

|                       |              |                                         |
|-----------------------|--------------|-----------------------------------------|
| For serving Citation  | $_____  | _____   |
| For mileage           | $_____  | of_____County,_____   |
| For Notary            | $_____  | By_____Deputy     |

(Must be verified if served outside the State of Texas.)

Signed and sworn to by the said_____before me this_____day of _____, 20_____,

to certify which witness my hand and seal of office.

_____

Notary Public_____County_____

# FORM NO.  353-3 - CITATION
# THE STATE OF TEXAS

To:

**ARENA  INVESTORS, LP,**
**BY SERVING ITS REGISTERED AGENT VCORP SERVICES LLC**
**1013 CENTRE ROAD SUITE 403-B**
**WILMINGTON DE  19805**

GREETINGS:
You have been sued.  You may employ an attorney.  If you or your attorney do not file a written
answer with  the clerk who issued this citation by 10 o'clock a.m. of the Monday next following the
expiration of twenty   days after you were served this citation and  petition, a default judgment may be
taken against you.  Your answer should be addressed to the clerk of the **101st District Court** at 600
Commerce Street, Ste. 101, Dallas, Texas 75202.

Said Plaintiff being **MONTEREY RESOURCES, LLC**

Filed in said Court  **16th day of April, 2019** against

**405 ARAPAHOE, LLC AND ARENA  INVESTORS, LP,**

For Suit, said suit being numbered **DC-19-05466,** the nature of which demand is as follows:
Suit on **OTHER CONTRACT** etc. as shown on said petition **REQUEST FOR DISCLOSURE**, a copy
of which accompanies this citation.  If this citation is not served, it shall be returned unexecuted.

WITNESS: FELICIA PITRE, Clerk of the District Courts of Dallas, County Texas.
Given under my hand and the Seal of said Court at office this 22nd day of April, 2019.

ATTEST: FELICIA PITRE, Clerk of the District Courts of Dallas, County, Texas

By_____, Deputy
                COURTNEY RUTLEDGE



| | |
|---|---|
| **ESERVE** | |
| **CITATION** | |
| **DC-19-05466** | |
| **MONTEREY RESOURCES, LLC** **VS.** **405 ARAPAHOE, LLCET AL** | |
| **ISSUED THIS** **22nd day of April, 2019** | |
| FELICIA PITRE Clerk District Courts, Dallas County, Texas | |
| By:  COURTNEY RUTLEDGE, Deputy | |
| **Attorney for Plaintiff** JULIE A PETTIT THE PETTIT LAW FIRM 2101 CEDAR SPRINGS SUITE 1540 DALLAS TX  75201 214-329-0151 x101 jpettit@pettitfirm.com | |

**DALLAS COUNTY**
**SERVICE FEES**
**NOT PAID**

# OFFICER'S RETURN

Case No. :  DC-19-05466

Court No.101st District Court

Style: Monterey Resources, LLC

vs.

405 Arapahoe, LLCet al

Came to hand on the _____day of _____, 20_____, at _____o'clock_____.M. Executed at _____,

within the County of _____ at _____ o'clock _____ .M. on the _____day of_____,

20_____, by delivering to the within named

_____

_____

each, in person, a true copy of this Citation together with the accompanying copy of this pleading, having first endorsed on same date of delivery.  The distance actually traveled by me in serving such process was _____miles and my fees are as follows:   To certify which witness my hand.

|  |  |  |  |
|---|---|---|---|
| For serving Citation | $_____ | _____ |  |
| For mileage | $_____ | of_____County, _____ |  |
| For Notary | $_____ | By_____Deputy |  |

(Must be verified if served outside the State of Texas.)

Signed and sworn to by the said_____before me this_____day of _____, 20_____,

to certify which witness my hand and seal of office.

_____

Notary Public_____County_____

FILED
DALLAS COUNTY
4/29/2019 10:11 AM
FELICIA PITRE
DISTRICT CLERK
Daniel Macias

**IN THE STATE OF TEXAS**
**IN THE DISTRICT COURT OF DALLAS COUNTY**

**MONTEREY RECOURCES LLC.,**                      **Plaintiff(s) – Petitioner(s)**

**V.**                                            **CASE NO.: DC-19-05466**

**405 ARAPAHOE, LLC AND ARENA INVESTORS, LP,**    **Defendant(s) – Respondent(s)**

STATE OF DELEWARE
COUNTY OF NEW CASTLE    ss.:

**Stephen A. Kempski**, the undersigned, being duly sworn, deposes and says that I was at the time of service over the age of 18 years and not a party to this action.

On **4/26/2019** at **11:05 AM**, I served a true copy of a **CITATION, PLANTIFF'S ORGINAL PETITION AND REQUEST FOR DISCLOSURE, AMENDED AND RESTATED CREDIT AGREEMENT, EXHIBITS A-C, ORDER,** upon **ARENA INVESTORS, LP c/o VCORP SERVICES LLC** at **1013 CENTRE ROAD, SUITE 403-B, WILMINGTON, DE 19805** in the manner indicated below:

**Corporation**   By delivering a true copy of each to **LAURA BRYDA** personally.
**[ X ]**         Deponent knew said corporation served to be the corporation described as the named recipient and knew said individual to be the **VICE PRESIDENT OF ADMINISTRATION** thereof, and an authorized person to accept service of process.

| **Approximate Description of Receipt** | **Female** | **White** | **Blonde** | **40's** | **5'6"** | **150 lbs** | |
|---|---|---|---|---|---|---|---|
| | Sex | Skin | Hair Color | Age | Height | Weight | Other |

Sworn to before me this
_29_ day of _April_, 20_19_

_Delia Kempski_
Notary Public

Stephen A. Kempski
364 E. Main Street, Suite 309
Middletown, Delaware 19709
800-637-1805

DELIA KEMPSKI
MY COMMISSION
EXPIRES
JAN. 31, 2020
NOTARY PUBLIC
STATE OF DELAWARE

FILED
DALLAS COUNTY
4/29/2019 10:07 AM
FELICIA PITRE
DISTRICT CLERK

Daniel Macias

**IN THE STATE OF TEXAS**
**IN THE DISTRICT COURT OF DALLAS COUNTY**

| | |
|---|---|
| **MONTEREY RECOURCES LLC.,** | **Plaintiff(s) – Petitioner(s)** |
| **V.** | **DOCKET NO.: DC-19-05466** |
| **405 ARAPAHOE, LLC AND ARENA INVESTORS, LP,** | **Defendant(s) – Respondent(s)** |

STATE OF DELEWARE
COUNTY OF NEW CASTLE      ss.:

**Stephen A. Kempski**, the undersigned, being duly sworn, deposes and says that I was at the time of service over the age of 18 years and not a party to this action.

On **4/26/2019** at **11:05 AM**, I served a true copy of a **CITATION, PLANTIFF'S ORGINAL PETITION AND REQUEST FOR DISCLOSURE, AMENDED AND RESTATED CREDIT AGREEMENT, EXHIBITS A-C, ORDER,** upon **405 ARAPAHOE, LLC c/o VCORP SERVICES LLC** at **1013 CENTRE ROAD, SUITE 403-B, WILMINGTON, DE 19805** in the manner indicated below:

**Corporation**
**[ X ]**
By delivering a true copy of each to **LAURA BRYDA** personally.
Deponent knew said corporation served to be the corporation described as the named recipient and knew said individual to be the **VICE PRESIDENT OF ADMINISTRATION** thereof, and an authorized person to accept service of process.

| **Approximate Description of Receipt** | **Female** | **White** | **Blonde** | **40's** | **5'6"** | **150 lbs** | |
|---|---|---|---|---|---|---|---|
| | Sex | Skin | Hair Color | Age | Height | Weight | Other |

Stephen A. Kempski
364 E. Main Street, Suite 309
Middletown, Delaware 19709
800-637-1805

Sworn to before me this
___ day of _____, 20 __

Notary Public

DELIA KEMPSKI
MY COMMISSION
EXPIRES
JAN. 31, 2020
NOTARY PUBLIC
STATE OF DELAWARE